**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FREDRIC N. ESHELMAN,<br><br>　　　　*Plaintiff,*<br><br>v.<br><br>TRUE THE VOTE, INC.,<br><br>　　　　*Defendant.* | Case No. <u>4:20-cv-04034</u><br><br>**JURY DEMANDED** |

**VERIFIED COMPLAINT**

For his Verified Complaint, Plaintiff Fredric N. Eshelman alleges as follows:

**PARTIES**

1.　　　Plaintiff Fredric N. Eshelman is a citizen of the United States who is a resident of, and domiciled in, North Carolina.

2.　　　Upon information and belief, Defendant True the Vote, Inc., is a 501(c)(3) not-for-profit corporation organized under the laws of Texas with its headquarters and principal place of business in Houston, Texas. Defendant may be served through its registered agent, Catherine E. Engelbrecht, at 7232 Wynnwood Lane, Houston, Texas 77008-6041, or wherever Defendant's registered agent may be found.

**JURISDICTION AND VENUE**

3.　　　The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Plaintiff is a citizen of North Carolina and Defendant is a citizen of Texas. Plaintiff seeks return of more than $2.5

1

million in conditional gifts to Defendant in addition to contractual and economic damages, attorney's fees, and other declarative and equitable relief.

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant is organized under Texas law and maintains its headquarters and principal place of business in Houston, Texas.

<u>FACTS</u>

5.      Immediately after the November 3rd general election, Plaintiff decided to support efforts to investigate allegations of illegal and fraudulent conduct in connection with the 2020 general election.

6.      Defendant holds itself out on its website as "the country's largest voters' rights organization" and notes that it is "well known for [its] ability to lead national unified plans to protect election integrity." In describing its mission, Defendant describes its operations as "a network hub, working together with other organizations to implement targeted election integrity initiatives to expose and deter election fraud."

7.      On or around November 4th and November 5th, Plaintiff spoke with Defendant's President, Ms. Engelbrecht, about Defendant's Validate the Vote 2020 project.

8.      During those conversations, Ms. Engelbrecht represented to Plaintiff that Defendant had organized its Validate the Vote 2020 effort to ensure the 2020 election returns reflect one vote cast by one eligible voter and thereby protect the right to vote and the integrity of the election.

9.      Ms. Engelbrecht further represented to Plaintiff during those conversations that Defendant believed those efforts were necessary in light of significant evidence that there were numerous instances of illegal ballots being cast and counted in the 2020 general election.

10.     Ms. Engelbrecht explained to Plaintiff that Defendant had developed a multi-pronged plan (referred to as its Validate the Vote 2020 initiative) to investigate, litigate, and expose

suspected illegal balloting and fraud in the 2020 general election. As part of its Validate the Vote 2020 plan, Defendant intended to: (1) solicit whistleblower testimonies from those impacted or involved in election fraud; (2) build public momentum through broad publicity; (3) galvanize Republican legislative support in key states; (4) aggregate and analyze data to identify patterns of election subversion; and (5) file lawsuits in federal court with capacity to be heard by the Supreme Court of the United States.[1]

11.     With respect to its plan to file lawsuits in key states, Ms. Engelbrecht represented that Jim Bopp—an attorney affiliated with Defendant—would file lawsuits in the seven closest battleground states with an eye toward serving subpoenas on state election officials to produce relevant election data.

12.     Based upon data subpoenaed in those seven proposed lawsuits, Ms. Engelbrecht represented to Plaintiff that Defendant then intended to undertake sophisticated data modeling and statistical analysis to identify potential illegal or fraudulent balloting.

13.     Ms. Engelbrecht advised Plaintiff that the expected cost of the Validate the Vote effort would be $7,325,000. Based upon information and belief, that amount was well in excess of Defendant's 2019 budget, which Plaintiff understands was approximately $750,000.

14.     Based upon Ms. Engelbrecht's representations regarding Defendant's comprehensive plans to investigate, litigate, and publicize illegal balloting and other election fraud as part of its Validate the Vote 2020 efforts, Plaintiff agreed to give an initial gift of $2 million to Defendant **on the condition** that the funds would be used to fund the initial stages of the Validate the Vote project. Specifically, $1 million of that initial pledge was intended to fund efforts to communicate

---

[1] A one-page summary of the Validate the Vote 2020 plan that Ms. Engelbrecht provided to Plaintiff is attached hereto as **Exhibit 1**.

Defendant's findings via the contemplated litigation. Plaintiff advised he would contribute more as the project progressed.

15.     Subject to those conditions, Plaintiff wired $2 million to Defendant on November 5, 2020, using wiring instructions provided by Ms. Engelbrecht.

