## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| FREDRIC N. ESHELMAN, <br><br> *Plaintiff,* <br><br> v. <br><br> TRUE THE VOTE, INC., <br><br> *Defendant.* | Case No.  4:20-cv-04034 |

## PLAINTIFF FREDRIC N. ESHELMAN'S
## VERIFIED MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Frederic N. Eshelman files this Verified Motion for Preliminary Injunction and asks this Court to grant a preliminary injunction under Federal Rule of Civil Procedure 65 against Defendant True the Vote, Inc., to enjoin it from transferring, disbursing, or otherwise dissipating any remaining portion of Mr. Eshelman's $2.5 million conditionally-given donation while this litigation is pending. As shown below, the Court should grant Mr. Eshelman's motion because: (1) he will likely succeed on the merits of his claims; (2) Mr. Eshelman faces a substantial threat of irreparable injury if the injunction is not granted; (3) there will be no harm to Defendant if the injunction is granted; and (4) granting the injunction would serve the public interest.

First, Mr. Eshelman is likely to succeed on the merits of his claims against Defendant. Based on representations by Defendant about Defendant's plan to investigate and litigate any election irregularities, Mr. Eshelman generously gave Defendant $2.5 million on the express condition that Defendant follow through on certain initiatives—referred to as Defendant's

Validate the Vote effort—targeted at ensuring election integrity and discovering and litigating voter fraud, if any such fraud was discovered.  When it became clear that Defendant would not meet, or had no intention of meeting, those conditions, Mr. Eshelman requested that Defendant account for the money spent and return all remaining funds.  Defendant declined to provide any accounting and refused to return the money that rightfully belongs to Mr. Eshelman.

Second, Mr. Eshelman faces a substantial threat of injury from Defendant's continued and unrestrained possession of his funds.  Defendant has indicated an intention to continue spending Mr. Eshelman's donated money, stating vaguely that it has a variety of commitments that must be fulfilled and activities that must be completed. Defendant has a limited annual budget and assets, and Mr. Eshelman has been unable to locate Defendant's founder and Executive Director since filing this lawsuit.  Indeed, the addresses identified by Defendant to the Texas Secretary of State appear to belong to unrelated businesses. Without an injunction, Defendant will continue to dissipate Mr. Eshelman's money and does not have sufficient assets from which Mr. Eshelman can recover money damages, thus depriving Mr. Eshelman of any meaningful remedy.

Third, Defendant will not be harmed if the Court grants the injunction.  Following the election, the need to act to uncover and seek to remedy any election irregularities was urgent. Although Defendant originally filed four lawsuits to pursue alleged voter fraud, which was the purpose behind Mr. Eshelman's directed donation, it almost immediately dismissed those lawsuits.  With the certification of the election results, there is no reason to continue spending Mr. Eshelman's money.

Lastly, the public interest is served if the funds are not dissipated.  Allowing Defendant to mislead donors to obtain donations, and then spend their directed donations for its own interest

and without accountability, does not serve the public interest.  Thus, this Court should grant Mr. Eshelman's Motion for Preliminary Injunction.

## FACTUAL BACKGROUND

The short history of this case already demonstrates a litany of bad-faith conduct by Defendant and raises significant doubts about Mr. Eshelman's ability to obtain meaningful relief in the event Defendant has already misappropriated, or later decides to misappropriate, his conditional gifts totaling $2.5 million. As set forth in detail below, Defendant knowingly failed to comply with the conditions upon Mr. Eshelman's gifts totaling $2.5 million (the "Eshelman Funds") and has intentionally refused to comply with Mr. Eshelman's request for the return of the those funds and for an accounting of any expenditures Defendant has made therefrom. Given Defendant's apparent inability to comply with rules governing the use of the corporate form and its limited financial resources, injunctive relief is necessary to protect Mr. Eshelman's ability to obtain the relief sought in his Verified Complaint (Dkt. 1).

