**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| FREDRIC N. ESHELMAN, <br><br> *Plaintiff,* <br><br> v. <br><br> TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, GREGG PHILLIPS, OPSEC GROUP, LLC, JAMES BOPP, JR., AND THE BOPP LAW FIRM, <br><br> *Defendants.* | Case No. 4:20-cv-04034 <br><br> **JURY DEMANDED** |

**VERIFIED AMENDED COMPLAINT**

For his Verified Amended Complaint, Plaintiff Fredric N. Eshelman alleges as follows:

## I.   PARTIES

1.      Plaintiff Fredric N. Eshelman is a citizen of the United States who is a resident of, and domiciled in, North Carolina.

2.      Upon information and belief, Defendant True the Vote, Inc. ("True the Vote"), is a 501(c)(3) not-for-profit corporation organized under the laws of Texas with its headquarters and principal place of business in Houston, Texas. Defendant True the Vote, Inc. has waived service in this matter pursuant to FED. R. CIV. P. 4(d).

3.      Defendant Catherine Engelbrecht is an individual and citizen of the State of Texas.  She may be served at 7232 Wynnwood Lane, Houston, Texas 77008-6041, or wherever in this State she may be found.

4.      Defendant Gregg Phillips is an individual and citizen of the State of Alabama.  He may be served at 23104 Hilbun Way, Birmingham, AL 35242, or wherever he may be found.

5.      Defendant OPSEC Group, LLC ("OPSEC") is a limited liability company organized under the laws of Alabama with its headquarters and principal place of business in Birmingham, Alabama.  Defendant OPSEC may be served through its registered agent Gregg A. Phillips located at the registered office at 23104 Hilbun Way, Birmingham, AL 35242, and the mailing address of the registered office is PO Box 548, PMB 70267, Birmingham, Alabama 35242.

6.      Defendant James Bopp, Jr. ("Bopp") is an individual and citizen of Indiana.  He may be served at 6470 Mayfield Lane, Zionsville, Indiana 47802 or 1 South 6th Street, Terre Haute, Indiana 47807, or wherever he may be found.

7.      Defendant The Bopp Law Firm is a professional corporation organized under the laws of the state of Indiana with its headquarters and principal place of business in Terre Haute, Indiana. Defendant The Bopp Law Firm may be served through its registered agent, James Bopp Jr. at 1 South 6th Street, Terre Haute, Indiana 47807.

## II.         JURISDICTION AND VENUE

8.      The Court has subject-matter jurisdiction over this matter under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000. Plaintiff is a citizen of North Carolina and Defendants are a citizens of Texas, Alabama, and Indiana. Plaintiff seeks return of more than $2.5 million in conditional gifts he gave to Defendant True the Vote, Inc. in addition to contractual and economic damages, attorneys' fees, and other declarative and equitable relief.

9.      The Court has personal jurisdiction over the Defendants.  Defendant True the Vote is organized under Texas law and maintains its headquarters and principal place of business in Houston, Texas, and because Defendant Engelbrecht is a resident and citizen of Texas and is the President of Defendant True the Vote.  The Court has personal jurisdiction over Defendant Phillips

2

because Defendant Phillips is either a current or recent employee, officer, or director of Defendant True the Vote and thus has purposefully availed himself of the privilege of conducting activities within Texas. The Court has personal jurisdiction over Defendant OPSEC because OPSEC is affiliated with and does work on behalf of Defendant True the Vote and Defendant OPSEC was wired money that is at the heart of this dispute from Defendant True the Vote's bank account, and because Defendant OPSEC contracted with a Texas resident, True the Vote, and all or part of such contract was to be performed in Texas, and this lawsuit, at least in part, arises out of or in connection with that contract. Thus, Defendant OPSEC has purposefully availed itself of the privilege of conducting activities in Texas. Likewise, the Court has personal jurisdiction of Defendant Bopp and The Bopp Law Firm because Defendant Bopp is the General Counsel of Defendant True the Vote and because Defendant The Bopp Law Firm works on behalf of Defendant True the Vote and was wired money (that is the at the heart of this dispute) from Defendant True the Vote's bank account. Furthermore, Defendants Bopp and The Bopp Law Firm contracted with a Texas resident, True the Vote, and all or part of such contract was to be performed in Texas, and this lawsuit, at least in part, arises out of or in connection with that contract. Therefore, both Defendants Bopp and The Bopp Law Firm have purposefully availed themselves of the privilege of conducting activities in Texas.

10.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Defendant True the Vote is organized under Texas law and maintains its headquarters and principal place of business in Houston, Texas, and because Defendant Engelbrecht is a resident and citizen of Texas and is President of Defendant True the Vote. Venue is further proper in this district because Defendant Phillips is either a current or recent employee, officer, or director of Defendant True the Vote. Venue is further proper because Defendant OPSEC is affiliated with and does work on behalf of

3

Defendant True the Vote, and because Defendant OPSEC was wired money (that is at the heart of this dispute) from Defendant True the Vote's bank account.  Venue is further proper because Defendant Bopp is the General Counsel of Defendant True the Vote, and because Defendant The Bopp Law Firm works on behalf of Defendant True the Vote and was wired money (that is the at the heart of this dispute) from Defendant True the Vote's bank account.

