## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| FREDRIC N. ESHELMAN, | |
| *Plaintiff,* | Case No. 4:20-cv-04034 |
| v. | **JURY DEMANDED** |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, GREGG PHILLIPS, OPSEC GROUP, LLC, JAMES BOPP, JR., AND THE BOPP LAW FIRM, | |
| *Defendants.* | |

## PLAINTIFF'S VERIFIED EMERGENCY APPLICATION FOR TEMPORARY RESTRAINING ORDER AS TO ALL DEFENDANTS AND VERIFIED MOTION FOR PRELIMINARY INJUNCTION AS TO CATHERINE ENGELBRECHT, GREGG PHILLIPS, OPSEC GROUP, LLC, JAMES BOPP, JR., AND THE BOPP LAW FIRM

Respectfully submitted,

*/s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Southern District I.D. Number 19347
DANIELS & TREDENNICK PLLC
*Attorney-in-Charge for Plaintiff*

OF COUNSEL:
DANIELS & TREDENNICK PLLC
Sabrina R. Tour
State Bar No. 24093271
Southern District I.D. Number 2714789
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: sabrina@dtlawyers.com

Meghan McCaig
State Bar No. 24070083
Federal I.D. No. 1804619
Meghan.McCaig@tklaw.com
Thompson & Knight LLP
One Arts Plaza
1722 Routh Street, Suite 1500
Dallas, Texas 75201
(214) 969-1700
(214) 969-1751 (facsimile)

Ronald M. Jacobs (admitted *pro hac vice*)
Christopher J. Climo (admitted *pro hac vice*)
Venable LLP
rjacobs@venable.com
600 Massachusetts Avenue, NW
Washington, D.C. 20001
(202) 344-8215
(202) 344-8300 (facsimile)

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

    I.    Defendant refused to comply with the conditions on the Eshelman Funds. ................3

    II.   Defendant repeatedly has refused to return the Eshelman Funds................................7

    III.  Defendants have misappropriated Mr. Eshelman's funds and there is a substantial risk that Mr. Eshelman's funds may continue to be irreparably misappropriated absent judicial intervention. ......................................................................................9

ARGUMENT AND AUTHORITIES ......................................................................................12

    I.    Mr. Eshelman is substantially likely to succeed on the merits...................................12

        A.  *Success of the Declaratory-Judgment Claim* ......................................................13

        B.  *Success of the Breach of Contract Claim*............................................................14

        C.  *Success of the Conversion Claim*........................................................................15

        D.  *Success of the Money Had and Received Claim*..................................................16

        E.  *Success of the Fraudulent and Negligent Misrepresentation Claims*..................17

    II.   If the restraining order and preliminary injunction is not entered, Mr. Eshelman faces a substantial threat of irreparable injury..........................................................18

    III.  There is no harm that will result if the injunction is granted. ....................................23

    IV.  Granting the injunction will serve the public interest.................................................23

    V.   The Court should enter the temporary restraining order and preliminary injunction.................................................................................................................24

CONCLUSION....................................................................................................................25

## INDEX OF AUTHORITIES

**Cases**

*Arthur W. Tifford, PA v. Tandem Energy Corp.*,
  562 F.3d 699 (5th Cir. 2009)..................................................................................15

*Ass'n of Taxicab Operators, USA v. City of Dallas*,
  760 F. Supp. 2d 693 (N.D. Tex. 2010) ...............................................................13

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*,
  875 F.2d 1174 (5th Cir. 1989)........................................................................15, 20

*Bandy v. First State Bank, Overton*,
  835 S.W.2d 609 (Tex. 1992)..................................................................................16

*Baribeau v. Gustafson*,
  107 S.W.3d 52 (Tex. App.—San Antonio 2003, pet. denied) ................................17

*Byrum v. Landreth*,
  566 F.3d 442 (5th Cir.2009)..................................................................................13

*De Beers Consol. Mines, Ltd. v. United States*,
  325 U.S. 212 (1945) ......................................................................................21, 23

*Deckert v. Independence Shares Corp.*,
  311 U.S. 282 (1940) ..............................................................................................23

*Doss v. Homecomings Fin. Network, Inc.*,
  210 S.W.3d 706 (Tex.App.—Corpus Christi 2006, pet. denied) ...........................16

*G & H Partners, Ltd. v. Boer Goats Int'l Ltd.*,
  896 F. Supp. 660 (W.D. Tex. 1995), *aff'd sub nom. G & H Partners v. Boer Goats*,
  84 F.3d 432 (5th Cir. 1996)...................................................................................20

*Houston Nat'l Bank v. Biber*,
  613 S.W.2d 771 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ...........16

*Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*,
  892 F.3d 719 (5th Cir. 2018)................................................................................15

*Janvey v. Alguire*,
  647 F.3d 585 (5th Cir. 2011)............................................................. 12, 13, 20, 21

*Janvey v. Alguire*,
    No. 3:09-CV-724-N, 2010 WL 11626677 (N.D. Tex. May 28, 2010) ...................................20

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*,
    991 S.W.2d 787 (Tex. 1999)........................................................................18

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................13, 14

*Oadra v. Stegall*,
    871 S.W.2d 882 (Tex. App.—Houston [14th Dist.] 1994, no writ)........................................14

*Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*,
    621 F.2d 683 (5th Cir. 1980)...............................................................20, 21, 23

*Roho, Inc. v. Marquis*,
    902 F.2d 356 (5th Cir. 1990)........................................................................13

*Staats v. Miller*,
    243 S.W.2d 686 (Tex. 1951)........................................................................16

*Texas Black Iron, Inc. v. Arawak Energy Int'l, Ltd.*, 527 S.W.3d 579
    (Tex.App.—Houston [14th Dist.] 2017, no pet.) ......................................................19, 20

*USACO Coal Co. v. Carbomin Energy, Inc.*,
    689 F.2d 94 (6th Cir. 1982).........................................................................22

*Waisath v. Lack's Stores, Inc.*,
    474 S.W.2d 444 (Tex. 1971)........................................................................15

*Wells v. Sansing*,
    245 S.W.2d 964 (Tex. 1952)........................................................................14

*Yates v. Blake*,
    491 S.W.2d 751 (Tex. App.—Corpus Christi 1973, no writ)..................................................14

## INTRODUCTION

Plaintiff moves for entry of a Temporary Restraining Order and Preliminary Injunction enjoining Defendants True the Vote Inc., Catherine Engelbrecht, Gregg Phillips, OPSEC Group, LLC, James Bopp, Jr., and The Bopp Law Firm, and all persons acting on their behalf, from transferring, disbursing, or otherwise dissipating any of Plaintiff's $2.5 million conditional gift ("Eshelman Funds") to True the Vote, pending entry by the Court of a preliminary injunction or final judgment in this action.[1]

First, Mr. Eshelman is likely to succeed on the merits of his claims. Based on Defendants' representations about their plan to investigate and litigate election irregularities in the 2020 presidential election, Plaintiff gave Defendant True the Vote $2.5 million on the express condition that Defendant follow through on certain specific and targeted initiatives—referred to as the "Validate the Vote 2020" effort—to discover and litigate voter fraud. When it became clear that True the Vote would not meet, or had no intention of meeting, those conditions, Plaintiff requested that True the Vote account for the money spent and return all remaining funds. Prior to Plaintiff's filing this suit, True the Vote refused to provide any accounting. Since Plaintiff filed this suit, True the Vote produced sparse records pursuant to the Court's order for expedited discovery. Defendants have refused to return the money that rightfully belongs to Mr. Eshelman. The records True the Vote produced show that it has transferred over $1.25 million dollars of Plaintiff's donation to the other Defendants. None of the other Defendants have returned Mr. Eshelman's money.

