# In the United States District Court
# For the Southern District of Texas
# Houston Division

| | |
|---|---|
| **Frederic N. Eshelman**; | |
| *Plaintiff*, | |
| *v.* | **Civil Case No.** 4:20-cv-04034 |
| **True the Vote, Inc.,** *et al.*; | Judge Charles Eskridge, III |
| *Defendants*. | |

## Defendant James Bopp, Jr. and The Bopp Law Firm, PC Consolidated Response in Opposition to Plaintiff's Verified Emergency Application for Temporary Restraining Order and Verified Motion for Preliminary Injunction

Def. Bopp and BLF
Resp. in Opp. to TRO/PI

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Nature and Stage of Proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    A.   Eshelman Made Unconditional Gifts to TTV. . . . . . . . . . . . . . . . . . . . . . . 6

    B.   No Allegation, nor Any Admissible Evidence, Clearly Shows
        an Agreed-to Right to Reverter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    C.   TTV Carried out its Proposed Activities under VTV and Sought to Fulfill
        the VTV Goals and TTV's Mission Statement. . . . . . . . . . . . . . . . . . . . . . 9

    D.   Eshelman Made a Second Gift after Observing and Approving of TTV's
        Efforts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    E.   TTV Refused to Pay a $1,000,000 Invoice from Old Town Digital Agency
        for Services That Were Never Performed, Which Triggered Eshelman's
        Demand for Return of His Gifts to TTV. . . . . . . . . . . . . . . . . . . . . . . . . . 10

    F.   TTV Has and Continues to Conduct the Activities Proposed in VTV, to
        Meet the Purposes of VTV, and to Meet TTV's Organizational Purposes
        and Goals. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Issues Requiring Resolution with Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . 13

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.   Eshelman's Claims Fail Because There Was No "Conditional"
        Gifts of Any Kind or an Agreed-to Right to Reverter. . . . . . . . . . . . . . . . 14

        1.   Eshelman Made No Conditions to the Effective Delivery of the
            Eshelman Gifts, and Full Control of the Funds Were Transferred
            from Eshelman to TTV. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. Eshelman Makes No Clear Showing of Conditions on the Spending of Eshelman's Gifts or an Agreed-to Right to Reverter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

 a. Eshelman Has Not Clearly Shown Conditions on the Spending of Eshelman's Gift. . . . . . . . . . . . . . . . . . . . . . . 19

  i. Eshelman Fails to Allege That He Imposed Conditions on TTV's Spending of His Gifts. . . . . . . 19

  ii. The Facts Do Not Clearly Show That Eshelman Imposed Any Conditions on the Spending of His Gifts. . . . . . . . . . . . . . . . . . 20

 b. Eshelman Has Not Clearly Shown, or Even Alleged, an Agreed-to Right to Reverter.  . . . . . . . . . 23

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

# Table of Authorities

**Cases**

*Adler v. Save*, 432 N.J. Super. 101 (App. Div. 2013)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Blocker v. State*, 718 S.W.2d 409 (Tex. App. 1986))
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Carroll v. City of Beaumont*, 18 S.W.2d 813 (Tex. Civ. App. 1929), writ refused (Nov. 27, 1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*City of El Cenizo, Texas v. Texas*, 890 F.3d 164 (5th Cir. 2018)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 24

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Harmon v. Schmitz*, 39 S.W.2d 587 (Tex. Comm'n App.1931, judgm't adopted)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

*Oadra v. Stegall,* 871 S.W.2d 882 (Tex. App. 1994)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens*, Inc., 318 Md. 47 (1989).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 24

*Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens*, Inc., 318 Md. 47 (1989).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Salazar v. San Juan Cty. Det. Ctr., No. CV 15-0417 JB/LF, 2016 WL 335447 (D.N.M. Jan. 15, 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. Civ. App. 1973)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                    iv

**Other Authorities**

15 Am. Jur. 2d Charities § 137 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

15 Am. Jur. 2d Charities § 139. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Darren B. Moore, Megan C. Sanders, *Giving With Strings Attached: An Examination of Key Issues for Consideration*, 1, State Bar of Texas 12th Annual Governance of Nonprofit Organizations (2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 23

## Introduction

Plaintiff Frederic N. Eshelman has not shown that he is substantially likely to prevail on the merits, since he has not made a clear showing that his gifts were conditional or that he claimed, and the parties agreed, that he had a right to reverter if the conditions were not fulfilled. As a result, James Bopp, Jr. and The Bopp Law Firm, PC (collectively, "**Bopp**") respectfully request this Court deny both the motion for the temporary restraining order and for preliminary injunction.