16.     Ms. Engelbrecht inferred to Plaintiff that the legal expenses might exceed the initial budget. In order to maintain what he thought the momentum, on November 13th, Plaintiff agreed to give Defendant an additional $500,000, subject to the same condition that those funds would be used to fund Defendant's Validate the Vote 2020 efforts.

17.     Subject to those conditions, Plaintiff wired $500,000 to Defendant on November 13, 2020, using wire instructions provided by Ms. Engelbrecht.

18.     Time was of the essence to the efforts outlined in Defendant's Validate the Vote 2020 plan because of various state and federal deadlines for certification of state election results and electoral college votes.

19.     After agreeing to conditionally give Defendant funds to support its Validate the Vote 2020 efforts, Plaintiff regularly and repeatedly sought substantive updates from Ms. Engelbrecht and other individuals associated with Defendant. Specifically, Plaintiff sought specific and actionable updates regarding progress on Defendant's purported investigation, litigation, and communication efforts in key states.

20.     Plaintiff's requests were consistently met with vague responses, platitudes, and empty promises of follow-up that never occurred.

21.     Specifically, in response to requests for specific and data relating to potential whistleblowers and how their allegations fit into an overall narrative, Ms. Engelbrecht would simply respond with vague comments like: "We are vetting" or "They are solid."

22.     Ms. Engelbrecht also routinely ignored repeated requests for memoranda and written reports to summarize Defendant's efforts to identify and obtain information from whistleblower witnesses.

23.     In response to questions about Defendant's litigation strategy in the seven key battleground states targeted by the Validate the Vote 2020 initiative, Plaintiff was only ever provided with four complaints filed in Wisconsin, Michigan, Georgia, and Pennsylvania. He was not provided any specific update on the status or strategy behind those cases. Nor was he provided any explanation as to the status of litigation in the remaining three states.

24.     Defendant failed to consult with or inform Plaintiff of that decision even though that decision amounted to a material deviation from the Validate the Vote 2020 plan that Plaintiff conditioned his gifts upon.

25.     Defendant's consistent delay and inability to make progress on the goals that Ms. Engelbrecht described to Plaintiff just after the election suggested that many of those goals might not be met since many important deadlines relating to state election results were rapidly approaching.

26.     Given Defendant's lack of progress on the goals articulated in its Validate the Vote 2020 plan and the rapidly approaching certification deadlines, plaintiff decided to call a meeting with Ms. Engelbrecht and other individuals associated with Defendant's Validate the Vote effort.

27.     Specifically, Plaintiff sought detailed information and reports on voter data that Defendant had collected, identities of any alleged whistleblowers (along with the information they would testify to and their vetting status), the entities and resources dedicated to performing statistical analysis on available voter data, the expected timeline to obtain such statistical analysis, the status and strategy update for the litigation in each of the seven battleground states, Defendant's

promises to provide media content for circulation, and Defendant's efforts to raise the remaining money to fund the project.

28.     That meeting took place by teleconference on November 16 and was attended by Plaintiff, Ms. Engelbrecht, and Mr. Bopp, among others.

29.     The November 16  meeting unfolded in a manner similar to the many others that had taken place regarding the Validate the Vote 2020 efforts since November 5—which is to say that Ms. Engelbrecht and Mr. Bopp failed to engage with or respond to Plaintiff's requests for specific, actionable updates on the issues set forth above and proposed plans to accomplish all of the efforts he had originally agreed to fund.

30.     According to PACER records in the various district courts, Defendant voluntarily dismissed all of the four pending pieces of litigation it was pursuing on November 16.

31.     Upon information and belief, Plaintiff further understands, upon information and belief, that the decision to abandon those cases was made in concert with counsel for the Trump campaign.

32.     Defendant undertook to voluntarily dismiss its four active litigation matters without consulting or informing Plaintiff of that decision even though that decision amounted to a material deviation from the scope of the Validate the Vote 2020 program upon which Plaintiff's gifts were conditioned.

33.     By November 16, it had become clear to Plaintiff that Defendant's delays and inability to make progress on its stated goals meant that it would be unable to execute on the Validate the Vote 2020 efforts that Plaintiff had agreed to fund.

34.     Since Defendant had failed to comply with the conditions on Plaintiff's gift, Plaintiff

sent an e-mail to Ms. Engelbrecht on Defendant's behalf early on November 17, 2020, to request

a refund of the balance of his $2.5 million contribution. In relevant part, that e-mail read:

> Please wire the balance of my contributions to my account as shown below.
> Also send a full accounting of all monies spent out of the $2.5M, which
> should be de minimis since nothing was accomplished over the 10 or so
> days. Thank you for a prompt response.[2]

35.     Consistent with its conduct over the preceding 12 days, Defendant failed to respond to

Plaintiff's request.

36.     In light of the upcoming vote certification deadlines and his desire to use the funds he

had conditionally gifted to Defendant to support other election-related efforts, Plaintiff sent Ms.