**I.   Defendant refused to comply with the conditions on the Eshelman Funds.**

Following the November 3, 2020 general election, Mr. Eshelman desired to fund efforts to identify and litigate allegations of election fraud. Verified Compl. (Dkt. 1) ¶ 5. As he sought to identify an organization to undertake such efforts, Mr. Eshelman spoke with Catherine Engelbrecht, Defendant's Executive Director, on or around November 4 and November 5, 2020. Verified Compl. (Dkt. 1) ¶ 7. During those conversations, Ms. Engelbrecht described Defendant's so-called "Validate the Vote 2020" program, which she described as an effort to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election. Verified Compl. (Dkt. 1) ¶ 10. Ms. Engelbrecht specifically represented that, as part of its Validate the Vote 2020 efforts, Defendant intended to: (1) solicit whistleblower testimonies from

those impacted or involved in election fraud; (2) build public momentum through broad publicity; (3) galvanize Republican legislative support in key states; (4) aggregate and analyze data to identify patterns of election subversion; and (5) file lawsuits in federal court with capacity to be heard by the Supreme Court of the United States. Verified Compl. (Dkt. 1) ¶ 10. Ms. Engelbrecht represented that Defendant intended to file lawsuits in the seven closest battleground states with an eye toward serving subpoenas on state election officials seeking relevant election data. Verified Compl. (Dkt. 1) ¶ 11.

Based on Ms. Engelbrecht's representations, Mr. Eshelman wired Defendant an initial gift of $2 million on November 5, 2020. Verified Compl. (Dkt. 1) ¶ 15. That gift was given with the express condition that those funds would be used to fund Defendant's efforts to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election. Verified Compl. (Dkt. 1) ¶ 14. Mr. Eshelman and Ms. Engelbrecht specifically agreed that $1 million of Mr. Eshelman's initial gift would be specifically used to fund efforts to communicate Defendant's findings during the contemplated litigation.[1] Verified Compl. (Dkt. 1) ¶ 14. Mr. Eshelman advised that he would contribute additional funds as the project progressed. Verified Compl. (Dkt. 1) ¶ 14.

On or around November 13, 2020, Ms. Engelbrecht indicated to Mr. Eshelman that the legal expenses associated with Defendant's Validate the Vote 2020 efforts might exceed the

---

[1] As noted in a December 5, 2020 letter from Dikran Yacoubian to Ms. Engelbrecht, Mr. Eshelman connected Defendant with Old Town Digital Agency LLC to discuss a communications strategy because Defendant does not have a "full power communications team in place." Although Old Town undertook significant preparatory efforts, those efforts ended up being for naught given Defendant's failure to provide any content or updates for circulation. Although Old Town issued a retainer-style $1 million invoice to cover expenses already incurred and anticipated ad buys, Old Town has since rescinded that invoice. A true and correct copy of Mr. Yacoubian's December 5 letter is attached hereto as **Exhibit 1**.

4

initial budget she had discussed with him. Verified Compl. (Dkt. 1) ¶ 16. On that basis, Mr. Eshelman wired Defendant an additional gift of $500,000 on November 13, subject to the same condition as his first gift—that is, that the funds would be used to fund Defendant's efforts to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election. Verified Compl. (Dkt. 1) ¶ 16.

Although Mr. Eshelman repeatedly sought substantive updates on the status of Defendant's efforts, neither Ms. Engelbrecht nor anyone else associated with Defendant's purported efforts ever provided anything beyond vague responses. Verified Compl. (Dkt. 1) ¶¶ 19-20. Specifically, Ms. Engelbrecht would respond to Mr. Eshelman's requests for specific information and data relating to potential whistleblowers and how their allegations fit into an overall narrative with vague comments like, "We are vetting," or "They are solid." Verified Compl. (Dkt. 1) ¶ 21. Similarly, Mr. Eshelman's requests for written reports and updates and information regarding litigation status and strategy routinely were rebuffed. Verified Compl. (Dkt. 1) ¶¶ 22-23.

By November 16, Defendant had made no meaningful progress toward the goals Ms. Engelbrecht originally had discussed with Mr. Eshelman. While Defendant had initially indicated its intent to bring lawsuits in seven battleground states, as of November 16, it had only filed complaints in four states (all of which it had since decided to voluntarily dismiss without consulting Mr. Eshelman). Verified Compl. (Dkt. 1) ¶¶ 23, 30, 32. Given Defendant's consistent obfuscation and failure to make progress on the stated goals of its Validate the Vote 2020 project, Mr. Eshelman called a meeting with Ms. Engelbrecht and others associated with Defendant that same day. Verified Compl. (Dkt. 1) ¶¶ 26-28. Like so many other prior conversations, Ms. Engelbrecht and others associated with Defendant failed to engage with or

5

respond to Mr. Eshelman's requests for specific, actionable updates on Defendant's strategy to accomplish the efforts upon which Mr. Eshelman had originally conditioned his gifts. Verified Compl. (Dkt. 1) ¶ 29. Following that meeting, it became clear that Defendant would be unable to make any meaningful progress towards the Validate the Vote 2020 efforts upon which he had conditioned his gifts. Verified Compl. (Dkt. 1) ¶ 33. Tellingly, Defendant issued a press release the very next day that explained it had abandoned its Validate the Vote 2020 efforts, noting that "barriers to advancing our arguments, coupled with constraints on time, made it necessary for us to pursue a different path."[2] However, any "barriers" or "constraints on time" that Defendant faced were entirely self-imposed.