### III.  FACTS

11.  Immediately after the November 3rd general election, Plaintiff decided to support efforts to investigate allegations of illegal and fraudulent conduct in connection with the 2020 general election.

12.  Defendants hold True the Vote out on True the Vote's website as "the country's largest voters' rights organization" and note that it is "well known for [its] ability to lead national unified plans to protect election integrity." In describing the organization's mission, Defendants describe its operations as "a network hub, working together with other organizations to implement targeted election integrity initiatives to expose and deter election fraud."  Defendant Engelbrecht is True the Vote's President.  Defendant Phillips is either a current or recent employee, officer, or director of True the Vote.  He is also the President of OPSEC Group, a for-profit data and research group closely affiliated with Defendant True the Vote and, on information and belief, sharing some of the same ownership and leadership as Defendant True the Vote.  Defendant Bopp is an attorney affiliated with the other Defendants, is True the Vote's General Counsel, and works at Defendant The Bopp Law Firm.

13.  On or around November 4th and November 5th, Plaintiff spoke with Defendant Engelbrecht about Defendant True the Vote's Validate the Vote 2020 project.

14.     During those conversations, Defendant Engelbrecht represented to Plaintiff that Defendant True the Vote had organized its Validate the Vote 2020 effort to ensure the 2020 election returns reflect one vote cast by one eligible voter and thereby protect the right to vote and the integrity of the election.

15.     Defendant Engelbrecht further represented to Plaintiff during those conversations that Defendant True the Vote believed those efforts were necessary in light of significant evidence that there were numerous instances of illegal ballots being cast and counted in the 2020 general election.

16.      Defendant Engelbrecht explained to Plaintiff that she, Defendant Phillips, Defendant Bopp, and Defendant True the Vote had developed a multi-pronged plan (referred to as Defendant True the Vote's Validate the Vote 2020 initiative) to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election. As part of their Validate the Vote 2020 plan, Defendants intended to: (1) solicit whistleblower testimonies from those impacted by or involved in election fraud; (2) build public momentum through broad publicity of those whistleblowers' stories; (3) galvanize Republican legislative support for voter fraud challenges in key states; (4) aggregate and analyze data to identify patterns of election subversion; and (5) file lawsuits in federal court with capacity to be heard by the Supreme Court of the United States.[1]

17.     With respect to its plan to file lawsuits in key states, Defendant Engelbrecht represented to Plaintiff that Defendant Bopp would file lawsuits in the seven closest battleground states with an eye toward serving subpoenas on state election officials to produce relevant election data.

---

[1] A one-page summary of the Validate the Vote 2020 plan that Defendant Engelbrecht provided to Plaintiff is attached hereto as **Exhibit 1**.

18.     Defendant Engelbrecht represented to Plaintiff that Defendants, based upon data to be subpoenaed in those seven proposed lawsuits, then intended to undertake sophisticated data modeling and statistical analysis to identify potentially illegal or fraudulent balloting.

19.     Defendant Engelbrecht advised Plaintiff that the expected cost of the Validate the Vote effort would be $7,325,000. Based upon information and belief, that amount was well in excess of True the Vote's 2019 budget, which Plaintiff understands was approximately $750,000.

20.     In reliance on Defendant Engelbrecht's representations regarding Defendants' comprehensive plans to investigate, litigate, and publicize illegal balloting and other election fraud as part of their Validate the Vote 2020 efforts, Plaintiff agreed to give an initial gift of $2 million to True the Vote *on the condition* that the funds would be used to fund the initial stages of the Validate the Vote project. Specifically, $1 million of that initial pledge was intended to fund efforts to communicate Defendants' findings via the contemplated litigation. Plaintiff advised he would contribute more as the project progressed (conditioned on Defendants' living up to their representations about how the money would be spent).

21.     Importantly, Plaintiff's contribution was directed and limited to Defendants' Validate the Vote 2020 project.  Plaintiff's contribution was not to True the Vote unconditionally or generally, nor was it made in support of other efforts, such as recounts or the Georgia Senate runoff elections.  Plaintiff and his representatives were very clear about this in multiple telephonic conferences with Defendants.

22.     Subject to those conditions, and in reliance on Defendant Engelbrecht's representations, Plaintiff wired $2 million to True the Vote's Wells Fargo bank account on November 5, 2020 using wiring instructions provided by Defendant Engelbrecht.

23.     On or about November 10, 2020, Defendant True the Vote paid $500,000 to Defendants Bopp and The Bopp Law Firm as a "retainer."  Plaintiff was not informed or aware of this payment until after this litigation was filed.

24.     On or about November 12, 2020, True the Vote paid $350,000 to Defendants Phillips and OPSEC as a "retainer."  Plaintiff was not informed or aware of this payment until after this litigation was filed.