---

[1] Plaintiff previously filed a Motion Preliminary Injunction (Dkt. 10) as to Defendant True the Vote; that Motion is pending before the Court. This current Application and Motion requests a Temporary Restraining Order as to all Defendants (including Defendant True the Vote), as well as a Preliminary Injunction as to the other five Defendants.

Second, Mr. Eshelman faces a substantial threat of injury from Defendants' continued and unrestrained possession of his funds. Just in the very short period of time since Defendant True the Vote obtained Mr. Eshelman's conditional gift, Defendant True the Vote has transferred over $1.25 million of Plaintiff's money to the other Defendants. Defendant True the Vote has also indicated an intention to continue spending Plaintiff's donated money. Prior to Mr. Eshelman's $2.5 million gift, Defendant True the Vote had only $███████ in its bank account. The other individual Defendants are, to the best of Defendant's knowledge, individuals of ordinary means. The other two entity Defendants, OPSEC Group and The Bopp Law Firm, are small businesses. Without a restraining order and injunction, Defendants will continue to dissipate Plaintiff's money and do not have sufficient assets from which he can recover money damages, thus depriving him of any meaningful remedy.

Third, Defendants will not be harmed if the Court grants the restraining order and injunction. After the election, the need to act to uncover and seek to remedy election irregularities was urgent. Although Defendants True the Vote, Engelbrecht, Bopp, Jr., and The Bopp Group originally filed four lawsuits to pursue alleged voter fraud, the purpose behind Plaintiff's directed donation, Defendants *almost immediately* dismissed those lawsuits. Likewise, Defendants OPSEC Group and Phillips were originally retained to investigate voter fraud, vet whistleblowers' testimony, perform statistical analysis of voting data, and orchestrate a communications strategy to raise public awareness of the evidence of voter fraud. However, with the January 6, 2021 certification of the election results, there is no longer any reason for True the Vote, or any other Defendant, to continue spending Plaintiff's money.

Lastly, the public interest will be served if the funds are not dissipated. Allowing Defendant True the Vote to mislead donors to obtain donations, and then spend their directed

donations for its own interest and without accountability, does not serve the public interest. Likewise, allowing insider beneficiary transferees of such scheme to retain Plaintiff's funds does not serve the public interest. Thus, this Court should grant Plaintiff's Application and Motion.

## BACKGROUND

### I.    Defendant refused to comply with the conditions on the Eshelman Funds.

Following the November 3, 2020 general election, Mr. Eshelman desired to fund efforts to identify and litigate allegations of election fraud.[2] As he sought to identify an organization to undertake such efforts, Mr. Eshelman spoke with Defendant Catherine Engelbrecht, Defendant's President, on or around November 4 and November 5, 2020.[3] Ms. Engelbrecht explained to Plaintiff that she, Defendants Phillips, Bopp, and True the Vote had developed a multi-pronged plan (referred to as Defendant True the Vote's "Validate the Vote 2020" initiative) to investigate, litigate, and expose suspected illegal balloting and fraud in the 2020 general election.[4] As part of their Validate the Vote 2020 plan, Defendants intended to: (1) solicit whistleblower testimonies from those impacted by or involved in election fraud; (2) build public momentum through broad publicity of those whistleblowers' stories; (3) galvanize Republican legislative support for voter fraud challenges in key states; (4) aggregate and analyze data to identify patterns of election subversion; and (5) file lawsuits in federal court with capacity to be heard by the Supreme Court of the United States.[5] Ms. Engelbrecht represented that True the Vote intended to file lawsuits in the seven closest battleground states, planning to serve subpoenas seeking relevant election data.[6] Defendant Phillips is either a current or recent employee, officer, or director of Defendant True the Vote. OPSEC is affiliated with and does work on behalf of Defendant True the Vote; Defendant

---

[2] Verified Am. Compl. (Dkt. 20) at ¶ 11-12.
[3] *Id.* at ¶ 13.
[4] *Id.* at ¶ 16.
[5] *Id.* at ¶ 16; Exhibit A, a true and correct copy of Validate the Vote 2020 Plan.
[6] Verified Am. Compl. (Dkt. 20) at ¶ 17.

Phillips is the President and Founder of OPSEC. Defendant Bopp is the General Counsel of Defendant True the Vote and Defendant The Bopp Law Firm works on behalf of Defendant True the Vote.

In reliance on Ms. Engelbrecht's representations regarding Defendants' comprehensive plans to investigate, litigate, and publicize illegal balloting and other election fraud as part of their Validate the Vote 2020 efforts, Plaintiff agreed to give an initial gift of $2 million to True the Vote **on the condition** that the funds would be used to fund the initial stages of the Validate the Vote project.[7] Specifically, $1 million of that initial pledge was intended to fund efforts to communicate Defendants' findings via the contemplated litigation. Plaintiff advised he would contribute more as the project progressed (conditioned on Defendants' living up to their representations about how the money would be spent).[8] Importantly, Plaintiff's contribution was directed and limited to Defendants' Validate the Vote 2020 project.[9] Plaintiff's contribution was not to True the Vote unconditionally or generally, nor was it made in support of other efforts, such as recounts or the Georgia Senate runoff elections.[10] Plaintiff and his representatives were very clear about this in multiple telephonic conferences with Defendants.[11] Subject to those conditions, and in reliance on Defendant Engelbrecht's representations, Plaintiff wired $2 million to True the Vote's Wells Fargo bank account on November 5, 2020 using wiring instructions provided by Ms. Engelbrecht.[12]

On or about November 10, 2020, Defendant True the Vote paid $500,000 to Defendants Bopp and The Bopp Law Firm as a "retainer." On or about November 12, 2020, True the Vote

---

[7] *Id.* at ¶ 20.
[8] *Id.* at ¶ 20.
[9] *Id.* at ¶ 21.
[10] *Id.* at ¶ 21.
[11] *Id.* at ¶ 21.
[12] *Id.* at ¶ 22.

paid $350,000 to Defendants Phillips and OPSEC as a "retainer." Plaintiff was not informed or aware that these payments had been made until after this litigation was filed.[13]