## Nature and Stage of Proceeding

Eshelman filed his *Plaintiff's Verified Emergency Application for Temporary Restraining Order as to All Defendants and Verified Motion for Preliminary Injunction as to Catherine Engelbrecht, Gregg Phillips, OPSEC Group, LLC, James Bopp, Jr., and the Bopp Law Firm, PC*, ECF 41-1 ("**Motion**").[1] The TRO request has been withdrawn as to Bopp, and the PI request now also applies to Defendant True the Vote, Inc. ("**TTV**"). The Motions ask this Court to enjoin the applicable Defendants from transferring, disbursing, or otherwise dissipating any remaining portion of Eshelman's $2.5 million gift to TTV. As both motions raise nearly identical issues, Bopp provides this Consolidated Response in Opposition.

---

[1] Eshelman's unredacted Motion was filed under seal at ECF 40.

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          3

# Facts

**A.      Eshelman Made Unconditional Gifts to TTV.**

TTV is a 501(c) organization that began in 2009—its mission is to promote the integrity of our elections. Engelbrecht Ex. 2 at 1. In October, as part of its substantial 2020 election integrity efforts throughout the Nation, Declaration of Catherine Engelbrecht ¶¶ 5-9, TTV created an "Election Integrity Hotline" to enable reporting of voting irregularities and fraud. Engelbrecht Decl. ¶ 5; Engelbrecht Ex. 2 at 2-6.

Immediately after the 2020 general election and prior to contacting TTV, Eshelman decided to support efforts to investigate allegations of fraud. Verified Amended Complaint ECF 20, ¶ 11. In particular, Eshelman wanted to establish a "reward program" to encourage people to report fraud, Engelbrecht Ex. 2 at 7, 8,[2] and "sought to identify an organization to undertake such efforts." Motion, 3.

On Nov 5th, Yacoubian spoke with Engelbrecht, TTV's President, regarding a "major donor's" interest in TTV. Engelbrecht Decl. ¶ 10. Shortly thereafter, Engelbrecht spoke with Yacoubian and Crawford to discuss TTV's current projects, in particular TTV's ongoing whistleblower project. *Id*. ¶ 11. The two then brought Eshelman on to the call at 11:12a.m., Engelbrecht Ex. 2 at 9; after a brief discussion of TTV's whistleblower

---

[2] In response to TTV's Expedited Discovery Requests, Eshelman provided a Response to 168 pages of communications and documents, Eshelman 00001-00168. Engelbrecht Ex. 1. Engelbrecht's exhibits are largely derived from the Eshelman production.

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                 4

project, Eshelman offered TTV a gift of $2M and asked for wiring instructions. *Id*. at 10, Engelbrecht Decl. ¶ 12. The wire transfer was sent by 2:31p.m. Engelbrecht Ex. 2 at 11. In a follow-up phone call, Crawford advised that TTV should think of the $2 million gift in two tranches—$1 million for the whistleblower program and $1 million for general operations. Engelbrecht Decl. ¶ 13.

During the Nov. 5th phone conversation, there was no discussion that Eshelman's gift was conditional in any way or that he could claim his gift back. Furthermore, in the numerous emails and texts between Engelbrecht, Eshelman, and his representatives, no one ever said that the gift was "conditional in any way [or] . . . if we were not able to accomplish our goals, he would expect to get his donation returned to him." *Id*. ¶ 16.

 After the phone call, Eshelman asked Crawford for a description "of what we're doing" to use to raise funds from other donors. Engelbrecht Ex. 3 at 1. At Crawford's request, Engelbrecht drafted a one-page overview of TTV's plans, entitled "Validate the Vote 2020" ("**VTV**") and sent it at 4:59p.m., Engelbrecht Ex. 3 at 3-5. Most of the one-pager was derived from a litigation plan Bopp prepared and sent to Engelbrecht at 3:37p.m. that afternoon. Engelbrecht Ex. 3 at 7. Engelbrecht only added the "Plan" section to the Bopp litigation plan and edited it. Crawford also suggested the name "Validate the Vote 2020" in a text at 2:20p.m. Engelbrecht Ex. 3 at 2. Engelbrecht was unaware of Bopp's litigation plan or even the name of the project until after the Eshelman call. Engelbrecht Decl. ¶¶ 14, 15.