Engelbrecht another e-mail requesting repayment early on November 19. In relevant part, that e-

mail read:

> Please acknowledge receipt of my previous email with wiring instructions
> to return the bulk of the money I put in. This is needed immediately for
> other activities toward the common goal.[3]

37.     Again, Defendant failed to respond to Plaintiff's request.

38.     Given Defendant's repeated refusal to respond to Plaintiff's request for repayment,

counsel for Plaintiff sent a letter to Defendant on November 21 regarding the "directed donations

that [Plaintiff] made to True the Vote, Inc. in the two weeks following the election, totaling $2.5

million." Specifically, that letter requested that Defendant confirm before 7:00 p.m. EST on

November 22 that it intended to return Plaintiff's $2.5 million in conditional gifts and that it would

undertake to initiate a wire transfer to do so by 10:00 a.m. on November 23.[4]

---

[2] A true and accurate copy of Plaintiff's November 17, 2020 e-mail (with redactions to protect Plaintiff's financial information) is attached hereto as **Exhibit 2**.
[3] A true and accurate copy of Plaintiff's November 19, 2020 e-mail is attached hereto as **Exhibit 3**.
[4] A true and accurate copy of the November 21 letter from Plaintiff's counsel is attached hereto as **Exhibit 4**.

39.     Ms. Engelbrecht responded by e-mail after 5:30 p.m. the next day, but did not confirm that Plaintiff intended to return Plaintiff's money.

40.     Instead, Defendant continued to engage in dilatory tactics, claiming without any specificity that it did not "expect to have complete information on what [it had] spent on the project this month until next month," that it had "made commitments to many people, including whistleblowers, that [it] must fulfill," and that it had "committed to activities that we must complete."[5]

41.     Nonetheless, Defendant's response did acknowledge that Plaintiff's gifts had been conditioned on their use in support of Defendant's Validate the Vote 2020 efforts. Specifically, Ms. Engelbrecht assured Plaintiff's counsel that Defendant had "spent the money on the project we discussed with Mr. Eshelman."

42.     Shortly thereafter on November 22, Plaintiff's counsel responded by e-mail, noting in relevant part:

> Mr. Eshelman expects a wire of at least $2 million first thing in the morning [of November 23]. Based on the limited reports that he has received, we cannot believe that True the Vote has committed more than $500,000.[6]

43.     As it had already done three times before, Defendant again refused to respond and failed to initiate a wire transfer of Plaintiff's funds by 10:00 a.m. EST.

44.     In light of Defendant's failure to wire the requested funds, Plaintiff (through counsel) sent one final demand letter to Defendant on November 23.[7] In that letter, Plaintiff notified

---

[5] A true and accurate copy of Ms. Engelbrecht's November 22 e-mail message is attached hereto as **Exhibit 5**.
[6] A true and accurate copy of Plaintiff's counsel's November 22 e-mail message is attached hereto as **Exhibit 6**.
[7] A true and accurate copy of Plaintiff's counsel's November 23 demand letter (omitting the originally attached exhibits which are merely duplicative of materials already attached to Plaintiff's complaint) is attached hereto as **Exhibit 7**.

Defendant that if it failed to initiate wire transfer of the requested $2 million before 5 p.m., Plaintiff would be forced to seek judicial intervention to obtain the requested funds.

45.     Thirty minutes after that deadline, Mr. Bopp responded to Plaintiff's counsel's letter on his law firm's letterhead (as opposed to Defendant's). In that letter, Defendant offered to return $1 million of Plaintiff's $2.5 million in conditional gifts in exchange for a waiver of claims and an agreement not to file suit against Defendant.[8]

46.     As of the time of the filing of this Verified Complaint, Defendant has still not initiated any wire transfer to Plaintiff.

47.     In light of Defendant's refusal to engage with Plaintiff's reasonable requests, Plaintiff fears that Defendant may be currently disposing (or may already have disposed) of the Plaintiff's funds in support of unrelated projects or bad-faith expenditures supposedly in support of the Validate the Vote 2020 project.

48.     While Plaintiff is forced to litigate to obtain what is rightfully his, relevant deadlines are rapidly approaching. Each day that passes makes it less likely that Plaintiff will be able to use the funds Defendant is wrongfully withholding for the purpose he initially intended them to be used—that is, to support efforts to investigate allegations of illegal and fraudulent conduct in connection with the 2020 general election.

## COUNT I
## Breach of Contract

49.     Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

50.     The parties, for valuable consideration, entered into an enforceable oral contract on November 5, 2020, whereby Plaintiff would make a gift of $2 million to Defendant in exchange

---

[8] A true and accurate copy of Mr. Bopp's November 23 letter is attached hereto as **Exhibit 8**.

for Defendant's commitment to undertake the specific efforts referred to by Ms. Engelbrecht and in the Defendant's marketing materials as the Validate the Vote 2020.