## II. Defendant repeatedly has refused to return or account for the Eshelman Funds.

Despite having publicly acknowledged its intent to abandon the efforts upon which Mr. Eshelman conditioned his gifts of $2.5 million, Defendant repeatedly has refused to comply with Mr. Eshelman's requests that Defendant return the balance of his funds. Even more remarkably, Defendant also has refused to provide even an accounting of the funds expended from Mr. Eshelman's gifts.

Once it became clear that Defendant would be unable to comply with the conditions on his gifts—namely, that the funds would be used to investigate and litigate allegations of fraud and illegal conduct in connection with the 2020 general election—Mr. Eshelman on November 17 directed Ms. Engelbrecht to "wire the balance of [his] contributions" and to provide a "full accounting of all monies spent out of the $2.5M." Verified Compl. (Dkt. 1) ¶ 34, Ex. 2. After 48 hours had passed without any word from Ms. Engelbrecht (or anyone else associated with

---

[2] A true and accurate copy of Defendant's November 17, 2020 press release is attached hereto as **Exhibit 2** and is available at https://truethevote.org/true-the-vote-update-on-litigation-and-ongoing-fight-for-election-integrity/ (last visited December 11, 2020).

Defendant), Mr. Eshelman again asked Ms. Engelbrecht on November 19 to "[p]lease acknowledge receipt of [his] previous email with wiring instructions to return the bulk of the money [he] put in."  Verified Compl. (Dkt. 1) ¶ 36, Ex. 3. Again, 48 hours passed without any word from Ms. Engelbrecht or Defendant. Verified Compl. (Dkt. 1) ¶¶ 37-38.

Given his desire to use the remainder of his funds to fund other time-sensitive efforts relating to the investigation of alleged election improprieties and Defendant's unreasonable delay in responding to his requests, *see* Verified Compl. (Dkt. 1) ¶ 36, counsel for Mr. Eshelman sent a formal letter to Ms. Engelbrecht on November 21. Verified Compl. (Dkt. 1) ¶ 38, Ex. 4. That letter specifically demanded that Defendant confirm by November 22 that it intended to return Mr. Eshelman's $2.5 million in conditional gifts and agree to initiate a wire transfer of those funds on the morning of November 23. Verified Compl. (Dkt. 1) ¶ 38, Ex. 4.

Ms. Engelbrecht's November 22 response to Mr. Eshelman's November 21 letter neither confirmed that Defendant intended to return Mr. Eshelman's money nor agreed to initiate a wire transfer of those funds on November 23. Verified Compl. (Dkt. 1) ¶¶ 39, 41, Ex. 5. However, Ms. Engelbrecht's response **did** acknowledge that Mr. Eshelman's gifts were given on the condition that they would be used to fund Defendant's efforts to identify and litigate fraud and illegal conduct during the November 2020 general election. Verified Compl. (Dkt. 1) ¶¶ 39, 41, & Ex. 5.  Ms. Engelbrecht's letter also made no attempt to provide an accounting for funds spent out of Mr. Eshelman's $2.5 million in conditional gifts, claiming instead that Defendant would not have "complete information" on its expenditures from Mr. Eshelman's funds until December and suggesting that Defendant intended to continue spending Mr. Eshelman's money, stating vaguely that it has a variety of commitments that must be fulfilled and activities that must be completed. Verified Compl. (Dkt. 1) ¶ 40 & Ex. 5. Mr. Eshelman responded to

7

Ms. Engelbrecht's November 22 correspondence by reaffirming his demand that Defendant wire him "at least $2 million first thing in the morning [on November 23]" since it seemed implausible that Defendant had "committed more than $500,000" between November 5 and November 16. Verified Compl. (Dkt. 1) ¶ 42, Ex. 6.