25.     Subsequently, in the days immediately after Plaintiff's conditional gift, all Defendants had conversations with Plaintiff or his representatives, wherein it was conveyed Defendants would work jointly in furtherance of the Validate the Vote 2020 initiatives to which Plaintiff conditionally gave his gift.

26.     Approximately one week after Plaintiff's $2 million conditional gift, Defendant Engelbrecht represented to Plaintiff that the legal expenses might exceed the initial budget. In order to maintain what he thought was momentum, and again in reliance on Defendant Engelbrecht's representations and Defendants' conversations with Plaintiff regarding their "mutual" work to accomplish the Validate the Vote 2020 goals, on November 13th, Plaintiff agreed to give Defendant True the Vote an additional $500,000, subject to the same condition that those funds would be used to fund Defendants' Validate the Vote 2020 efforts.

27.     Subject to those conditions, and in reliance on Defendant Engelbrecht's representations, Plaintiff wired $500,000 to True the Vote on November 13, 2020 to True the Vote's Wells Fargo bank account using wire instructions provided by Defendant Engelbrecht.

28.     Time was of the essence to the efforts outlined in Defendants' Validate the Vote 2020 plan because of various state and federal deadlines for certification of state election results and electoral college votes.

29.     After agreeing to conditionally give True the Vote funds to support its Validate the Vote 2020 efforts, Plaintiff regularly and repeatedly sought substantive updates from Defendant Engelbrecht, Defendant Phillips, Defendant Bopp, and other individuals associated with True the Vote. Specifically, Plaintiff sought specific and actionable updates—both directly and through his agents—regarding progress on Defendants' purported investigation, litigation, and communication efforts in key states.

30.     Plaintiff's requests were consistently met with vague responses, platitudes, and empty promises of follow-up that never occurred.

31.     Specifically, in response to requests for specific data relating to potential whistleblowers and how their allegations fit into an overall narrative, Defendant Engelbrecht would simply respond with vague comments like: "We are vetting" or "They are solid."

32.     Defendant Engelbrecht also routinely ignored repeated requests for memoranda and written reports to summarize Defendants' efforts to identify and obtain information from whistleblower witnesses.

33.     In response to questions about Defendants' litigation strategy in the seven key battleground states targeted by the Validate the Vote 2020 initiative, Plaintiff was only ever provided with four complaints filed in Wisconsin, Michigan, Georgia, and Pennsylvania. He was not provided any specific update on the status or strategy behind those cases. Nor was he provided any explanation as to the status of litigation in the remaining three states.

34.     As it turned out, Defendants never filed suit in three of the seven states they had represented to Plaintiff would be the subject of the Validate the Vote 2020 effort.  Defendants failed to consult with or inform Plaintiff of the decision not to pursue litigation in the remaining three states, even though that decision amounted to a material deviation from the Validate the Vote

2020 plan Defendants represented to Plaintiff, on which representation Plaintiff conditioned his gift and on which he relied when making it.

35.     Defendants' consistent delay and inability to make progress on the goals that Defendant Engelbrecht described to Plaintiff just after the election suggested that many of those goals might not be met, since many important deadlines relating to state election results were rapidly approaching.

36.     Given Defendants' lack of progress on the goals articulated in the Validate the Vote 2020 plan and the rapidly approaching certification deadlines, Plaintiff decided to call a meeting with Defendants Engelbrecht, Phillips, and Bopp, and other individuals associated with Defendants' Validate the Vote effort.

37.     Specifically, Plaintiff sought detailed information and reports on voter data that Defendants had collected, identities of any alleged whistleblowers (along with the information they would testify to and their vetting status), the entities and resources dedicated to performing statistical analysis on available voter data, the expected timeline to obtain such statistical analysis, the status and strategy update for the litigation in each of the seven battleground states, Defendants' promises to provide media content for circulation, and Defendants' efforts to raise the remaining money to fund the project.

38.     That meeting took place by teleconference on November 16 and was attended by Plaintiff and Defendants Engelbrecht, Phillips, and Bopp, among others.

39.     The November 16 meeting unfolded in a manner similar to the many others that had taken place regarding the Validate the Vote 2020 efforts since November 5—which is to say that Defendants failed to engage with or respond to Plaintiff's requests for specific, actionable updates

on the issues set forth above and proposed plans to accomplish all of the efforts he had originally agreed to fund.

40.     According to PACER records in the various district courts, Defendants voluntarily dismissed all of the four pending pieces of litigation True the Vote was pursuing on November 16, the very same day as Defendants' meeting with Plaintiff.

41.     Upon information and belief, Plaintiff further understands that the decision to abandon those cases was made in concert with counsel for the Trump campaign.

42.     Defendants undertook to voluntarily dismiss the four active litigation matters without consulting or informing Plaintiff of that significant decision even though that decision amounted to a material deviation from the scope of the Validate the Vote 2020 program Defendants represented to Plaintiff, on which representation Plaintiff conditioned his gift and on which he relied when making it.