In the days immediately after Plaintiff's conditional gift, all Defendants had conversations with Plaintiff or his representatives, wherein it was conveyed Defendants would work jointly in furtherance of the Validate the Vote 2020 initiatives to which Plaintiff conditionally gave his gift.[14]

Approximately one week after Plaintiff's $2 million conditional gift, Defendant Engelbrecht represented to Plaintiff that the legal expenses might exceed the initial budget.[15] In order to maintain what he thought was momentum, and again in reliance on Engelbrecht's representations and Defendants' conversations with Plaintiff regarding their "mutual" work to accomplish the Validate the Vote 2020 goals, on November 13th, Plaintiff agreed to give True the Vote an additional $500,000, subject to the same condition that those funds would be used to fund Defendants' Validate the Vote 2020 efforts.[16] Subject to those conditions, and in reliance on Engelbrecht's representations, Plaintiff wired $500,000 to True the Vote on November 13, 2020 to True the Vote's Wells Fargo bank account using wire instructions provided by Engelbrecht.[17] Time was of the essence to the efforts outlined in Defendants' Validate the Vote 2020 plan because of state and federal deadlines for certification of state election results and electoral college votes.[18]

After agreeing to conditionally give True the Vote funds to support its Validate the Vote 2020 efforts, Plaintiff regularly and repeatedly sought substantive updates from Defendant Engelbrecht, Defendant Phillips, Defendant Bopp, and other individuals associated with True the Vote.[19] Specifically, Plaintiff sought specific and actionable updates—both directly and through

---

[13] *Id.* at ¶¶ 23-24.
[14] *Id.* at ¶ 25.
[15] *Id.* at ¶ 26.
[16] *Id.* at ¶ 26.
[17] *Id.* at ¶ 27.
[18] *Id.* at ¶ 28.
[19] *Id.* at ¶ 29.

his agents—regarding progress on Defendants' purported investigation, litigation, and communication efforts in key states.[20] But Plaintiff's requests were consistently met with vague responses, platitudes, and empty promises of follow-up that never occurred.[21] Defendant Engelbrecht also routinely ignored repeated requests for memoranda and written reports to summarize Defendants' efforts to identify and obtain information from whistleblower witnesses.[22]

In response to questions about Defendants' litigation strategy in the seven states targeted by the Validate the Vote 2020 initiative, Plaintiff was only ever provided with four complaints filed in Wisconsin, Michigan, Georgia, and Pennsylvania. He was not provided any specific update on the status or strategy behind those cases, nor was he provided any explanation as to the status of litigation in the remaining three states.[23] As it turned out, Defendants never filed suit in three of the states they had represented to Plaintiff would be included in the Validate the Vote 2020 effort. Defendants failed to consult with or inform Plaintiff of the decision not to pursue lawsuits in the remaining three states, even though the decision amounted to a material deviation from the plan Defendants represented, on which representation Plaintiff relied and conditioned his gift.[24]

Defendants' consistent delay and inability to make progress on the goals that Defendant Engelbrecht described to Plaintiff just after the election suggested that many of those goals might not be met, as many important deadlines relating to state election results were rapidly approaching.[25] Given Defendants' lack of progress on the goals articulated in the Validate the Vote 2020 plan and the approaching certification deadlines, Plaintiff called a meeting with Defendants Engelbrecht, Phillips, and Bopp, and other individuals associated with Defendants' Validate the

---

[20] *Id.* at ¶ 29.
[21] *Id.* at ¶ 30.
[22] *Id.* at ¶ 32.
[23] *Id.* at ¶ 33.
[24] *Id.* at ¶ 34.
[25] *Id.* at ¶ 35.

Vote effort.[26] Specifically, Plaintiff sought detailed information and reports on voter data that Defendants had collected, identities of any alleged whistleblowers, the entities and resources dedicated to performing statistical analysis on available voter data, the expected timeline to obtain such statistical analysis, the status and strategy update for the litigation in the seven states, Defendants' promises to provide media content, and Defendants' fundraising efforts.[27]

That meeting took place by teleconference on November 16 and was attended by Plaintiff and Defendants Engelbrecht, Phillips, and Bopp, among others.[28] The meeting unfolded in a manner similar to the many others that had taken place regarding the Validate the Vote 2020 efforts since November 5: Defendants failed to engage with or respond to Plaintiff's requests for specific, actionable updates on the issues set forth above and proposed plans to accomplish all of the efforts he had originally agreed to fund.[29] According to PACER records, Defendants voluntarily dismissed *all* of the four pending pieces of litigation True the Vote was pursuing on November 16, the very same day as Defendants' meeting with Plaintiff.[30] Tellingly, True the Vote issued a press release the very next day that explained it had abandoned its Validate the Vote 2020 efforts.[31]

## II.    Defendant repeatedly has refused to return the Eshelman Funds.

Despite having publicly acknowledged its intent to abandon the efforts upon which Mr. Eshelman conditioned his gifts of $2.5 million, Defendant True the Vote repeatedly has refused to comply with Mr. Eshelman's requests that Defendant True the Vote return the balance of his funds. Defendant True the Vote has transferred <u>over half</u> of the Eshelman Funds to the other Defendants; none have returned Plaintiff's monies improperly sent to them by True the Vote.

---

[26] *Id.* at ¶ 36.
[27] *Id.* at ¶ 37.
[28] *Id.* at ¶ 38.
[29] *Id.* at ¶ 39.
[30] *Id.* at ¶ 40.
[31] Exhibit B, a true and correct copy of the November 17, 2020 Press Release.

Once it became clear that Defendant True the Vote had failed to comply with the conditions on his gifts, Plaintiff on November 17 directed Defendant Engelbrecht to "wire the balance of [his] contributions" and to provide a "full accounting of all monies spent out of the $2.5M."[32] After 48 hours without any word from True the Vote, Plaintiff again asked Ms. Engelbrecht on November 19 to "[p]lease acknowledge receipt of [his] previous email with wiring instructions to return the bulk of the money [he] put in."[33] Again, Defendants failed to respond.[34]

Given his desire to use the remainder of his funds to fund other time-sensitive efforts relating to the investigation of alleged election improprieties and Defendants' unreasonable delay in responding to his requests, counsel for Mr. Eshelman sent a formal letter to Ms. Engelbrecht on November 21.[35] That letter specifically demanded that True the Vote confirm by November 22 that it intended to return Mr. Eshelman's $2.5 million in conditional gifts and agree to initiate a wire transfer of those funds on the morning of November 23.[36]

Ms. Engelbrecht's November 22 response to Plaintiff's letter neither confirmed that Defendant intended to return Plaintiff's money nor agreed to initiate a wire transfer of those funds on November 23.[37] However, Ms. Engelbrecht's response *did* acknowledge that Plaintiff's gifts were given on the condition that they would be used to fund Defendant's efforts to identify and litigate fraud and illegal conduct during the November 2020 general election.[38] Ms. Engelbrecht's letter also made no attempt to provide an accounting for funds spent out of Plaintiff's $2.5 million in conditional gifts, claiming instead that True the Vote would not have "complete information" on its expenditures from Plaintiff's funds until December and suggesting that Defendant intended