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                  5

Thus, there could not have been a detailed discussion of VTV on the November 5th call, as Eshelman claims, as its name, existence and most of the details of it, especially Bopp's litigation proposal, did not exist before the phone call and were developed after it. Am. Compl. , ¶ 13 ("On or around November 4th and November 5th, Plaintiff spoke with Defendant Engelbrecht about Defendant True the Vote's Validate the Vote 2020 project."); ¶¶ 14-19 (alleging discussion of many of the details of VTV later contained in VTV's one-pager, including details about proposed lawsuits). Nor could there have been a discussion of any conditions imposed on his gift related to those yet developed activities. *Id*. ¶ 20. In fact, once VTV's one-pager was received after the phone call, it was treated as something new by Eshelman and his representatives, who then planned a conference call "to discuss Validate the Vote," Engelbrecht Ex. 3 at 10, which occurred the next day. *Id*. at 11. The next day, TTV announced its Whistleblower Compensation Fund, which incorporated Eshelman's desire to establish a "reward program" to encourage people to report fraud, which Eshelman discussed with Engelbrecht on the November 5th call. Engelbrecht Ex. 3 at 12-14.

**B.    No Allegation, nor Any Admissible Evidence, Clearly Shows an Agreed-to Right to Reverter.**

In the 24 pages of the Amended Complaint, the 25 pages of the Motion, Eshelman's numerous exhibits, or the 168 pages of written communications produced by Eshelman, no allegation or supporting evidence exists to show any statement by Eshelman

**Def. Bopp and BLF
Resp. in Opp. to TRO/PI**          6

claiming, or the parties agreeing to, a right of reverter if the funds were not used on VTV. And Engelbrecht affirms that no such statements, or any agreement related to them, was ever made on November 4th, 5th, or 13th, or anytime. Engelbrecht Decl. ¶ 16, 19.

**C.     TTV Carried out its Proposed Activities under VTV and Sought to Fulfill the VTV Goals and TTV's Mission Statement.**

After Eshelman's gift and after the subsequent development of VTV, TTV engaged in substantial efforts to meet VTV's goal "[t]o ensure the 2020 election returns reflect one vote cast by one eligible voter and thereby protect the right to vote and the integrity of the election," Engelbrecht Ex. 3 at 4, which comported with TTV's mission statement to "[e]mpower and equip citizens to ensure that our election process is protected from fraud and exploitation." Engelbrecht Ex. 2 at 1. VTV included at least five strategies aimed at seven states: solicit whistleblower testimonies; build public momentum through broad publicity; galvanize Republican legislative support; aggregate and analyze data to identify patterns of election subversion; and file lawsuits in federal court(s) to gain needed voting records. Engelbrecht Ex. 3 at 4. TTV carried out substantial activities in pursuit of all five VTV strategies. Engelbrecht Decl. ¶¶ 17, 18.

**D.     Eshelman Made a Second Gift after Observing and Approving of TTV's Efforts.**

After the initial gift, Eshelman and his representatives were kept aware of TTV's activities and approved of them, Engelbrecht Ex. 4 at 1-9, resulting in a second gift of $500,000 on November 13th, apparently to help with the data expenses related to litigation

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                7

support. *Id*. at 10. Engelbrecht and Eshelman did not speak on November 13th, but Engelbrecht and Crawford discussed the legal efforts of Bopp that day. During that conversation, there was no discussion that any additional gift would be conditioned in any way or that the gift was subject to reverter if it was not spent subject to some condition. Engelbrecht Decl. ¶ 19. This gift was apparently given as a result of Crawford's subsequent email to Eshelman suggesting that "we may need additional short term money for Bopp." Engelbrecht Ex. 4 at 10-11.

**E.      TTV Refused to Pay a $1,000,000 Invoice from Old Town Digital Agency for Services That Were Never Performed, Which Triggered Eshelman's Demand for Return of His Gifts to TTV.**

On the same day of the second gift, November 13th, Engelbrecht was shocked to receive, *see generally* Engelbrecht Decl. ¶ 20, an invoice for $1,000,000 from Old Town Digital Agency LLC ("**OT**") for services rendered. Engelbrecht Ex. 5 at 2-3. TTV had no contracts with OT, and they had performed no services for TTV. *Id*. Engelbrecht advised Eshelman that day by phone and email about the invoice, Engelbrecht Ex. 5 at 4-5. Eshelman researched OT, since he apparently knew nothing about them, but "couldn't find anything" except a Delaware registration. He asked Crawford about it. *Id*. at 5. Crawford responded with modest information about OT, but failed to disclose his or Yacoubian's involvement in it, and, for the first time, made scathing comments about Engelbrecht. *Id*. at 6. Crawford called Engelbrecht where he "angrily asked me why I was calling Mr. Eshelman to question *their* invoice." *See generally* Engelbrecht Decl. ¶ 22