51.     The parties subsequently amended or restated the terms of the original oral agreement on November 13, 2020 when Plaintiff agreed to make an additional $500,000 gift to Defendant on the condition that those funds would also be used solely to fund Defendant's Validate the Vote 2020 project.

52.     The parties mutually understood that if Defendant deviated from the Validate the Vote 2020 plan as described to Plaintiff by Ms. Engelbrecht and in Defendant's marketing materials, that Plaintiff would have the right to revoke his conditional gift.

53.     As set forth above, Defendant has abandoned its efforts to implement and execute the programs and efforts associated with its Validate the Vote 2020 initiative.

54.     Consistent with Texas law, Plaintiff has repeatedly notified Defendant of his intent to revoke his conditional gift due to Defendant's failure to comply with its obligations under the parties' gift agreement. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App. 1994); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App. 1973).

55.     Faced with Plaintiff's requests and its own failure to abide by the terms of the parties' agreement, Defendant's refusal to surrender possession of $2.5 million of Plaintiff's funds amounts to a material breach of the parties' agreement.

56.     Defendant's breach has caused Plaintiff to suffer damages in excess of $2.5 million.

57.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his reasonable and necessary attorney's fees, costs, and expenses pursuant to section 38.001 of the Texas Civil Practice and Remedies Code.

10

## COUNT II
**Conversion**

58.     Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Complaint as though fully set forth herein.

59.     Where a donor manifests his intent to revoke a conditional gift for failure to satisfy a condition of the gift, title to the originally gifted property remains vested in the donor. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App. 1994); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App. 1973).

60.     Plaintiff has repeatedly notified Defendant of his intent to revoke his conditional gift of $2.5 million due to Defendant's failure to comply with its obligations under the parties' gift agreement – that is, its failure to implement and execute the Validate the Vote 2020 program.

61.     Despite Plaintiffs' repeated notice of his revocation of his conditional gifts, Defendant has persisted in wrongfully withholding $2.5 million in Plaintiff's money.

62.     Defendant's unauthorized and wrongful exercise of control over Plaintiff's $2.5 million to the exclusion of Plaintiff's superior claim to those funds amounts to conversion.

63.     Defendant's commission of the tort of conversion has caused Plaintiff to suffer damages in excess of $2.5 million

## COUNT III
**Declaratory Judgment**

64.     Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Complaint as though fully set forth herein.

65.     As set forth above, Plaintiff has effectively revoked his conditional gifts totaling $2.5 million to Defendant on the basis of Defendant's failure to abide by the condition on those gifts – namely, that Defendant would implement and execute the plans incorporated into its Validate the Vote 2020 initiative.

66.     Having issued a valid revocation of a conditional gift, Plaintiff remains the rightful owner of the $2.5 million that was initially given as a conditional gift to Defendant.

67.     Accordingly, Plaintiff is entitled to a declaratory judgment that he is the rightful owner of the $2.5 million at issue in this litigation and an order requiring Defendant to immediately transfer possession to Plaintiff. *See* Tex. Civ. Prac. & Remedies Code §§ 37.004, 37.011.

68.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his reasonable and necessary attorney's fees, costs, and expenses pursuant to section 37.009 of the Texas Civil Practice and Remedies Code.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fredric N. Eshelman prays that this Honorable Court would grant the following relief:

1. An order declaring Mr. Eshelman to be the rightful owner of the $2.5 million conditionally given to Defendant and requiring Defendant to immediately surrender possession of those funds to Mr. Eshelman;

2. A temporary restraining order or other injunctive relief to preserve the status quo and to prohibit Defendant from disbursing any portion of Mr. Eshelman's $2.5 million in conditional gifts while this litigation is pending;

3. An award of contractual and economic damages of $2.5 million, at a minimum;

4. An award of Mr. Eshelman's attorney's fees and costs;

5. An award of pre- and post-judgment interest;

6. All other relief that the Court deems just and proper.

## Verification

I, Fredric N. Eshelman, verify under penalty of perjury that I have read the above complaint and its contents. I also verify under penalty of perjury that, to the best of my knowledge and recollection, the matters stated in the complaint are true and correct.

Executed on November 25, 2020.

Fredric N. Eshelman

13

Respectfully submitted,

*/s/ J. Meghan McCaig*
State Bar No. 24070083
Federal I.D. No. 1804619
Meghan.McCaig@tklaw.com
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (facsimile)

**ATTORNEY-IN-CHARGE FOR PLAINTIFF**

**OF COUNSEL FOR PLAINTIFF:**

Ronald M. Jacobs (*pro hac vice* to be submitted)
Christopher J. Climo (*pro hac vice* to be submitted)
Venable LLP
rjacobs@venable.com
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-8215
(202) 344-8300 (facsimile)