Yet again, Defendant ignored Mr. Eshelman's demand and refused to return any of his funds or to provide any accounting for those funds on November 23. Verified Compl. (Dkt. 1) ¶ 43. Accordingly, Mr. Eshelman sent a final demand letter to Ms. Engelbrecht, noting his intent to file suit if Defendant refused to return at least $2 million of his conditional gifts by 5pm on November 23. Verified Compl. (Dkt. 1) ¶ 43, Ex. 7. Unsurprisingly, Defendant yet again failed to return Mr. Eshelman's funds or to provide an accounting. Verified Compl. (Dkt. 1) ¶ 45. Rather, Defendant proposed to return less than half of Mr. Eshelman's funds in exchange for a waiver of claims. Verified Compl. (Dkt. 1) ¶ 45. Unhappy to accept a partial return of the money that is rightfully his without any information about where the balance of his money went or how Defendant expended it, Mr. Eshelman chose not to respond and filed this action on November 25.

As of the date of this filing, Defendant has still not offered to return the balance of Mr. Eshelman's gifts or to provide any type of accounting of how those funds were used.

**III. There is a risk that Mr. Eshelman's funds may be irreparably misappropriated absent judicial intervention.**

Given Defendant's repeated failure to respond to Mr. Eshelman's requests for status updates and its persistent refusal to return or account for Mr. Eshelman's $2.5 million, Mr. Eshelman fears that Defendant may be currently disposing (or may already have disposed of) his $2.5 million in conditional gifts. Verified Compl. (Dkt. 1) ¶ 47. Those concerns are amplified by events that have occurred since Mr. Eshelman filed this lawsuit.

8

Mr. Eshelman's attempts to serve the complaint in this matter have revealed a troubling pattern of Defendant's conscious disregard or reckless inability to comply with rules governing the use of the corporate form and an apparent attempt by Ms. Engelbrecht to avoid service of process. During Mr. Eshelman's initial attempts to serve Ms. Engelbrecht (Defendant's registered agent), Mr. Eshelman's process server visited Ms. Engelbrecht's home where her adult son explained that Ms. Engelbrecht was away from home; he declined to provide any information about where she had traveled to or when she planned to return home. Given Ms. Engelbrecht's apparent efforts to avoid service of process, Mr. Eshelman engaged Tim Wilson, a licensed private investigator, to serve Ms. Engelbrecht at various addresses on file with the State of Texas.[3] Mr. Wilson first visited the address that Defendant represents to the Texas Secretary of State as its business address. Wilson Decl., attached as Ex. 3, ¶ 5.  However, that address appeared to be occupied by a tax office that was closed "until tax season" without any evidence or indication that Defendant maintained operations out of that space. Wilson Decl., attached as Ex. 3, ¶ 5. Mr. Wilson then visited the address that Defendant provided to the Texas Secretary of State for Ms. Engelbrecht in her capacity as Defendant's registered agent. Wilson Decl., attached as Ex. 3, ¶ 6. That address is occupied by Camp Bow Wow, a dog daycare and boarding facility. Wilson Decl., attached as Ex. 3, ¶ 6. None of the staff at Camp Bow Wow had ever heard of Defendant or Ms. Engelbrecht. Wilson Decl., attached as Ex. 3, ¶ 6. Despite having made several other efforts to locate Ms. Engelbrecht—including at her home—Mr. Wilson was unable to do so. Wilson Decl., attached as Ex. 3, ¶ 7.

---

[3] A declaration by Tim Wilson, the private investigator retained by Mr. Eshelman, is attached hereto as **Exhibit 3**.

Defendant's failure to comply with its duty to provide the State of Texas with accurate and current contact information is even more worrisome given the scale of Mr. Eshelman's conditional gifts relative to Defendant's typical annual budget. Between 2016 and 2018, Defendant's public disclosures indicate that its annual budgets ranged from $425,410 to $563,388.[4]   By comparison, Mr. Eshelman's conditional gifts totaling $2.5 million were massive—approximately five times Defendant's typical annual budget. Given that disparity, the fact that Defendant incurred a net operating loss between 2016 and 2018, and the fact that the entity does not appear to have any significant endowment or cash reserves, *see* Def.'s Forms 990, attached as Exhibits 4–6, Defendant does not have the financial wherewithal to repay Mr. Eshelman in the event his funds were to be used in violation of Mr. Eshelman's wishes.