43.     By November 16, it had become clear to Plaintiff that Defendants' delays and inability or unwillingness to make progress on their stated goals meant that True the Vote would be unable or unwilling to execute on the Validate the Vote 2020 efforts that Plaintiff had agreed to help fund and that Defendants had represented to him True the Vote would undertake.

44.     Since Defendant True the Vote had failed to comply with the conditions on Plaintiff's gift, Plaintiff sent an e-mail to True the Vote and Engelbrecht early on November 17, 2020, to request a refund of the balance of his $2.5 million contribution. In relevant part, that e-mail read:

> Please wire the balance of my contributions to my account as shown below. Also send a full accounting of all monies spent out of the $2.5M, which should be de minimis since nothing was accomplished over the 10 or so days. Thank you for a prompt response.[2]

---

[2] A true and accurate copy of Plaintiff's November 17, 2020 e-mail (with redactions to protect Plaintiff's financial information) is attached hereto as **Exhibit 2**.

45.     Consistent with their conduct over the preceding twelve days, Defendants failed to respond to Plaintiff's request.

46.     In light of the upcoming vote certification deadlines and his desire to use the funds he had conditionally gifted to True the Vote to support other, legitimate efforts to expose and litigate election fraud, Plaintiff sent Defendant Engelbrecht another e-mail requesting repayment early on November 19. In relevant part, that e-mail read:

> Please acknowledge receipt of my previous email with wiring instructions to return the bulk of the money I put in. This is needed immediately for other activities toward the common goal.[3]

47.     Again, Defendants failed to respond to Plaintiff's request.

48.     Given Defendants' repeated refusal to respond to Plaintiff's request for repayment, counsel for Plaintiff sent a letter to Defendant True the Vote on November 21 regarding the "directed donations that [Plaintiff] made to True the Vote, Inc. in the two weeks following the election, totaling $2.5 million." Specifically, that letter requested that True the Vote confirm before 7:00 p.m. EST on November 22 that it intended to return Plaintiff's $2.5 million in conditional gifts and that it would undertake to initiate a wire transfer to do so by 10:00 a.m. on November 23.[4]

49.     Defendant Engelbrecht responded by e-mail after 5:30 p.m. the next day but did not confirm that Plaintiff intended to return Plaintiff's money.

50.     Instead, Defendants continued to engage in dilatory tactics, Ms. Engelbrecht claiming without any specificity that they did not "expect to have complete information on what _we_ have spent on the project this month until next month[,]" and that "_we_ have made commitments to many

---

[3] A true and accurate copy of Plaintiff's November 19, 2020 e-mail is attached hereto as **Exhibit 3**.
[4] A true and accurate copy of the November 21 letter from Plaintiff's counsel is attached hereto as **Exhibit 4**.

people, including whistleblowers, that __*we*__ must fulfill.  And __*we*__ have committed to activities that __*we*__ must complete" (emphasis added).[5]

51.     Nonetheless, Defendants' response did acknowledge that Plaintiff's gifts had been conditioned on their use in support of Defendants' Validate the Vote 2020 efforts. Specifically, Defendant Engelbrecht assured Plaintiff's counsel that True the Vote had "spent the money on the project *we* discussed with Mr. Eshelman" (emphasis added).  That statement, as it turns out, was false, as set forth further below.

52.     Shortly thereafter on November 22, Plaintiff's counsel responded by e-mail, noting in relevant part:

> Mr. Eshelman expects a wire of at least $2 million first thing in the morning [of November 23]. Based on the limited reports that he has received, we cannot believe that True the Vote has committed more than $500,000.[6]

53.     As they had already done three times before, Defendants again refused to respond and failed to initiate a wire transfer of Plaintiff's funds by 10:00 a.m. EST.

54.     In light of Defendants' failure to wire the requested funds, Plaintiff (through counsel) sent one final demand letter to Defendant True the Vote, through Defendant Engelbrecht, on November 23.[7] In that letter, Plaintiff notified Defendants Engelbrecht and True the Vote that if they failed to initiate a wire transfer of the requested $2 million before 5 p.m., Plaintiff would be forced to seek judicial intervention to obtain the requested funds.

55.     Thirty minutes after that deadline, Defendant Bopp responded to Plaintiff's counsel's letter on his law firm's letterhead (as opposed to True the Vote's). In that letter, True the Vote

---

[5] A true and accurate copy of Ms. Engelbrecht's November 22 e-mail message is attached hereto as __Exhibit 5__.

[6] A true and accurate copy of Plaintiff's counsel's November 22 e-mail message is attached hereto as __Exhibit 6__.

[7] A true and accurate copy of Plaintiff's counsel's November 23 demand letter (omitting the originally attached exhibits which are merely duplicative of materials already attached to Plaintiff's complaint) is attached hereto as __Exhibit 7__.

offered to return $1 million of Plaintiff's $2.5 million in conditional gifts in exchange for a waiver of claims and an agreement not to file suit against Defendant True the Vote.[8]  Because of Defendants' refusal to provide any information or accounting regarding what the other $1.5 million had been spent on, Plaintiff refused to release any claims for those amounts.