---

[32] Verified Am. Compl. (Dkt. 20) ¶ 44; Exhibit C, a true and correct copy of Plaintiff's November 17, 2020 Email.
[33] Verified Am. Compl. (Dkt. 20) ¶ 46; Exhibit D, a true and correct copy of Plaintiff's November 19, 2020 Email.
[34] Verified Am. Compl. (Dkt. 20) at ¶ 47.
[35] *Id.* at ¶ 48; Exhibit E, a true and correct copy of the November 21, 2020 Letter.
[36] *Id.*
[37] Verified Am. Compl. (Dkt. 20) ¶¶ 49-50; Exhibit F, a true and correct copy of the November 22 Email.
[38] Verified Am. Compl. (Dkt. 20) ¶¶ 51; Exhibit F.

to continue spending Plaintiff's money, stating vaguely that it has a variety of commitments that must be fulfilled and activities that must be completed.[39] Plaintiff's counsel responded to Ms. Engelbrecht's November 22 correspondence by reaffirming his demand that True the Vote wire him "at least $2 million first thing in the morning [on November 23]" since it seemed implausible that True the Vote had "committed more than $500,000" between November 5-16.[40]

Yet again, Defendants ignored Mr. Eshelman's demand and refused to return any of his funds or to provide any accounting for those funds on November 23.[41] Accordingly, Plaintiff (through counsel) sent a final demand letter, noting his intent to file suit if True the Vote refused to return at least $2 million of his conditional gifts by 5pm on November 23.[42] Unsurprisingly, Defendant yet again failed to return Plaintiff's funds or to provide an accounting.[43] Rather, Defendant Bopp wrote on behalf of True the Vote and proposed to return less than half of Plaintiff's funds in exchange for a waiver and release of all claims.[44] Unhappy to accept a partial return of the money that is rightfully his in exchange for a release of all claims to the remaining funds, Plaintiff filed this action on November 25, 2020.

### III. Defendants have misappropriated Mr. Eshelman's funds and there is a substantial risk that Mr. Eshelman's funds may continue to be irreparably misappropriated absent judicial intervention.

Documents produced by Defendants show that Defendant True the Vote has already disposed of over half of the Eshelman Funds by paying that money to the other Defendants, and in support of unrelated projects or bad-faith expenditures supposedly for the Validate the Vote

---

[39] Verified Am. Compl. (Dkt. 20) ¶ 50; Exhibit F.
[40] Verified Am. Compl. (Dkt. 20) at ¶ 52; Exhibit G, a true and correct copy of Counsel's November 22, 2020 Email.
[41] Verified Am. Compl. (Dkt. 20) ¶ 53.
[42] *Id.* at ¶ 43; Exhibit H, a true and correct copy of Counsel's November 23 Demand Letter (omitting the originally attached documents which are merely duplicative of materials already attached to Plaintiff's Amended Complaint).
[43] Verified Am. Compl. (Dkt. 20) at ¶ 55; Exhibit I, a true and correct copy of Mr. Bopp's November 23, 2020 Letter.
[44] *Id.*

2020 project.[45]

Defendant True the Vote's Wells Fargo bank records confirm that True the Vote had only $▮▮▮▮▮ in its account prior to Mr. Eshelman's donations.[46] Defendant True the Vote has improperly taken the monies given by Plaintiff specifically for the Validate the Vote 2020 effort regarding the general election, and has instead already wired over the half of the money to the other Defendants for efforts having nothing to do with the Validate the Vote 2020 effort. Notably, the bank records Defendant produced in this case are dated November 5 through December 24, 2020.[47] Plaintiff suspects that Defendant True the Vote has continued and, importantly, <u>will continue</u> to improperly dispose of the Eshelman Funds unless the Court enjoins these improper actions. Plaintiff further suspects that the other Defendants who have been improperly enriched will spend the Eshelman Funds they have improperly gained, unless enjoined by the Court.

Defendant Engelbrecht has been enriched with the funds that Plaintiff gave to True the Vote, as payments totaling at least $30,000 by True the Vote were made to Engelbrecht personally after the date of Plaintiff's conditional gift.[48] Also after Plaintiff gave his conditional gift to True the Vote, True the Vote made payments totaling $750,000 to Defendant OPSEC, and continued to do so even after Plaintiff filed this lawsuit.[49] Defendant OPSEC has been enriched with those funds, and Plaintiff suspects that Defendant Phillips (OPSEC's President) has been personally enriched in and through his ownership interest in OPSEC Group.[50] Likewise, Defendants Bopp and The Bopp Law Firm have also been enriched with the funds, as True the Vote paid The Bopp

---

[45] *See id.* at 59; Exhibit J, a true and correct copy of Defendant True the Vote's Wells Fargo Bank Records.
[46] Exhibit J.
[47] Exhibit J.
[48] Exhibit J at TTV006 (11/30 transaction) and TTV009 (11/10 transaction).
[49] *Id.* at TTV009 (11/12 transaction) corresponding with Exhibit K, a true and correct copy of OPSEC's 11/9/20 invoice for $350,000; Exhibit J at TTV 004 (12/09 transaction of $▮▮▮▮▮ payable to multiple payees most likely including OPSEC, as it likely corresponds with Exhibit L, a true and correct copy of OPSEC's 12/7 invoice).
[50] Verified Am. Compl. (Dkt. 20) at ¶ 59.

Law Firm $500,000 right after Plaintiff gave his conditional gift to True the Vote.[51]

Neither Defendants Engelbrecht, Bopp, The Bopp Law Firm, OPSEC, nor Phillips acquired the money in good faith or for valuable consideration, as they were all directors, officers, employee or agents of True the Vote and knew of the conditions tied to Plaintiff's gift to True the Vote but did not use the funds in furtherance of the Validate the Vote 2020 mission, and because they did not properly work for and earn the money paid to them by True the Vote, as their work (if any) was not for the Validate the Vote 2020 initiative.[52]

Defendant True the Vote has failed to comply with its duty to provide the State of Texas with accurate and current contact information.[53] This is even more worrisome given the scale of Plaintiff's conditional gifts relative to True the Vote's typical annual budget. Between 2016 and 2018, True the Votes' public disclosures indicate that its annual budgets ranged from $425,410 to $563,388.[54] By comparison, Plaintiff's conditional gifts totaling $2.5 million were massive—five times True the Vote's typical annual budget. Given that disparity, that True the Vote incurred a net operating loss between 2016 and 2018, and that the entity does not appear to have any significant endowment or cash reserves,[55] True the Vote does not have the financial wherewithal to repay Plaintiff in the event his funds were found to be used in violation of Plaintiff's wishes.