**Def. Bopp and BLF
Resp. in Opp. to TRO/PI**                      8

(emphasis added). A few hours later, Crawford again made more scathing comments about Engelbrecht to Eshelman and urged Eshelman to get $1 million of his gift back and give it to OT. Engelbrecht Ex. 5 at 7. Exasperated, *id*., Eshelman told Engelbrecht to pay OT. *Id.* at 4. At the advice of counsel and conferring with other major donors to TTV, Engelbrecht did not and a few days later Eshelman demanded a return of all gifts. Am. Compl., Ex. 2.

After Eshelman's demand that TTV pay OT's invoice and knowing nothing about OT or any services they had provided, Engelbrecht emailed OT requesting information on who they were and what services they claim to have provided. Engelbrecht Ex. 5 at 8. Days later, Yacoubian responded for OT, cancelling the invoice, since "you have never asked me to perform any of the services we had discussed," *id*. at 10, followed up later by a more elaborate letter. *Id*. at 11-13.

OT registered on 9/17/2020 as a Delaware LLC, Engelbrecht Ex. 6 at 1-2, has a Virginia address on its invoice, Engelbrecht Ex. 5 at 3, but is not registered to do business in Virginia. The first two pages of results of a Google search of OT yield no results of their existence or any activities. Engelbrecht Ex. 6 at 3-6. Crawford told Eshelman that LoudDoor had "created" OT "to protect their private sector work from their political activities." Engelbrecht Ex. 5 at 6. Yacoubian is the President of LoudDoor. Engelbrecht Ex. 6 at 7.

Yacoubian also explained that "Old Town and I had, during the campaign, done

some work that the donor [Eshelman] supported." Engelbrecht Ex. 5 at 11. On

information and belief, that work was on behalf of Our American Century, a federal super

PAC, which raised $7.55 million in 2020—$7 million from Eshelman, and spent

$7,137,563—$5,500,000 by OT. Engelbrecht Ex. 6 at 9-11. Our American Century is the

subject of a Federal Election Commission Complaint by the Campaign Legal Center for

candidate contributions in excess of the contribution limits for republishing candidate

campaign advertisements and for other campaign finance violations. *Id*. at 12-24.

**F.**    **TTV Has and Continues to Conduct the Activities Proposed in VTV, to Meet the Purposes of VTV, and to Meet TTV's Organizational Purposes and Goals.**

TTV has and continues to fulfill VTV's goals. *See generally* Engelbrecht Decl. ¶¶

17, 18, 26. Its 24/7 whistleblower hotline, its podcasts on social media, and its website

have resulted in thousands of responses. *Id.* TTV vets responses, and, if credible, some of

the testimonies are investigated further. *Id.* TTV also notifies legal authorities, policy

makers, or election integrity observers when appropriate. TTV galvanized support in key

states, primarily Michigan, Wisconsin, Pennsylvania, Georgia, Arizona, and Texas by

sharing information with public officials interested in ensuring voting integrity in the

2020 general and future elections. *Id.* In Connecticut, Pennsylvania, Maryland, Texas,

Alabama, and Colorado, TTV and OpSec used regression analysis to determine whether

or not voters were eligible based on residency and/or identity. *Id.*

TTV also worked on the Georgia runoff as part of VTV. *See generally* Engelbrecht

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          10

Decl. ¶ 24. From the beginning, Eshelman was concerned about election integrity issues in Georgia, Engelbrecht Ex. 3 at 11, Ex. 7 at 1-3, and was aware of TTV's VTV work in Georgia. *Id*. at 5-12. TTV is currently defending in federal court the right of voters to file challenges to the eligibility of a voter to vote in a particular election, as provided for by Georgia law. Engelbrecht Decl. ¶ 24; Engelbrecht Ex. 7 at 13-15. Eshelman now claims that his "conditional" gifts did not include "support of other efforts, such as recounts or the Georgia Senate runoff election." Am. Compl. ¶ 21. However, Eshelman never told TTV that one of the "conditions" of his gifts was that the funds could not be used for election integrity efforts in the Georgia Senate runoff election. Engelbrecht Decl. ¶ 25.