## LEGAL STANDARD

The purpose of a preliminary injunction is to preserve the status quo and thus prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits.  *See City of Dall. v. Delta Air Lines, Inc*., 847 F.3d 279, 285 (5th Cir. 2017).  To secure a preliminary injunction, the movant must establish four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is not issued; (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction will not disserve the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

---

[4] True and correct copies of True the Vote's Forms 990, as filed with the Internal Revenue Service, for the years 2016, 2017, and 2018 are attached hereto as **Exhibits 4–6**.  Although a 501(c)(3) organization is supposed to make its Forms 990 publicly available, and although Mr. Eshelman's counsel requested Defendant's 2019 Form 990 from counsel for Defendant, Defendant has not made that document available.

## ARGUMENT AND AUTHORITIES

Defendant's wrongful act in refusing to return Mr. Eshelman's money will cause, and is causing, irreparable harm to Mr. Eshelman and his efforts to fund efforts that are actively engaged in efforts to ensure the integrity of the November 2020 election. Moreover, if Defendant dissipates Mr. Eshelman's remaining funds, it is unlikely that Mr. Eshelman will be able to recover those funds from Defendant.  As a result, Mr. Eshelman now seeks a preliminary injunction.

### I.   Mr. Eshelman is substantially likely to succeed on the merits.

To satisfy the first element required for a preliminary injunction, Mr. Eshelman need only present a prima facie case. *Id*. at 596.  He is not required to show that he is certain to win or to prove an entitlement to summary judgment. *Id.* at 595–96 (citing *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir.2009)). "Even some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators, USA v. City of Dallas*, 760 F. Supp. 2d 693, 696 (N.D. Tex. 2010).

Accordingly, likelihood of success on the merits is gauged by "standards provided by the substantive law." *Janvey,* 647 F.3d at 596 (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). Here, Mr. Eshelman has alleged breach of contract and conversion against Defendant and seeks a declaration that he is the rightful owner of all funds remaining out of his $2.5 million donation, which Defendant must immediately remit to Mr. Eshelman. This case is governed by the substantive law of Texas.

### A.   *Success of the Declaratory-Judgment Claim*

Mr. Eshelman seeks an order declaring himself to be the rightful owner of the $2.5 million conditionally given to Defendant and requiring Defendant to immediately surrender

possession of those funds to him.  Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (citations and internal quotation marks omitted).  To exercise that discretion, the Court should consider whether "the dispute [is] definite and concrete, touching the legal relations of parties having adverse legal interests" and whether the Court can provide "specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts."  *Id.* at 127 (citations and internal quotation marks omitted).

In this case, the controversy between the parties is both definite and concrete, and it will be fully resolved if the Court determines that the gift from Mr. Eshelman to Defendant was conditional, that Defendant failed to fulfill the conditions on that gift, and that the remaining funds should be returned to Mr. Eshelman. Because Mr. Eshelman did not make an unconditional transfer of property to Defendant, he did not unconditionally gift the funds to Defendant.  In Texas, a gift is effective only when there is (1) a clear intent by the donor to make a gift and (2) an immediate and *unconditional* transfer of the property, such that title passes contemporaneously from the donor to the recipient. *Oadra v. Stegall*, 871 S.W.2d 882, 890 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Wells v. Sansing*, 245 S.W.2d 964, 965 (Tex. 1952)).

Although Mr. Eshelman transferred $2.5 million to Defendant, he did not give Defendant the $2.5 million unconditionally. Thus, no valid gift was made—and unconditional ownership to the money did not vest in Defendant—because Mr. Eshelman's gift was premised on a condition that has not yet occurred (nor, given the recent election certifications, will it ever). *See Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App.—Corpus Christi 1973, no writ) (holding that no valid

gift was made where gift was premised upon the giving party's death, even though recipient already had the property in her possession).  Mr. Eshelman's repeated efforts to revoke the gift by requesting that Defendant return the funds "confirms [his] intention not to vest unconditional ownership" in Defendant.  *Id.* Consequently, Mr. Eshelman is still the owner of any funds that Defendant failed to use according to Mr. Eshelman's stated conditions.

Because no valid gift was made by Mr. Eshelman to the Defendant, Mr. Eshelman is entitled to a declaration that he is the owner of the funds and that Defendant is required to return them to him.

### B.  Success of the Breach of Contract Claim

Mr. Eshelman also can demonstrate a likelihood of success on his breach of contract claim against Defendant.  Under Texas law, the essential elements of a breach of contract action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach.  *See Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc*., 892 F.3d 719, 731 (5th Cir. 2018).