56.     On December 8, 2020, Plaintiff filed this lawsuit.

57.     On December 9, 2020, the day after Plaintiff filed this lawsuit, Defendant True the Vote paid another $400,000 to Defendants Phillips and OPSEC.

58.     As of the date Plaintiff filed this Amended Complaint, True the Vote had still not initiated any wire transfer to Plaintiff in any amount or even agreed to stop spending whatever remained of Plaintiff's conditional donation, even though the opportunity to contest the results of the November 2020 election in court were long past.

59.     In light of Defendants' refusal to engage with Plaintiff's reasonable requests, Plaintiff suspects, and documents produced by Defendants confirm, that Defendants are currently disposing (or have already disposed) of Plaintiff's funds in support of unrelated projects or bad-faith expenditures supposedly in support of the Validate the Vote 2020 project.  Defendant Engelbrecht has been enriched with the funds that Plaintiff gave to Defendant True the Vote, as payments totaling at least $30,000 by True the Vote were made to Defendant Engelbrecht personally after the date of Plaintiff's conditional gift.  Also after Plaintiff gave his conditional gift to True the Vote, in November and December 2020 True the Vote made payments totaling $750,000 to Defendant OPSEC, and continued to do so even after Plaintiff filed this lawsuit. Defendant OPSEC has been enriched with those funds, and Plaintiff suspects that Defendant Phillips (OPSEC's President) has been personally enriched with some of those monies in and through his ownership

---

[8] A true and accurate copy of Mr. Bopp's November 23 letter is attached hereto as **Exhibit 8**.

13

interest in OPSEC Group.  Likewise, Defendants Bopp and The Bopp Law Firm have also been enriched with the funds from Plaintiff, as Defendant True the Vote paid The Bopp Law Firm $500,000 after Plaintiff gave his conditional gift to True the Vote.  Neither Defendant Engelbrecht, Defendant Bopp, Defendant The Bopp Law Firm, Defendant OPSEC, nor Defendant Phillips acquired the money in good faith or for valuable consideration, as they knew of the conditions tied to Plaintiff's gift to True the Vote but did not use the funds in furtherance of the Validate the Vote 2020 mission, and because they did not properly work for and earn the monies paid to them by True the Vote as their work (if any) was not for the Validate the Vote 2020 initiative towards which Plaintiff conditionally gave his gifts totaling $2.5 million.

60.    Also because of Defendants' refusal to engage with Plaintiff's reasonable requests, Plaintiff further suspects, on information and belief, that Defendant Engelbrecht's representations to him regarding the scope of the Validate the Vote 2020 effort were false when made, or made with the present intention not to perform as promised.

61.    Based on Plaintiff's investigation, Defendants Engelbrecht and Phillips are lovers. Public records reveal that Defendant Phillips formed OPSEC in September 2020.  OPSEC is a for-profit company.  Plaintiff suspects that Defendants Engelbrecht and Phillips saw an opportunity in the run-up to the 2020 election to take financial advantage of growing conservative suspicion and outrage over the potential for election fraud, and established OPSEC to be the for-profit entity to which True the Vote would pay monies donated by donors like Plaintiff in the wake of the election, ostensibly for information-gathering and investigative efforts to uncover election fraud.  In reality, OPSEC was a vehicle for Phillips and Engelbrecht to line their pockets with money from donors like Plaintiff.

62.     Such a transaction between Defendants True the Vote and OPSEC would violate the terms of Section 22.230 of the Texas Business Code applicable to nonprofit corporations because it is a transaction between a nonprofit organization and an interested person (either because of Defendant Gregg's dual roles with OPSEC and True the Vote, or because of Defendant Englebrecht's relationship with Gregg, or both).

63.     Upon information and belief, Defendants Bopp and The Bopp Law Firm have billed Defendant True the Vote for legal work prior to the Validate the Vote 2020 effort, and were owed hundreds of thousands of dollars for that work at the time Plaintiff made his conditional donation. Upon information and belief, the money that True the Vote 2020 paid to Defendants Bopp and The Bopp Law Firm from Plaintiff's conditional donation was not used to further the Validate the Vote 2020 effort, but rather was used to pay those outstanding amounts for prior legal services in connection with efforts related to other elections—amounts of which Plaintiff was not aware and which he never agreed to pay.

64.     Based on records provided as part of the expedited discovery granted by the Court, it appears that Defendant True the Vote used funds from Plaintiff to pay ordinary operating expenses and retainers that were not part of the Validate the Vote 2020 project to which Plaintiff directed his donation.

65.     In short, all the Defendants worked together on the scheme to swindle funds from Plaintiff on the pretext of using all the funds from Plaintiff for the Validate the Vote 2020 project, while knowing the funds would be used for other unrelated projects or to pay past expenses incurred prior to the Validate the Vote 2020 initiative.