Likewise, Defendant OPSEC Group was formed very recently—on September 25, 2020.[56] Thus, as a brand-new organization, OPSEC Group is unlikely to have the assets to satisfy a final judgment in this case which would require a return of Plaintiff's money. The other Defendants

---

[51] Exhibit J at TTV009 (11/10 transaction).
[52] Verified Am. Compl. (Dkt. 20) at ¶ 59.
[53] *See* Exhibit M, a true and correct copy the Declaration of Tim Wilson at ¶ 5.
[54] *See* Exhibits N, O, and P,true and correct copies of True the Vote's Forms 990, as filed with the Internal Revenue Service, for the years 2016, 2017, and 2018. Although a 501(c)(3) organization is supposed to make its Forms 990 publicly available, and although Mr. Eshelman's counsel requested Defendant's 2019 Form 990 from counsel for Defendant, Defendant has not made that document available.
[55] *Id.*
[56] Exhibit Q, a true and correct copy of OPSEC Group's Articles of Formation.

are simply individuals and a small law firm, and similarly are unlikely to be able pay back Plaintiff should a final judgment for Plaintiff be entered in this case.

In short, all the Defendants worked together on the scheme to swindle funds from Plaintiff on the pretext of using all the funds from Plaintiff for the Validate the Vote 2020 project, while knowing the funds would be used for other unrelated projects or to pay past expenses incurred prior to the Validate the Vote 2020 initiative.

## ARGUMENT AND AUTHORITIES

Plaintiff seeks a temporary restraining order and preliminary injunction enjoining Defendant True the Vote from using any portion of the $2.5 million conditionally given by Plaintiff, and a temporary restraining order and preliminary injunction enjoining all other Defendants from using any of the money improperly paid to them by Defendant True the Vote on or after November 5, 2020, to prevent Defendants from further depleting what remains of Plaintiff's donation and placing those funds beyond the reach of this Court.

A party seeking a temporary restraining order or preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure must show four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any prejudice the injunction might cause the defendant; and (4) that the injunction will not disservice the public interest. *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011).

### I.      Mr. Eshelman is substantially likely to succeed on the merits.

The verified facts supporting this Application and Motion establish that Plaintiff has a substantial likelihood of success on the merits against Defendants. Defendant True the Vote has pocketed $2.5 million of Plaintiff's and has not used the gifts on the conditions under which the gift was given, nor has it returned the money to Plaintiff despite Plaintiff's multiple requests. All

other Defendants have improperly retained the Eshelman Funds sent to them by Defendant True the Vote. Plaintiff is entitled to recover these funds, and until then, enjoin Defendants from using and further depleting any portion of the Eshelman Funds.

To satisfy the first element required for a temporary restraining order or preliminary injunction, Mr. Eshelman need only present a prima facie case. *See id*. at 596. He is not required to show that he is certain to win or to prove an entitlement to summary judgment. *Id.* at 595–96 (citing *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir.2009)). "Even some likelihood of success can be enough to support the issuance of a preliminary injunction." *Ass'n of Taxicab Operators, USA v. City of Dallas*, 760 F. Supp. 2d 693, 696 (N.D. Tex. 2010).

Likelihood of success on the merits is gauged by "standards provided by the substantive law." *Janvey,* 647 F.3d at 596 (citing *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). This case is governed by the substantive law of Texas. Here, Plaintiff has alleged breach of contract, conversion, money had and received, and fraudulent and negligent misrepresentation against Defendants and seeks a declaration that he is the rightful owner of all funds remaining out of his $2.5 million donation.

### A. Success of the Declaratory-Judgment Claim

Mr. Eshelman seeks an order declaring himself to be the rightful owner of the $2.5 million conditionally given to Defendant and requiring Defendant to immediately surrender possession of those funds to him. Federal courts have "unique and substantial discretion in deciding whether to declare the rights of litigants." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) (citations and internal quotation marks omitted). To exercise that discretion, the Court should consider whether "the dispute [is] definite and concrete, touching the legal relations of parties having adverse legal interests" and whether the Court can provide "specific relief through a decree

of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* at 127 (citations and internal quotation marks omitted).

In this case, the controversy between the parties is both definite and concrete, and it will be fully resolved if the Court determines that the gift from Mr. Eshelman to True the Vote was conditional, that True the Vote failed to fulfill the conditions on that gift, and that the remaining funds should be returned to Mr. Eshelman. Because Mr. Eshelman did not make an unconditional transfer of property to True the Vote, he did not unconditionally gift the funds to Defendant. In Texas, a gift is effective only when there is (1) a clear intent by the donor to make a gift and (2) an immediate and *unconditional* transfer of the property, such that title passes contemporaneously from the donor to the recipient. *Oadra v. Stegall*, 871 S.W.2d 882, 890 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Wells v. Sansing*, 245 S.W.2d 964, 965 (Tex. 1952)).

Although Mr. Eshelman transferred $2.5 million to Defendant True the Vote, he did not give True the Vote the $2.5 million unconditionally. Thus, no valid gift was made—and unconditional ownership to the money did not vest in True the Vote—because Mr. Eshelman's gift was premised on a condition that did not and will not occur. *See Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. App.—Corpus Christi 1973, no writ) (holding that no valid gift was made where gift was premised upon the giving party's death, even though recipient already had the property in her possession). Mr. Eshelman's repeated efforts to reclaim the gift "confirms [his] intention not to vest unconditional ownership" in Defendant. *Id.* Consequently, Mr. Eshelman is still the owner of any funds that True the Vote failed to use according to his stated conditions.

### B.  *Success of the Breach of Contract Claim*

Plaintiff also can demonstrate a likelihood of success on his breach of contract claim against True the Vote. The essential elements of a breach of contract action are: (1) the existence

of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *See Innova Hosp. San Antonio, LP v. Blue Cross & Blue Shield of Ga., Inc.*, 892 F.3d 719, 731 (5th Cir. 2018).

On November 5, 2020, the parties agreed that Mr. Eshelman would supply Defendant True the Vote with $2 million on the condition that Defendant would use the money to fund Defendant's initial Validate the Vote 2020 initiative. Mr. Eshelman agreed to give Defendant an additional $500,000 on November 13, 2020, subject to the same conditions. These agreements formed a valid contract, and Mr. Eshelman performed his obligations under the contract by providing Defendant with $2.5 million. Defendant True the Vote, however, breached the contract by failing to follow through on its promise to engage in certain actions to advance the Validate the Vote 2020 project. Defendant's inaction caused Mr. Eshelman damage because Defendant has not provided the services it promised to perform.

In light of these facts, Mr. Eshelman's breach-of-contract action against Defendant True the Vote has a likelihood for success on the merits. *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1178 (5th Cir. 1989) (holding that evidence of defendant's obligation to pay plaintiff "a substantial sum of money" after plaintiff performed under the contract "is sufficient to show a potential for success on the merits").