## Issues Requiring Resolution with Standard of Review

The issues before this Court are whether to grant Eshelman a temporary restraining order or a preliminary injunction. To be entitled to either form of relief, a plaintiff must show: (1) a substantial likelihood that it will prevail on the merits, (2) a substantial threat that it will suffer irreparable injury if the injunction is not granted, (3) its threatened injury outweighs the threatened harm to the party to be enjoined, and (4) granting the preliminary injunction will not disserve the public interest. *City of El Cenizo, Texas v. Texas*, 890 F.3d 164, 176 (5th Cir. 2018). A preliminary injunction is never awarded as of right and is "an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974).

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                11

## Summary of Argument

Eshelman's motions should be denied because he has not shown that he has a substantial likelihood of success on the merits. All of his claims require a clear showing of both a conditional gift and an agreed-to right of reverter. Eshelman admits that he gave TTV gifts, but the facts demonstrate that, based on Texas law, Eshelman has not clearly shown that his gifts were conditional. Furthermore, he does not even allege, much less present facts clearly showing, that the parties agreed that he had a right to reverter if his "conditions" were not fulfilled. On either of these grounds, the motions should be denied.

## Argument

Eshelman is not substantially likely to succeed on the merits. "To show a likelihood of success, the plaintiff must present a prima facie case." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). However, in evaluating whether a plaintiff has established a prima facie case, the courts must consider not solely the admissible offered by the plaintiff, but also any evidence offered by the defendant. *See* Salazar v. San Juan Cty. Det. Ctr., No. CV 15-0417 JB/LF, 2016 WL 335447, *2 (D.N.M. Jan. 15, 2016).

**A.    Eshelman's Claims Fail Because There Was No "Conditional" Gifts of Any Kind or an Agreed-to Right to Reverter.**

All of Eshelman's claims seek the "return of more that $2.5 million in conditional gifts he gave to Defendant True the Vote, Inc." Am. Compl. ¶ 8. The alleged "condition"

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          12

was that Eshelman "agreed to give an initial gift of $2 million to True the Vote *on the condition* that the funds would be used to fund the initial stages of the Validate the Vote project." *Id*. ¶ 20 (emphasis in original). No matter how one characterizes it, *conditional gifts* are the basis for *all* his claims:

Count I, Breach of Contract, requires, under Eshelman's theory, "a gift in exchange for TTV's commitment to undertake specific efforts" regarding VTV, Am. Compl. ¶ 68, which TTV failed to do. *Id*. ¶ 71. This is a "conditional gift," as Eshelman described it based on his theories. *Id*. ¶ 72.

Count II, Conversion, requires, under Eshelman's theory, "his intent to revoke a conditional gift for failure to satisfy a condition of the gift," *Id*. ¶ 77.

Count III, Declaratory Judgment, requires, under Eshelman's theory, "a valid revocation of a conditional gift," *Id*. ¶ 88.

Count IV, Fraudulent Representation, requires, under Eshelman's theory, "Plaintiff's conditional gift," *Id*. ¶ 93.

Count V, Negligent Misrepresentation, requires, under Eshelman's theory, "Plaintiff's conditional gift," *Id*. ¶ 96.

Count VI, Money Had and Received, requires, under Eshelman's theory, money given to Defendants "as conditioned by Plaintiffs," *Id*. ¶ 97.

One of the two decisive issues is whether Eshelman clearly shows that he gave TTV a "conditional gift." The other is whether Eshelman clearly shows, or even alleges,

that TTV agreed to a right to reverter, if his "conditions" were not met.

A "conditional" gift can come in two forms. One—conditions to the effective *delivery* of the gift where full control of the funds is not transferred from the donor to the donee until those conditions are met. Thus, no gift is actually made. The second type of conditional gift is where the gift has been delivered, but it is clearly shown that there were conditions by the donor on the *spending* of the gift *and* an agreed-to *right to reverter*, if any conditions were not met. Eshelman cites cases for the former but actually argues the latter. He never actually says that the gifts were not made, just that the funds were not spent in the manner he claims he clearly intended. *Id*. ¶¶ 14-22. Eshelman's case collapses because he does not show that he made either form of "conditional gift," or that he established an agreed-to right of reverter.