On November 5, 2020, the parties agreed that Mr. Eshelman would supply Defendant with $2 million on the condition that Defendant would use the money to fund Defendant's initial Validate the Vote initiatives, including litigation on any findings Defendant might make regarding voter fraud or election integrity problems. Mr. Eshelman further agreed to give Defendant an additional $500,000 on November 13, 2020, subject to the same conditions. These agreements formed a valid contract, and Mr. Eshelman performed his obligations under the contract by providing Defendant with $2.5 million. Defendant, however, breached the contract by failing to follow through on its promise to engage in certain actions to advance the Validate

13

the Vote project. Defendant's inaction caused Mr. Eshelman damage because Defendant has not provided the services it promised to perform, and Mr. Eshelman has been unable to use the money he gave to Defendant to fund other activities related to election integrity.

In light of these facts, Mr. Eshelman's breach-of-contract action against Defendant has a likelihood for success on the merits. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1178 (5th Cir. 1989) (holding that evidence of defendant's obligation to pay plaintiff "a substantial sum of money" after plaintiff performed under the contract "is sufficient to show a potential for success on the merits").

### C.  Success of the Conversion Claim

Mr. Eshelman similarly can demonstrate a likelihood of success on his conversion claim against Defendant.  Conversion under Texas law is "the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2009) (quoting *Waisath v. Lack's Stores, Inc*., 474 S.W.2d 444, 447 (Tex. 1971)). Here, Defendant is presently exercising an unauthorized and wrongful control over Mr. Eshelman's conditional gifts totaling $2.5 million—an act that is inconsistent with Mr. Eshelman's rights to his money.

As explained above, Mr. Eshelman's donation to the Defendant was not an effective "gift" because it was conditioned upon Defendant engaging in certain activities under its Validate the Vote program. Because Defendant failed to timely follow through on these efforts, title to the $2.5 million never vested in Defendant.

Because Mr. Eshelman still has title to the $2.5 million and is the current owner of the money, Defendant's refusal to give the money back despite Mr. Eshelman's repeated requests is

14

an act that is inconsistent with Mr. Eshelman's rights to the money as its true owner. *See Bandy v. First State Bank, Overton*, 835 S.W.2d 609, 622 (Tex. 1992); *see also Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("An action lies for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question."). Thus, Mr. Eshelman has a likelihood of success on the merits of his conversion claim as well.

## II.     If the injunction is not granted, Mr. Eshelman faces a substantial threat of irreparable injury.

Mr. Eshelman likewise can satisfy the second element required for a preliminary injunction because Mr. Eshelman faces a substantial threat of irreparable injury if this Court does not grant the injunction.

Although a preliminary injunction may be an inappropriate remedy "where the potential harm to the movant is strictly financial," *Atwood*, 875 F.2d at 1179, "the mere fact that economic damages ***may*** be available does not always mean that a remedy at law is adequate." *Janvey*, 647 F.3d at 600 (emphasis added). For example, the primary justification for granting a preliminary injunction is "to preserve a court's ability to render a meaningful decision on the merits." *Id.* But when the assets in dispute are at risk of dissipation by the defendant, a court may not be able to render a meaningful remedy without the use of an injunction. *See id.* Thus, a court "may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute . . . ." *Id.* (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686-87 (5th Cir. 1980) ("[E]ven were [plaintiff's] remedy limited to damages, an injunction may issue to protect that remedy.")); *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 217 (1945)

(holding that an injunction may issue to protect assets that are the subject of the dispute or to enjoin conduct that might be enjoined under a final order).

Additionally, although proof of the threatened harm must be more than mere speculation, evidence that the defendant intends to dissipate or transfer the assets in dispute is sufficient to demonstrate more than an unfounded fear on the part of the applicant. *Id.* (upholding injunction freezing assets while a receivership case proceeded to judgment); *Productos Carnic*, 621 F.2d at 686 (upholding trial court's determination that plaintiff had undoubtedly shown potential irreparable injury in the face of evidence that defendant intended to transfer the disputed property or its proceeds).