66.     Plaintiff has suffered and will continue to suffer irreparable harm, loss, and damage because of Defendants' continued and unrestrained possession of the funds, if Defendants' actions

are not quickly remedied or halted by the Court. Defendants have indicated an intention to continue spending Plaintiff's donated money, stating vaguely that Defendant True the Vote has a variety of "commitments" that must be fulfilled and "activities" that must be completed. Despite repeated requests that Defendant True the Vote agree in writing to cease using Plaintiff's conditionally donated funds, Defendants have refused to provide such a commitment, indicating their intent to continue using the funds for efforts unrelated to and inconsistent with the representations about the Validate the Vote 2020 effort.

## IV.   CAUSES OF ACTION

### COUNT I
### Breach of Contract as to True the Vote

67.   Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

68.   The parties, for valuable consideration, entered into an enforceable oral contract on November 5, 2020, whereby Plaintiff would make a gift of $2 million to Defendant True the Vote in exchange for True the Vote's commitment to undertake the specific efforts referred to by Defendant Engelbrecht and in True the Vote's marketing materials as the Validate the Vote 2020.

69.   The parties subsequently amended or restated the terms of the original oral agreement on November 13, 2020 when Plaintiff agreed to make an additional $500,000 gift to True the Vote on the condition that those funds would also be used solely to fund Defendant's Validate the Vote 2020 project.

70.   The parties mutually understood that if True the Vote deviated from the Validate the Vote 2020 plan as described to Plaintiff by Ms. Engelbrecht and in True the Vote's marketing materials, that Plaintiff would have the right to revoke his conditional gift.

16

71.     As set forth above, True the Vote has abandoned its efforts (or never really intended) to implement and execute the programs and efforts associated with its Validate the Vote 2020 initiative.

72.     Consistent with Texas law, Plaintiff has repeatedly notified True the Vote of his intent to revoke his conditional gift due to True the Vote's failure to comply with its obligations under the parties' gift agreement. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App—Houston [14th Dist.] 1994, no writ); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App.—Corpus Christi 1973, no writ).

73.     Faced with Plaintiff's requests and its own failure to abide by the terms of the parties' agreement, True the Vote's refusal to surrender possession of $2.5 million of Plaintiff's funds amounts to a material breach of the parties' agreement.

74.     True the Vote's breach has caused Plaintiff to suffer damages in excess of $2.5 million.

75.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his reasonable and necessary attorney's fees, costs, and expenses pursuant to § 38.001 of the Texas Civil Practice and Remedies Code.

## COUNT II
### Conversion as to All Defendants

76.     Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Amended Complaint as though fully set forth herein.

77.     Where a donor manifests his intent to revoke a conditional gift for failure to satisfy a condition of the gift, title to the originally gifted property remains vested in the donor. *See Oadra v. Stegall*, 871 S.W.2d 882, 891-92 (Tex. App. 1994); *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App. 1973).  Further, because Defendant True the Vote and Defendant Engelbrecht had no present

intention of performing on their representations to Plaintiff, *i.e.*, Plaintiff was induced to make the conditional donation under false pretenses, Plaintiff had the immediate right to re-take possession of his funds as soon as he wired the money to True the Vote.

78.    Plaintiff has repeatedly notified Defendants of his intent to revoke his conditional gift of $2.5 million due to Defendants' failure to comply with their obligations under the parties' gift agreement—that is, their failure to implement and execute the Validate the Vote 2020 program.

79.    Despite Plaintiff's repeated notice of his revocation of his conditional gifts, Defendants have persisted in wrongfully withholding $2.5 million in Plaintiff's money.

80.    None of the Defendants have returned any of Plaintiff's money.

81.    Defendant Engelbrecht has herself been personally enriched by Plaintiff's funds, as money has been wired by True the Vote directly to Defendant Engelbrecht using the money from Plaintiff's conditional gift.  Though Plaintiff made multiple requests to her to return his entire gift, she has not returned any of the money, including the amount she is believed to have personally pocketed.

82.    Additionally, Defendants Bopp, The Bopp Law Firm, and OPSEC have been paid over a million dollars collectively by Defendant True the Vote from the $2.5 million that is rightfully Plaintiff's.  Plaintiff further suspects Defendant Phillips personally pocketed some or all of the money Defendant True the Vote gave to Defendant OPSEC.  Plaintiff's representatives made demands on Gregg Phillips by phone that Plaintiff's $2.5 million be returned.  Though Defendants OPSEC and Phillips knew they illicitly gained some of the funds themselves, neither of them have returned any of Plaintiff's money.  Demand to Defendants Bopp and The Bopp Law Firm would be futile, as they know that Plaintiff has demanded his entire $2.5 million back from Defendant

True the Vote, and yet Defendants Bopp and The Bopp Law Firm have refused to return the portion they acquired of Plaintiff's conditional gift.

83.     Defendants' unauthorized and wrongful exercise of control over Plaintiff's $2.5 million to the exclusion of Plaintiff's superior claim to those funds amounts to conversion.

84.     Additionally, Defendant True the Vote, even if it had not acquired possession of Plaintiff's property under false pretenses, wrongfully exercised dominion and control over the property by using it in a way that departed from the conditions under which it was received.

85.     Defendants' commission of the tort of conversion has caused Plaintiff to suffer damages in excess of $2.5 million.