### C.  Success of the Conversion Claim

Plaintiff similarly can demonstrate a likelihood of success on his conversion claim against Defendants.  Conversion is "the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." *Arthur W. Tifford, PA v. Tandem Energy Corp.*, 562 F.3d 699, 705 (5th Cir. 2009) (quoting *Waisath v. Lack's Stores, Inc.*, 474 S.W.2d 444, 447 (Tex. 1971)). Here, Defendants are

presently exercising an unauthorized and wrongful control over Plaintiffs conditional gifts totaling $2.5 million—acts that are inconsistent with Plaintiff's rights to his money.

As explained above, Mr. Eshelman's donation to the Defendant True the Vote was not an effective "gift" because it was conditioned upon Defendant engaging in certain activities under its Validate the Vote program. Because Defendant True the Vote failed to meet those conditions, title to the $2.5 million never vested in True the Vote.

Because Plaintiff still has title to the $2.5 million and is the current owner of the money, Defendants' refusal to give the money back despite Plaintiff's repeated requests is an act that is inconsistent with Plaintiff's rights to the money as its true owner. *See Bandy v. First State Bank, Overton*, 835 S.W.2d 609, 622 (Tex. 1992); *see also Houston Nat'l Bank v. Biber*, 613 S.W.2d 771, 774 (Tex. App.—Houston [14th Dist.] 1981, writ ref'd n.r.e.) ("An action lies for conversion of money when its identification is possible and there is an obligation to deliver the specific money in question."). Thus, Plaintiff has a likelihood of success on the merits of his conversion claim.

### D. Success of the Money Had and Received Claim

Mr. Eshelman similarly can demonstrate a likelihood of success on his money had and received claim against Defendants. To prove a claim for money had and received, the plaintiff must establish that the defendant holds the money that in equity and good conscience belongs to the Plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951). Whether the defendant acquired the money wrongfully is irrelevant; the action is not premised on wrongdoing. *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 711 (Tex.App.—Corpus Christi 2006, pet. denied). Rather, the sole inquiry is whether the defendant received money that rightfully belongs to the plaintiff. *Staats*, 243 S.W.2d at 687-88.

Here, Defendants hold money that, in equity and good conscience, belongs to Plaintiff. Plaintiff conditionally gave $2.5 million to Defendant True the Vote, in which Defendants Engelbrecht and Phillips are officers and/or directors, and of which Defendants Bopp, The Bopp Law Firm, and OPSEC are agents. Defendants did not meet their obligations to use the money as conditioned by Plaintiff. As demonstrated above, Defendants Engelbrecht, Phillips, OPSEC, Bopp, and The Bopp Law Firm have received a substantial part—at least half—of the money Plaintiff conditionally donated to True the Vote, and are currently holding said funds, all of which in equity and good conscience belongs to Plaintiff. Thus, Mr. Eshelman has a likelihood of success on the merits of his money had and received claim.

### E. Success of the Fraudulent and Negligent Misrepresentation Claims

Additionally, Mr. Eshelman can demonstrate a likelihood of success on his fraudulent misrepresentation claim as to True the Vote and Engelbrecht. *See, e.g., Baribeau v. Gustafson*, 107 S.W.3d 52, 58 (Tex. App.—San Antonio 2003, pet. denied). Defendants made material misrepresentations that were false, and Defendants knew the representations were false when made or made recklessly without any knowledge of the truth, with the intention that Plaintiff act upon the misrepresentations. Plaintiff justifiably relied upon the misrepresentations and suffered damages. *See id*.

As demonstrated above, multiple times in November 2020 Defendants Engelbrecht and True the Vote made material misrepresentations to Plaintiff that, using Plaintiff's conditional gift, True the Vote would investigate, litigate, and publicize illegal balloting and other election fraud via litigation and targeted paid advertising as part of its Validate the Vote 2020 efforts. But Engelbrecht and True the Vote knew at the time that those representations were false, as they knew they intended to use Plaintiff's conditional gifts for other purposes, such as paying the money to

activists and paying off debts it owed to other activists, whistleblowers, and attorneys in connection with other matters besides the Validate the Vote 2020 project, and not for the manner in which they told Plaintiff they would use the money. Defendants Engelbrecht and True the Vote made these representations with the intention that Plaintiff act and gift the monies to True the Vote. Plaintiff justifiably relied on Defendants' misrepresentations by making conditional gifts of $2.5 million to True the Vote, and has suffered at least $2.5 million in damages as a result.

Alternatively, Plaintiff can demonstrate a likelihood of success on his negligent misrepresentation claim. *See, e.g.*, *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 793 (Tex. 1999). Defendants Catherine Engelbrecht and True the Vote made representations in the course of their business and/or in a transaction in which they had a pecuniary interest that was false for the purpose of guiding Plaintiff. Defendants failed to exercise reasonable care in gathering and disseminating the information, and Mr. Eshelman suffered a financial loss due to his justifiable reliance on Defendants' representations.

## II. If the restraining order and preliminary injunction is not entered, Mr. Eshelman faces a substantial threat of irreparable injury.

Without immediate relief, Plaintiff will suffer a substantial threat of irreparable injury. With each day that passes, the likelihood that Plaintiff will recover the funds misappropriated through Defendants' actions diminishes because the actual and substantial likelihood that Defendants will conceal, hide, dissipate, or otherwise improperly expend the funds or assets purchased with those funds increases.

Further, should Defendants conceal, hide, dissipate, or otherwise expend the proceeds of the misappropriation, it would likely render any judgment against Defendants uncollectible. Accordingly, if Defendants are not immediately enjoined from further dissipating the Eshelman Funds in their respective accounts, Plaintiff will not have an adequate remedy at law. *See Texas*

*Black Iron, Inc. v. Arawak Energy Int'l, Ltd.*, 527 S.W.3d 579, 586 (Tex.App.—Houston [14th Dist.] 2017, no pet.) ("Texas cases hold that a plaintiff does not have an adequate remedy at law if the defendant faces insolvency or becoming judgment proof before trial.")