1. **Eshelman Made No Conditions to the Effective Delivery of the Eshelman Gifts, and Full Control of the Funds Were Transferred from Eshelman to TTV.**

Eshelman cites two Texas cases for authority for the proposition that a gift is only effectively made when there is: (1) a clear intent by the donor to make the gift; and (2) an immediate and unconditional transfer of the property, such that title passes contemporaneously from the donor to the recipient. Motion, 14 (citing *Oadra v. Stegall, 871 S.W.2d 882, 891-92 (Tex. App. 1994)*; *Yates v. Blake*, 491 S.W.2d 751, 754 (Tex. Civ. App. 1973)*).

The *Oadra* and *Yates* Courts analyzed whether a gift had actually been effectively

*delivered* and whether control of the property was divested from one party and transferred to another—not whether the failure to meet a condition for the spending of the funds once delivered could justify reversion, as Eshelman argues. Both cases held that no gift is made unless a donor actually intends for a gift to be fully given over to the donee, and the gift is fully delivered and accepted by the donee. *Oadra*, 871 S.W.2d at 893 (finding no gift if donor maintained control over funds, since "[r]etention of control is the antithesis of a gift."); *Yates*, 491 S.W.2d at 753 (holding no gift of two CDs, because grantor retained ownership and full powers over CDs, even though recipient had physical possession of them).

Eshelman's own pleadings do not support an application of either *Oadra* or *Yates* here. Eshelman knew that TTV is a charitable organization which accepts gifts, Am. Compl. ¶ 2, and admits he made wire transfers to TTV's account. *Id.* ¶¶ 22, 23. As a result, Eshelman completely divested himself of any claim of ownership of the funds once he made the transfers to an account wholly owned and controlled by TTV. Eshelman's gifts were effectively *delivered* when control of the funds were transferred from Eshelman to TTV—Eshelman made no additional "conditions" on the delivery and receipt of the gifts.

### 2. Eshelman Makes No Clear Showing of Conditions on the Spending of Eshelman's Gifts or an Agreed-to Right to Reverter.

Eshelman's claims also fail because he has not clearly shown that he imposed

"conditions" on the spending of the gifts or had an agreed-to right to reverter. No Texas cases exist on this form of conditional gift. However, under other sources of authority and case law outside of Texas, Eshelman cannot establish that he made a conditional gift to TTV, or that he has an agreed-to right to reverter.

In order to show that a gift to a charity was made conditionally and to enforce its return, the donor must make a clear showing of both: (1) the conditions placed on the gift, and (2) an agreed-to right to reverter, if the charity fails to meet the specified conditions. 15 Am. Jur. 2d Charities § 139. A conditional gift is enforceable according to the terms of the document or documents that created the gift. 15 Am. Jur. 2d Charities § 137. Neither conditions nor the right to reverter may be implied unless the intendment is clear. *Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens*, Inc., 318 Md. 47, 52 (1989).

While courts might enforce oral conditions and an agreed-to right to reverter based on oral testimony, Bopp has found no authority showing that conditions, or a right to reverter, may be enforced based *exclusively* on oral testimony. *See, e.g., Adler v. Save*, 432 N.J. Super. 101,111 (App. Div. 2013) (using charity's email solicitations and acknowledgments, check stub memo lines, and other written evidence, along with oral testimony, to determine the donor's intent).

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**                16

### a. Eshelman Has Not Clearly Shown Conditions on the Spending of Eshelman's Gift.

Eshelman must clearly show that there were conditions on the spending of his gift. However, Eshelman fails to even allege he clearly communicated conditions to TTV and the facts do not support his allegations.

### i. Eshelman Fails to Allege That He Imposed Conditions on TTV's Spending of His Gifts.

Eshelman consistently alleges that his purported conditions arise from his "reliance" on TTV's "representations." For instance, Eshelman claims that "[i]n reliance on Defendant's representations regarding Defendants' comprehensive plans . . . [regarding] their [VTV] efforts, Plaintiff agreed to give an initial gift of $2 million to True the Vote *on the condition* that the funds would be used to fund the initial stages of [VTV]." Am. Comp. ¶ 20 (emphasis in original). Eshelman repeatedly alleges that this "condition" arises "in reliance on Defendant Engelbrecht's representations." *Id*. ¶¶ 22, 26, 27.

A condition on a gift does not arise based on "reliance" by the donor on what the donee says they are doing or going to do. The condition needs to be expressly communicated to the donee. This is implicit from the general law of gifts which provides that "monies donated to a charitable entity are said to be impressed with a charitable trust for the benefit of the public, meaning the funds have to be used for the organization's stated purposes and any other restrictions." Darren B. Moore, Megan C. Sanders, *Giving*

*With Strings Attached: An Examination of Key Issues for Consideration*, 1, State Bar of Texas 12th Annual Governance of Nonprofit Organizations (2014), attached as Appendix, (citing *Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App. 1986)). So without clearly shown conditions on spending the funds, the charity can use the funds for its general purposes.