Here, the threat of Defendant's dissipation of Mr. Eshelman's $2.5 million would undoubtedly preclude this Court from granting Mr. Eshelman an effective remedy, either in equity or law, because Defendant's assets in the absence of Mr. Eshelman's money do not come close to enabling it to pay the damages to which Mr. Eshelman is entitled. Defendant is an entity with a total 2019 budget of approximately $750,000 and limited assets. Defendant's net assets only totaled $99,244 in 2016, $54,107 in 2017, and $64,743 in 2018. *See* Def.'s Forms 990, attached as Exs. 4–6. Yet despite its limited means, Defendant sought to take on a campaign involving extensive litigation, publicity efforts, and whistleblower interviews for a total cost of about $7,325,000. Additionally, Defendant's conduct to date evidences Defendant's intent to dissipate or transfer the money provided by Mr. Eshelman. *See* Verified Compl. (Dkt. 1) ¶ 40 & Ex. 5.

Mr. Eshelman, for his part, wanted to donate money to a cause that would actively work to investigate allegations of voter fraud and ensure the integrity of the election. Both Mr. Eshelman and Defendant were aware of the tight deadlines, given state deadlines associated

with states' certification of the election, the Electoral College's vote on December 14, and the fact that elected officials will assume office in January. Yet from the moment Defendant received the $2.5 million, Defendant refused to give any details or information when questioned about the progress of its efforts and how the money was being used, evading Mr. Eshelman's attempts at communications and only deigning to give vague answers when pressed. *See* Verified Compl. (Dkt. 1) ¶¶ 19–23. Defendant filed only four lawsuits out of the seven it told Mr. Eshelman it would file, and even then voluntarily nonsuited the lawsuits only a few days later. Defendant was similarly evasive and nonresponsive with other parties involved in the campaign, indicating that $1 million of Mr. Eshelman's money would pay a third-party marketing company—none of which the marketing company received.

Furthermore, after Mr. Eshelman asked for a return of the funds, Defendant did not promise a return of the money. Instead, Defendant vaguely stated that it had "made many commitments to many people" that had to be fulfilled and had "committed to activities that [it] must complete." Verified Compl. (Dkt. 1) ¶ 40 & Ex. 5. Though Defendant assured Mr. Eshelman the funds were used in furtherance of the Validate the Vote efforts, it provided no supporting documentation. Worse yet, when Mr. Eshelman demanded immediate return of $2 million of his conditional gifts totaling $2.5 million, Defendant replied that it was prepared to offer a return of only $1 million, conditioned on a release of any claims Mr. Eshelman has against Defendant. *See* Verified Compl. (Dkt. 1) ¶ 45 & Ex. 8. Consequently, when Mr. Eshelman attempted to have Defendant served with the Verified Complaint in this matter, it was no surprise that the private investigator hired to serve Defendant could not find the Defendant at any of the addresses associated with Defendant or Defendant's registered agent.

*See* Wilson Decl. ¶¶ 4–7, attached as Ex. 3.  In fact, two of the addresses were occupied by business entirely unaffiliated with Defendant.  *See id.* ¶¶ 5–6.

In light of Defendant's evasive conduct, Defendant's limited assets, and the fact that Defendant claims to have already dissipated at least a portion of Mr. Eshelman's money in a span of approximately ten days, it is evident that Mr. Eshelman would suffer irreparable harm without the issuance of an injunction. For one, Defendant's dissipation of the funds would deprive Mr. Eshelman of a meaningful remedy after trial. Second, without an immediate return of the funds, Mr. Eshelman will be deprived of the opportunity to fund other activities that are working to investigate the validity of the 2020 election.

Therefore, the only adequate, effective, and complete relief to Mr. Eshelman is to restrain Defendant from transferring, dissipating, or disbursing Mr. Eshelman's money. *See USACO Coal Co. v. Carbomin Energy, Inc*., 689 F.2d 94, 97 (6th Cir. 1982) (citing *DeBeers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) and *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) for the proposition that "[t]he power of the district court to preserve a fund or property which may be the subject of a final decree is well established.").

### III.    There is no harm that will result if the injunction is granted.

An injunction is proper if the threat of an ineffective remedy outweighs the damage which the injunction might cause the defendant. *Productos Carnic*, 621 F.2d at 687. Here, maintaining the status quo using an injunction would not cause Defendant any harm. If Defendant is prevented from transferring or further committing Mr. Eshelman's funds, the only possible harm Defendant faces is the loss of progress in its Validate the Vote effort.  Given that Defendant has apparently abandoned the efforts that were the reason for Mr. Eshelman's

18

conditional donation, *see* November 17 Press Release, attached as Ex. 2, however, freezing the funds will not materially affect Defendant's interests. *Deckert*, 311 U.S. at 290 (upholding injunction as reasonable where the injunction was framed narrowly to restrain only the transfer of certain trust funds). Further, Defendant's significant lack of funds for its proposed plan demonstrates that even with Mr. Eshelman's $2.5 million contribution, Defendants would not be able to continue significant activities without millions' worth of additional capital.