**COUNT III**
**Declaratory Judgment**

86.     Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Amended Complaint as though fully set forth herein.

87.     As set forth above, Plaintiff has effectively revoked his conditional gifts totaling $2.5 million to True the Vote on the basis of True the Vote's failure to abide by the condition on those gifts—namely, that Defendant True the Vote would implement and execute the plans incorporated into its Validate the Vote 2020 initiative.

88.     Having issued a valid revocation of a conditional gift, Plaintiff remains the rightful owner of the $2.5 million that was initially given as a conditional gift to True the Vote.

89.     Accordingly, Plaintiff is entitled to a declaratory judgment that he is the rightful owner of the $2.5 million at issue in this litigation and an order requiring True the Vote to immediately transfer possession to Plaintiff. *See* Tex. Civ. Prac. & Remedies Code §§ 37.004, 37.011.

90.     Plaintiff has retained counsel to represent him in this matter and has agreed to pay reasonable and necessary attorney's fees, costs, and expenses.  Plaintiff is entitled to recover his

reasonable and necessary attorney's fees, costs, and expenses pursuant to Section 37.009 of the Texas Civil Practice and Remedies Code.

## <u>COUNT IV</u>
**Fraudulent Misrepresentation as to Defendants True the Vote and Catherine Engelbrecht**

91.    Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Amended Complaint as though fully set forth herein.

92.    Defendants made material misrepresentations that were false, and Defendants knew the representations were false when made or made recklessly without any knowledge of the truth, with the intention that Plaintiff act upon the misrepresentations.  Plaintiff justifiably relied upon the misrepresentations and suffered damages.

93.    Specifically, on or around November 4 or 5, 2020, on November 13, 2020, and on November 16, 2020, Defendants Catherine Engelbrecht and True the Vote made material misrepresentations to Plaintiff—all by phone—that, using Plaintiff's conditional gift, True the Vote would investigate, litigate, and publicize illegal balloting and other election fraud via litigation and targeted paid advertising as part of its Validate the Vote 2020 efforts.   But Defendants Engelbrecht and True the Vote knew at the time that those representations were false, as they knew they intended to use Plaintiff's conditional gifts for other purposes, such as paying the money to activists and, upon information and belief, paying off debts it owed to other activists, whistleblowers, and attorneys in connection with other matters besides the Validate the Vote 2020 project, and not for the manner in which they told Plaintiff they would use the money.  Defendants Engelbrecht and True the Vote made these representations with the intention that Plaintiff act and gift the monies to True the Vote.  Plaintiff justifiably relied on Defendants' misrepresentations by making conditional gifts of $2.5 million to True the Vote, and has suffered at least $2.5 million in damages as a result.

## COUNT V
**Negligent Misrepresentation as to Defendants True the Vote and Catherine Engelbrecht**

94.     Plaintiff incorporates by reference all allegations in all paragraphs of the Verified Amended Complaint as though fully set forth herein.

95.     In the alternative, Defendants Catherine Engelbrecht and True the Vote made representations in the course of their business and/or in a transaction in which they had a pecuniary interest that was false for the purpose of guiding Plaintiff.  Defendants failed to exercise reasonable care in gathering and disseminating the information, and Plaintiff suffered a financial loss due to his justifiable reliance on Defendants' representations.

96.     Specifically, on or around November 4 or 5, 2020, on November 13, 2020, and on November 16, 2020, Defendants Catherine Engelbrecht and True the Vote made material representations to Plaintiff—all by phone—in the course of their business and/or in a transaction in which they had a pecuniary interest that were false, that Defendants would investigate, litigate, and publicize illegal balloting and other election fraud via litigation as part of its Validate the Vote 2020 efforts and that Plaintiff's conditional gift would be used for same, for the purpose of guiding Plaintiff to make the conditional gift to True the Vote.  Defendants failed to exercise reasonable care in gathering and disseminating that information to Plaintiff, and Plaintiff suffered a financial loss of at least $2.5 million due to his justifiable reliance on Defendants' representations.

## COUNT VI
**Money Had and Received as to All Defendants**

97.     Defendants hold money that, in equity and good conscience, belongs to Plaintiff. Plaintiff conditionally gave $2.5 million to Defendant True the Vote, in which Defendants Engelbrecht and Phillips are officers and/or directors, and in which Defendants Bopp, The Bopp Law Firm, and OPSEC are agents, and Defendants did not perform on their end of their obligations

to use the money as conditioned by Plaintiff.  Defendants Engelbrecht, Phillips, OPSEC, Bopp, and The Bopp Law Firm have, on information and belief, received all or part of the money Plaintiff conditionally donated to True the Vote, and are currently holding said funds, all of which in equity and good conscience belongs to Plaintiff.

## V.     REQUEST FOR PRELIMINARY INJUNCTION

98.     Plaintiff re-alleges the foregoing paragraphs and incorporates them here as if fully set forth herein.

99.     Pending before the Court is Plaintiff's Motion for Preliminary Injunction (Dkt. 10) as to Defendant True the Vote, the allegations of which are incorporated here by reference.  Plaintiff requests this Court to set its Motion for Preliminary Injunction for hearing and after a hearing, issue a preliminary injunction against Defendant True the Vote on the same terms as requested therein.