In this case, there is a direct, proven connection between Defendant True the Vote's Wells Fargo bank account where Plaintiff wired the money[57] and the wrongful conduct of Defendants. There is also a direct, proven connection between The Bopp Law Firm's bank account where True the Vote wired $500,000[58] and the wrongful conduct of Defendants. Likewise, there is a direct, proven connection between OPSEC Group's bank account where True the Vote wired $750,000[59] and Defendants' wrongful conduct. There is also a direct, proven connection between Ms. Engelbrecht's accounts where True the Vote wired $30,000 and Defendants' wrongful conduct.[60]

Therefore, Plaintiff requests the Court to freeze: (1) $2.5 million of the Eshelman Funds in Defendant True the Vote's bank account, which represents the amount Plaintiff conditionally gave to Defendant True the Vote (or any amount less than $2.5 million if less than that amount currently is in True the Vote's bank account); (2) $500,000 of the Eshelman Funds in The Bopp Law Firm's account (or any amount less than $500,000 if less than that amount currently is in the account); (3) $750,000 of the Eshelman Funds in Defendant OPSEC Group's account (or any amount less than $750,000 if less than that amount currently is in the account) and (4) $30,000 in Defendant Engelbrecht's accounts (or any amount less than $30,000 if less than that amount currently is in Engelbrecht's accounts). Accordingly, a temporary restraining order and preliminary injunction freezing $2.5 million of the assets (and the lesser amounts for the other Defendants) in those

---

[57] Exhibit J at TTV0010 (11/5 transaction) and TTV009 (11/13 transaction).
[58] Exhibit J at TTV009 (11/10 transaction).
[59] Exhibit J at TTV009 (11/12 transaction) corresponding with Exhibit K, a true and correct copy of OPSEC's 11/9/20 invoice for $350,000; Exhibit J at TTV 004 (12/09 transaction of $▇▇▇▇ payable to multiple payees most likely including OPSEC, as it likely corresponds with Exhibit L, a true and correct copy of OPSEC's 12/7 $400,000 invoice).
[60] Exhibit J at TTV006 (11/30 transaction) and TTV009 (11/10 transaction).

specific accounts is not only permissible, but necessary. *See Texas Black Iron*, 527 S.W.3d at 587 (injunction is not precluded where the assets at issue in the injunction are at issue in and may be used to satisfy claims in the parties' dispute); *see also G & H Partners, Ltd. v. Boer Goats Int'l Ltd.*, 896 F. Supp. 660, 663 (W.D. Tex. 1995), *aff'd sub nom. G & H Partners v. Boer Goats*, 84 F.3d 432 (5th Cir. 1996) (acknowledging TRO previously granted by the court that "prohibit[ed] the defendants from removing funds located in defendants' account in the Sunburst Bank in Louisiana […] because it contained a $120,000 payment made to defendants for the embryos"); *Janvey v. Alguire*, No. 3:09-CV-724-N, 2010 WL 11626677, at *2 (N.D. Tex. May 28, 2010) (granting TRO where plaintiff "provide[d] evidence that the frozen funds are the product of fraudulent transfer).

The harm to Plaintiff described herein is a direct and proximate result of the acts of Defendants. The requested temporary restraining order and preliminary injunction is appropriate to preserve the status quo until a hearing on Plaintiff's application for injunctive relief can be held.

Although a preliminary injunction may be an inappropriate remedy "where the potential harm to the movant is strictly financial," *Atwood*, 875 F.2d at 1179, "the mere fact that economic damages **may** be available does not always mean that a remedy at law is adequate." *Janvey*, 647 F.3d at 600 (emphasis added). For example, the primary justification for granting a preliminary injunction is "to preserve a court's ability to render a meaningful decision on the merits." *Id.* But when the assets in dispute are at risk of dissipation by the defendant, a court may not be able to render a meaningful remedy without the use of an injunction. *See id.* Thus, a court "may maintain the status quo and issue a preliminary injunction to protect a remedy, including a damages remedy, when the freezing of the assets is limited to the property in dispute . . . ." *Id.* (citing *Productos Carnic, S.A. v. Cent. Amer. Beef & Seafood Trading Co.*, 621 F.2d 683, 686-87 (5th Cir. 1980)

("[E]ven were [plaintiff's] remedy limited to damages, an injunction may issue to protect that remedy.")); *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 217 (1945) (holding that an injunction may issue to protect assets that are the subject of the dispute or to enjoin conduct that might be enjoined under a final order).

Additionally, although proof of the threatened harm must be more than mere speculation, evidence that the defendant intends to dissipate or transfer the assets in dispute is sufficient to demonstrate more than an unfounded fear on the part of the applicant. *Janvey*, 647 F.3d at 599-600 (upholding injunction freezing assets while a receivership case proceeded to judgment); *Productos Carnic*, 621 F.2d at 686 (upholding trial court's determination that plaintiff had undoubtedly shown potential irreparable injury in the face of evidence that defendant intended to transfer the disputed property or its proceeds).

Here, the threat of Defendants' further dissipation of Plaintiff's $2.5 million would undoubtedly preclude this Court from granting Plaintiff an effective remedy, either in equity or law, because Defendants' assets in the absence of Plaintiff's money fall far short of the damages to which Mr. Eshelman is entitled. As explained above, True the Vote is an entity with a small budget and limited assets. True the Vote's net assets only totaled $99,244 in 2016, $54,107 in 2017, and $64,743 in 2018, and had only $███████ in its account prior to Plaintiff's donation.[61] Additionally, True the Vote's conduct to date transferring much of the money to the other Defendants—even after this suit was filed—evidences True the Vote's intent to dissipate or transfer Plaintiff's money.[62] Likewise, Defendant True the Vote's refusal to commit to forego spending the Eshelman Funds is itself proof enough of Defendants' intent. Because the other Defendants were all employees, officers, or agents of True the Vote, they all know of Plaintiff's

---

[61] *See* Exhibits J and N-P.
[62] *See* Exhibit J.

repeated requests to return the money, yet they have not returned the money improperly transferred to them by True the Vote. This is sufficient to show that the other Defendants anticipate hiding or dissipating the portions of the Eshelman Funds that they have.

After Mr. Eshelman asked for a return of the funds, True the Vote vaguely stated it had "made many commitments to many people" that had to be fulfilled and had "committed to activities that [it] must complete."[63] Though Defendants assured Mr. Eshelman the funds were used in furtherance of the Validate the Vote efforts, they provided no supporting documentation. Worse yet, when Mr. Eshelman demanded immediate return of $2 million of his conditional gifts totaling $2.5 million, Defendant replied that it was prepared to offer a return of only $1 million, conditioned on a release of any claims Mr. Eshelman has against Defendant.[64] Consequently, when Mr. Eshelman attempted to have True the Vote served with the Complaint in this matter, it was no surprise that the investigator could not find True the Vote at any of the addresses associated with True the Vote or its registered agent.[65] In fact, two of the addresses were occupied by business entirely unaffiliated with True the Vote.[66]

Due to Defendants' bad faith and evasive conduct, Defendants' limited assets, and the fact that True the Vote has already dissipated over half of Plaintiff's money in less than two months, it is clear Plaintiff would suffer irreparable harm without the issuance of an injunction. Defendants' dissipation of the funds would deprive Mr. Eshelman of a meaningful remedy after trial.

Therefore, the only adequate, effective, and complete relief to Mr. Eshelman is to restrain Defendants from transferring, dissipating, or disbursing Mr. Eshelman's money. *See USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 97 (6th Cir. 1982) (citing *DeBeers Consolidated*

---

[63] *Id.* at ¶ 50; Exhibit F.
[64] *See* Verified Am. Compl. (Dkt. 20) at ¶ 55; Exhibit I.
[65] *See* Exhibit M*, Wilson Declaration.
[66] *See id.*

*Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945) and *Deckert v. Independence Shares Corp.*, 311 U.S. 282 (1940) for the proposition that "[t]he power of the district court to preserve a fund or property which may be the subject of a final decree is well established.").