Since a conditional gift is an exception to the general rule that a gift can be used by the charity for its stated purposes, then the donor's imposition of conditions on his gift must be expressly communicated to the donee, almost always in writing or with written evidence of it. "Conditional" gifts cannot arise only from a donor's state of mind—as Eshelman contends here—otherwise, every dissatisfied donor, who had received any explanation of the charity's activities and plans, could enforce the "conditions" that arose in his mind. Eshelman's state of mind of "relying" on TTV's "representations" is not enough to clearly show his "conditions," but that state of mind is all he alleges.

Engelbrecht explains how it works in the charitable world and at TTV:

[TTV] operates entirely and exclusively on the contributions of its donors. Before a donor contributes, I often discuss with them the current and proposed activities and projects of TTV. If a donor had wanted to impose conditions on a gift, I always expected that the donor would make that explicit and I would have to agree to the conditions attached to the prospective gift.

Engelbrecht Decl. ¶ 3.

**Def. Bopp and BLF
Resp. in Opp. to TRO/PI**            18

> **ii.     The Facts Do Not Clearly Show That Eshelman Imposed Any Conditions on the Spending of His Gifts.**

TTV asked Eshelman for the facts which demonstrate that he "communicated the conditions upon his gifts," and he responded, "during phone conversation with Defendant Engelbrecht . . . on November 4, 5, and 13, 2020," which he also claimed were affirmatively acknowledged by Engelbrecht in a letter on November 22nd. Engelbrecht Ex. 1 at 7 (citing Am. Compl., Ex. 5).

**November 4, 2020 Phone Call**

There was no phone call between Engelbrecht and Eshelman on November 4th. Their first communication of any kind was a phone call on November 5th. *See* Facts at A.

**November 5, 2020 Phone Call**

Engelbrecht swears that there was no discussion, on the November 5th phone call, that Eshelman's gift was conditional in any way or that he could claim his gift back. *Id.* And while Eshelman claims that the conditions arose from the November 5th call, Am. Compl., ¶ 20—this is not credible for several reasons.

First, there is no written record of any kind about what was said by Eshelman to Engelbrecht on their phone call of November 5th. The other parties to the call, Crawford and Yacoubian, Eshelman's representatives, provide no supporting Declarations. In fact, in the 168 pages of communications produced by Eshelman, or in the numerous written communications that he and his representatives had with Engelbrecht, there is not even

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          19

one single statement or reference to Eshelman's gifts being conditioned in any way, until Eshelman decided to demand his gift back following TTV's refusal to pay OT's invoice at Eshelman's demand. *See* Facts at A, D and E. It strains credulity that a donor would contribute $2.5 million to a charity based on conditions important to him, but that those conditions were never referred to in his or his representatives' numerous written communications with Engelbrecht or between Eshelman, Crawford, and Yacoubian.

Second, the November 5th phone conversation could not have involved a detailed discussion of VTV, beyond the whistleblower piece, since at the time of the phone call, VTV didn't exist and wasn't named, no applicable project proposal had been drafted, and Engelbrecht did not know about a central element to it—Bopp's litigation proposal. *See generally* Facts at A.

Finally, the facts leading up to the November 5th phone call, and right after, conclusively show that it was all about Eshelman's desire for a "reward program" for voter fraud reporting and TTV's existing whistleblower project. *Id.*

### November 13, 2020 Phone Call

Regarding the November 13th call, the only thing that Eshelman alleges specifically about it is in paragraphs 26-27 of his Amended Complaint. There, Eshelman does not actually say that he had a phone call with Engelbrecht and Engelbrecht denies that one occurred. Facts at D. What we do know is that there was an email exchange between Crawford and Eshelman, where Crawford told Eshelman that "we may need

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**              20

additional short term money for Bopp" and Eshelman responded "having Nan transfer

$500k today." Engelbrecht Ex. 4 at 10-11. There was absolutely nothing said in that email

exchange that the additional gift would be "subject to the same conditions that those

funds would be used to fund [VTV]," as Eshelman alleges. Am. Compl. ¶ 26.

### November 22, 2020 Engelbrecht Letter

Eshelman cited Engelbrecht's letter of November 22nd as the remaining factual

support for his alleged conditions on his gifts. Am. Compl. Ex. 5. Eshelman points to a

statement letter that TTV "spent the money on the project we discussed with Mr.