Thus, the injury to Mr. Eshelman that would occur without the injunction heavily outweighs whatever hardship Defendant might allege from being restrained from further dissipating Mr. Eshelman's money.

## IV. Granting the injunction will serve the public interest.

Lastly, granting the injunction would not disserve the public interest. The public interest in this case is the public's ability to trust in the Court to protect individual's property rights from infringement by wrongful possessors. If the injunction issues, Defendant will not be able to spend Mr. Eshelman's funds on its Validate the Vote campaign, which purportedly operates to "protect the right to vote." On the other hand, (1) there is no evidence Defendant has used or will use Mr. Eshelman's funds to accomplish meaningful Validate the Vote goals and (2) Defendant's possession of funds that it is clearly not entitled to retain would erode the public's trust in the efficacy of the judicial system to protect individual property rights.

Furthermore, Mr. Eshelman has been and remains committed to upholding the rights of U.S. voters. Thus, to the extent that Mr. Eshelman seeks to fund other more active and effective efforts focused on electoral integrity, he would be precluded from doing so if Defendant is allowed to further dissipate the funds. Ultimately, the public interest will best be served by ensuring that Mr. Eshelman's money is not dissipated.

**V.      The Court should grant a preliminary injunction against Defendant.**

Therefore, Mr. Eshelman requests a preliminary injunction against Defendant True the Vote, Inc. and its agents, servants, employees, independent contractors, attorneys, representatives, and those persons in active concert or participation with it who receive actual notice of the order by personal service or otherwise, from further transferring, disbursing, or otherwise dissipating the $2.5 million Mr. Eshelman gave to Defendant as a conditional gift.

As reflected by the declaration of his counsel, Mr. Eshelman has provided notice to Defendant of this action and has sent Defendant's counsel a copy of this Motion.[5]  Defendant indicated it opposes the relief requested.  *See* McCaig Decl., attached as Ex. 7, ¶ 4.

**PRAYER**

Mr. Eshelman seeks judgment and relief against Defendant, including entry of a preliminary injunction enjoining Defendant from proscribed activities set forth above, and any such other relief that this Court deems just and proper.

Dated this 14th day of December, 2020.

---

[5] A declaration from Mr. Eshelman's counsel, Meghan McCaig, is attached as **Exhibit 7**.

Respectfully submitted,

*/s/ J. Meghan McCaig*
J. Meghan McCaig
State Bar No. 24070083
Federal I.D. No. 1804619
Meghan.McCaig@tklaw.com
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751

**ATTORNEY-IN-CHARGE FOR PLAINITFF**

**OF COUNSEL FOR MR. ESHELMAN:**

Ronald M. Jacobs (*pro hac vice*)
Christopher J. Climo (*pro hac vice*)
Venable LLP
rjacobs@venable.com
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-8215
(202) 344-8300 (facsimile)

## CERTIFICATE OF CONFERENCE

I hereby certify that on the 9th day of December, 2020, I conferred with counsel for Defendant regarding the relief requested in this motion.  Defendant's counsel informed me that Defendant opposes this motion.  It is therefore being presented to the Court for decision.

*/s/ J. Meghan McCaig*
J. Meghan McCaig

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of December, 2020, a true and correct copy of the above and foregoing instrument has been forwarded to counsel of record via facsimile transmission (courtesy copy via email) as follows:

Brock Akers
The Akers Firm PLLC
3401 Allen Parkway, Suite 101
Houston, TX 77019
713-583-8662
bca@akersfirm.com

/s/ *J. Meghan McCaig*
J. Meghan McCaig

**VERIFICATION**

THE STATE OF NORTH CAROLINA    §

COUNTY OF *NEW HANOVER*    §
                           §

    My name is Fredric N. Eshelman.  I am of legal age and am otherwise competent to make this verification.  I have read the foregoing Motion for Preliminary Injunction, and all of the factual statements contained therein that are not otherwise attested to by other declarations or evidence attached to the Motion for Preliminary Injunction are true and correct and within my personal knowledge.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

    Executed on December __11__, 2020

Fredric N. Eshelman