## VI.     APPLICATION FOR APPOINTMENT OF RECEIVER

100.     Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

101.     Because Plaintiff conditionally gave $2.5 million to Defendant True the Vote and Defendant True the Vote has failed to abide by those conditions, Plaintiff has a probable interest in the money held by Defendant True the Vote.

102.     The money is in danger of being lost or removed by Defendants' misappropriation of the funds through, among other improper actions, Defendants' using the monies to pay off other debts or obligations or potentially paying the money to themselves.

103.    As such, Plaintiff requests that the Court appoint a Receiver to take possession of, and to collect, manage, control and pay over the proceeds of the assets and bank accounts belonging to Defendant True the Vote.

104.    Plaintiff further requests that an accounting be done of Defendant True the Vote's books and records to identify where Defendants spent, placed, or paid any part of Plaintiff's $2.5 million conditional gift.

## VII.    PRE-JUDGMENT WRIT OF ATTACHMENT

105.    Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

106.    Plaintiff respectfully requests that the Court grant a writ of attachment to Defendants' non-exempt property, including but not limited to, Defendants' bank accounts.

107.    Defendants are justly indebted to Plaintiff because they have $2.5 million of Plaintiff's money to which they are not entitled, in that they did not follow the conditions attached to Plaintiff's conditional gifts totaling $2.5 million.

108.    The requested attachment is not sought for the purpose of injury or harassment to Defendants.

109.    Plaintiff will likely lose the $2.5 million unless the Writ of Attachment is issued.

110.    Based on information and belief, Defendants have hidden or are about to hide their property for the purpose of defrauding their creditors like Plaintiff, and Defendants have disposed of, or are about to dispose of all or part of their property with the intent to defraud their creditors like Plaintiff; and the Defendants owe Plaintiff for property (Plaintiff's money) obtained by Defendants under false pretenses.

## VIII.   RELIEF REQUESTED

WHEREFORE, Plaintiff Fredric N. Eshelman prays that this Honorable Court would grant the following relief:

1. An order declaring Mr. Eshelman to be the rightful owner of the $2.5 million conditionally given to Defendant True the Vote and requiring Defendant True the Vote to immediately surrender possession of those funds to Mr. Eshelman;

2. Injunctive relief to preserve the status quo and to prohibit Defendants from disbursing any portion of Mr. Eshelman's $2.5 million in conditional gifts while this litigation is pending;

3. An award of contractual and economic damages of $2.5 million, at a minimum;

4. An order appointing a Receiver over the assets and business of Defendant True the Vote because Plaintiff has a probable interest in the money held by Defendants, and the money is in danger of being lost, removed, or materially injured, by Defendants' using the monies to pay off other debts or obligations or paying the money to themselves;

5. An order for pre-judgment writ of attachment against Defendants' non-exempt property, including but not limited to, Defendants' bank accounts;

6. An order for an accounting of Defendant True the Vote's records with respect to Plaintiff's conditional donations;

7. An award of Mr. Eshelman's attorney's fees and costs;

8. An award of pre- and post-judgment interest;

9. An award of exemplary damages under Texas Civil Procedure & Remedies Code § 41.003(a) as Plaintiff's damages stemmed from Defendants' gross negligence, malice, or actual fraud; and

10. All other relief that the Court deems just and proper.

Respectfully submitted,

*/s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Southern District I.D. Number 19347
DANIELS & TREDENNICK PLLC
*Attorney-in-Charge for Plaintiff*

OF COUNSEL:
DANIELS & TREDENNICK PLLC
Sabrina R. Tour
State Bar No. 24093271
Southern District I.D. Number 2714789
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: sabrina@dtlawyers.com

Meghan McCaig
State Bar No. 24070083
Federal I.D. No. 1804619
Meghan.McCaig@tklaw.com
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (facsimile)

Ronald M. Jacobs (admitted *pro hac vice*)
Christopher J. Climo (admitted *pro hac vice*)
Venable LLP
rjacobs@venable.com
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-8215
(202) 344-8300 (facsimile)

## CERTIFICATE OF SERVICE

I hereby certify that on the 31st day of December, 2020, a true and correct copy of the above foregoing document has been forwarded to counsel of record via ECF and email as follows:

Brock Akers
The Akers Firm PLLC
3401 Allen Parkway, Suite 101
Houston, TX 77019
(713) 583-8662
bca@akersfirm.com

*Counsel for Defendant True the Vote*

*/s/ Douglas A. Daniels*
Douglas A. Daniels

## Verification

I, Fredric N. Eshelman, verify under penalty of perjury under the laws of the United States of America that I have read the above amended complaint and its contents. I also verify under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and recollection, the matters stated in the amended complaint are true and correct.

Executed on _____ / 2-2/, 2020 .


Fredric N. Eshelman

27