### III. There is no harm that will result if the injunction is granted.

An injunction is proper if the threat of an ineffective remedy outweighs the damage which the injunction might cause the defendant. *Productos Carnic*, 621 F.2d at 687. Here, maintaining the status quo using an injunction would not cause Defendant any harm. If Defendants are prevented from transferring or further committing Mr. Eshelman's funds, the only possible harm Defendants face is the loss of progress in its Validate the Vote effort. Given that the election results are now certified and Defendants have abandoned the efforts that were the reason for the conditional donation,[67] however, freezing the funds will not materially affect Defendants' interests. *Deckert*, 311 U.S. at 290 (upholding injunction as reasonable where the injunction was framed narrowly to restrain only the transfer of certain trust funds). Thus, the injury to Mr. Eshelman that would occur without the injunction heavily outweighs whatever hardship Defendant might allege from being restrained from further dissipating Mr. Eshelman's money.

### IV. Granting the injunction will serve the public interest.

Granting the restraining order and injunction would not disserve the public interest. The public interest in this case is the public's ability to trust in the Court to protect individual's property rights from infringement by wrongful possessors. Further, (1) there is no evidence Defendants have used or will use Plaintiff's funds to accomplish meaningful Validate the Vote goals and (2) Defendants' possession of funds that it is clearly not entitled to retain would erode the public's trust in the efficacy of the judicial system to protect individual property rights.

---

[67] *See* Exhibit B, November 17 Press Release.

**V.  The Court should enter the temporary restraining order and preliminary injunction.**

Therefore, to prevent the unjust and inequitable wasting of the misappropriated funds and any assets purchased with those funds that belong to Plaintiff, Plaintiff requests the entry of a Temporary Restraining Order as follows, and further requests entry of a Preliminary Injunction following a hearing:

a.  Restraining and enjoining Defendants True the Vote, Catherine Engelbrecht, Gregg Phillips, OPSEC Group, James Bopp, and The Bopp Law Firm, including their officers, agents, servants, attorneys, accountants, and any representatives acting or purporting to act on their behalf, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each of them from in any way directly or indirectly releasing, distributing, spending, transferring, removing, encumbering, disposing of, or otherwise paying, selling, depleting, destroying, sabotaging, or dissipating any of the $2.5 million (representing the $2.5 million amount that Plaintiff conditionally gave to Defendant True the Vote ), or the entire amount of the account if there is less than $2.5 million in the account, in the following accounts (in the respective individual amounts below):

    1.  Wells Fargo Bank NA, ABA #████████; Account Name - True the Vote; Account #████████
       a.  $2.5 million, or the entire amount if less remains in the account
    2.  OPSEC Group
       a.  $750,000 or the entire amount if less remains in the account
    3.  Fifth Third Bank; Account Name - The Bopp Law Firm; SRF# ████████; TRN#████████
       a.  $500,000 or the entire amount if less remains in the account
    4.  Wells Fargo Bank Account NA; Account Name – Engelbrecht C Checking; Account #████████
       a.  $30,000 or the entire amount if less remains in the account

b.  Restraining and enjoining Defendants True the Vote, Catherine Engelbrecht, Gregg Phillips, OPSEC Group, James Bopp, and The Bopp Law Firm, including their officers, agents, servants, attorneys, accountants, and any representatives acting or purporting to act on their behalf, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each of them from in any way removing, destroying, concealing or otherwise altering any file, document, associated paperwork, or the like (whether a copy or original) related to Defendants, including, but not limited to, bank statements and credit card statements and any purchases made with those Eshelman Funds;

c.   Ordering Defendants True the Vote, Catherine Engelbrecht, Gregg Phillips, OPSEC Group, James Bopp, and The Bopp Law Firm, including their officers, agents, servants, attorneys, accountants, and any representatives acting or purporting to act on their behalf, and all persons in active concert or participation with them who receive actual notice of this Order by personal service or otherwise, and each of them are ordered to, within 24 hours of this Order, give Plaintiff access to review and copy all paper and electronic financial records identifying any bank accounts, including their account numbers, investment accounts, or similar financial accounts into which funds from Defendant True the Vote's Wells Fargo Account # ▮▮▮▮▮▮▮▮ after November 5, 2020 have been transferred;

d.   Ordering the financial institutions associated with Defendants True the Vote, Catherine Engelbrecht, Gregg Phillips, OPSEC Group, James Bopp, and The Bopp Law Firm to (**1**) hold and retain within their control at least $2.5 million of the assets, funds, accounts, or other property in the aforementioned accounts in (a)1-4, or the entire amount in the same account if the account has less than the requisite amounts in (a)1a, (a)2a, (a)3a, and (a)4a, and (**2**) prohibit the releasing, distributing, spending, transferring, removing, encumbering, disposing of, or otherwise paying, selling, depleting, destroying, sabotaging, or dissipating of more than $2.5 of the aforementioned assets, funds, or accounts.

Plaintiff will provide Defendants' counsel (or provide Defendants directly by email if no counsel has made an appearance for various Defendants) with notice of this Application for Temporary Restraining Order and Motion for Preliminary Injunction.  Nonetheless, Plaintiff avers that the hearing on this Application for Temporary Restraining Order should go forward regardless of whether Defendants are able to participate because of the nature of this case and the likelihood that money will disappear or be transferred without prompt action. Plaintiff is willing to post a bond in an amount determined by the Court.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court enter the temporary restraining order and preliminary injunction.

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of January, 2021 a true and correct copy of the above foregoing document has been forwarded to counsel of record via ECF, and to all parties via email:

Brock Akers
The Akers Firm PLLC
3401 Allen Parkway, Suite 101
Houston, TX 77019
(713) 583-8662
bca@akersfirm.com
*Counsel for Defendant True the Vote*

James Bopp, Jr.
jboppjr@aol.com
Melena Siebert
msiebert@bopplaw.com
Rob Citak
rcitak@bopplaw.com
Jeffrey Gallant
jgallant@bopplaw.com
Courtney Milbank
cmilbank@bopplaw.com
The Bopp Law Firm
1 South Sixth St.
Terre Haute, IN 47807
(812) 232-2434
*Counsel for Defendants James Bopp, Jr. and The Bopp Law Firm*

Defendant Catherine Engelbrecht
catherine@truethevote.org

Defendant The OPSEC Group, LLC
Via Gregg Phillips, Registered Agent
gp@opsec.group

Defendant Gregg Phillips
gp@opsec.group

*/s/ Douglas A. Daniels*
Douglas A. Daniels

## VERIFICATION

I, Fredric Eshelman, declare under penalty of perjury that the information contained in the foregoing Application for Temporary Restraining Order and Motion for Preliminary Injunction is true and correct to the best of my knowledge and recollection.

Dated: January _8_, 2021

Fredric Eshelman