Eshelman," as proof that "Engelbrecht affirmatively acknowledged . . . [that] Plaintiff's

gifts . . . were to be used expressly for . . . [activities] in connection with the 2020 general

election." Engelbrecht Ex. 1 at 8. However, this factual statement does not say a thing

about the gifts being conditioned on that spending.

### b.    Eshelman Has Not Clearly Shown, or Even Alleged, an Agreed-to Right to Reverter.

Under Texas law, an obligation to return personal property donated to a charity

exists only if there is an enforceable reversionary right by virtue of an agreement between

the donor and donee. Moore at 7, 8. "This is true because a charitable contribution is, by

its nature, an irrevocable gift whereby the donor is releasing control of the property to the

charity." *Id.* (citing *Harmon v. Schmitz*, 39 S.W.2d 587, 589 (Tex. Comm'n App.1931,

judgm't adopted); *see also Carroll v. City of Beaumont*, 18 S.W.2d 813, 819–20 (Tex.

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**            21

Civ. App. 1929), writ refused (Nov. 27, 1929) (holding agreed-to reversionary interest is necessary). The legal right to reverter may not be implied—it must be clear in the agreement between the donor and charity. *Ringgold,* 318 Md. at 52 (1989).

Eshelman never even alleges an agreed-to right to reverter, even if he had clearly established a "conditional" gift. *See generally* Facts at B. He alleges that he gave gifts to TTV on the condition, created by his "reliance" on TTV's "representations," that the funds would be used for the initial stages of VTV, Am. Compl. ¶ 20, but he never even alleges, much less clearly shows, that he claimed to TTV the right to get his gifts back, if his conditions were not met.

Thus, on either ground, all of his claims fail. Moreover, Eshelman has not shown irreparable injury, that his threatened injury outweighs the threatened harm to TTV, and that granting the preliminary injunction will not disserve the public interest. *See* Defendant TTV's Response, incorporated by reference herein.

## Conclusion

Eshelman has not shown that he is substantially likely to prevail on the merits, since he has not made a clear showing that his gifts were conditional or that he claimed, and the parties agreed, that he had a right to reverter if the conditions were not fulfilled. As a result, Bopp respectfully requests this Court deny both the motion for the temporary restraining order and for preliminary injunction.

Dated: January 21, 2021

Respectfully Submitted,

/s/ Brock Akers

Brock Akers,
State Bar No. 00953250
AKERS FIRM
The Clocktower Building
3401 Allen Parkway, Ste. 101
Houston, Texas 77019
(713) 877-200
(713)583-8662 (Fax)
*Attorney-in-charge*

Respectfully Submitted,

/s/ James Bopp, Jr.

James Bopp, Jr.,* IN # 2838-84
 jboppjr@aol.com
Jeffrey P. Gallant, *VA # 46876
 jgallant@bopplaw.com
Courtney Turner Milbank,*
IN # 32178-29
 cmilbank@bopplaw.com
Melena S. Siebert,* IN # 35061-15
 msiebert@bopplaw.com
Rob Citak,* KY # 98023
 rcitak@bopplaw.com
THE BOPP LAW FIRM, PC
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
* Admitted *pro hac vice*
*Counsel for Defendant*

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          23

## Certificate of Word Count

I hereby certify that the foregoing document has 4,985 words, pursuant to this Court's rules.

/s/ James Bopp, Jr.
James Bopp, Jr

## Certificate of Conference

I hereby certify that on January 13, 2021, all counsel met and conferred via a video conference platform. During that conference, the issues outstanding before this Court were discussed. The results of this conference were submitted in a Joint Status Report, ECF 42. This Court ordered this response be filed by January 21, 2021. *See* ECF 44. This Court also granted Eshelman's motion to file under seal. Id. This Court's case manager explained to Bopp's counsel that any exhibits which comport with the Court's Order regarding Eshelman's motion to seal (e.g., bank account numbers), may be filed under seal, without a separate motion for leave to do so.

/s/ James Bopp, Jr.
James Bopp, Jr.

**Def. Bopp and BLF**
**Resp. in Opp. to TRO/PI**          24

## Certificate of Service

I hereby certify that on January 21, 2021, a true and correct copy of the foregoing document and all attachments thereto have been forwarded to counsel of record via the Court's CM/ECF system.

/s/ James Bopp, Jr.
James Bopp, Jr.