**Appendix**
**to**
**Defendant James Bopp, Jr. and The Bopp Law Firm, PC**
**Consolidated Response in Opposition to Plaintiff's Verified**
**Emergency Application for Temporary Restraining Order and**
**Verified Motion for Preliminary Injunction**

**"*Giving With Strings Attached: An Examination of Key Issues*
*for Consideration*"**

# GIVING WITH STRINGS ATTACHED:
# AN EXAMINATION OF KEY ISSUES FOR CONSIDERATION

**DARREN B. MOORE**
**MEGAN C. SANDERS**
Bourland, Wall & Wenzel, P.C.
Attorneys and Counselors
301 Commerce Street, Suite 1500
Fort Worth, Texas 76102
(817) 877-1088
(817) 877-1636 (facsimile)
E-mail: dmoore@bwwlaw.com

State Bar of Texas
**12th ANNUAL**
**GOVERNANCE OF NONPROFIT ORGANIZATIONS**
August 21-22, 2014
Austin

# CHAPTER 9

The information set forth in this outline should not be considered legal advice, because every fact pattern is unique.  The information set forth herein is solely for purposes of discussion and to guide practitioners in their thinking regarding the issues addressed herein.

All written material contained within this outline is protected by copyright law and may not be reproduced without the express written consent of Bourland, Wall & Wenzel.

© Bourland, Wall & Wenzel, P.C.

# Speaker/Author

**DARREN B. MOORE**
Bourland, Wall & Wenzel, P.C.
301 Commerce Street
Fort Worth, Texas

Phone: (817) 877-1088
Email: dmoore@bwwlaw.com
Twitter: @darrenbmoore
Blog: moorenonprofitlaw.com

Mr. Moore practices with Bourland, Wall & Wenzel, P.C., a Fort Worth, Texas law firm which represents individuals, closely held and family businesses, professional practices and charitable organizations within its areas of legal practice. Mr. Moore was born in Lubbock, Texas on December 11, 1973. He earned a B.A., cum laude, from Texas A&M University and his J.D., magna cum laude, from Baylor Law School where he served as Editor in Chief of the Baylor Law Review.

Mr. Moore was admitted to practice law in Texas in 2000 and before the United States District Court, Northern District of Texas and United States Tax Court in 2001. He is a member of the State Bar of Texas; Tarrant County Bar Association; American Bar Association (Business Law Section, Section of Taxation); College of the State Bar; and is a Fellow of the Texas Bar Foundation. He has been named a "Rising Star" by Texas Super Lawyers in 2009, 2010, 2011, 2012, and 2013.

Mr. Moore's practice focuses on representation of nonprofit organizations. Mr. Moore advises clients on a wide range of tax and legal compliance issues including organization of various types of nonprofit entities, obtaining and maintaining tax-exempt status, risk management, employment issues, governance, and other business issues, as well as handling litigation matters on behalf of his exempt organization clients.

Mr. Moore is an adjunct professor at Baylor Law School where he has taught Nonprofit Organizations since 2001. Additionally, he writes and speaks regularly on tax and legal compliance issues including co-authoring the third edition of Bourland, Wall & & Wenzel, P.C.'s publication, <u>Keeping Your Church Out of Court</u>.

# Author
## Megan C. Sanders
## Bourland, Wall & Wenzel, P.C.
## Fort Worth, Texas

Megan C. Sanders joined the firm as an associate in 2011. An honors graduate of Baylor University School of Law and Texas Christian University, her practice focuses primarily on estate planning, probate, charitable entity formation, charitable giving, and tax planning issues. She represents professionals, families, charitable entities and closely-held businesses in the firm's areas of expertise to achieve their estate planning, wealth migration, asset protection, and transfer tax planning goals, among others.

### Relevant Experience

- Co-author, Gifting of Unusual Gifts with a Focus on Oil and Gas and Real Estate, presented at the 29th Annual Nonprofit Organizations Institute, January 18-20, 2012
- Co-author and co-presenter, The Design and Implementation of Conflict of Interest and Gift Acceptance Policies, presented to the Fort Worth chapter of the Texas Society of CPAs, September 25, 2012.
- Co-author and co-presenter, Nuts & Bolts: Estate & Charitable Planning 101, presented to the North Texas Chapter of the Partnership for Philanthropic Planning, March 12, 2013.
- Co-author and co-presenter, Legal & Tax Uncertainty: How to Work with Your Donors to Plan for It, presented to the North Texas Chapter of the Partnership for Philanthropic Planning, March 12, 2013.
- Co-author, Charitable Remainder Trusts, presented to the Planned Giving Council of Houston, March 28, 2013.
- Author, Roundtable Discussion: Charitable Giving With Oil and Gas Interests, Presented to The American College of Trust and Estate Counsel 2013 Fall Meeting, October 24-27, 2013.
- Author, Resolving Trustee Disputes: Foundation Split-Ups and Other Approaches,
  - Presented to the SALK Institute, 41st Annual Tax Seminar for Private Foundations, May 15-17, 2013;
  - Presented to the State Bar of Texas 11th Annual Governance of Nonprofit Organizations, August 22-23, 2013;
  - Published in Family Foundation Advisor, Vol. 12, No. 5, 6 and 7, 2013; and
  - Presented to The University School of Law-Conference of Southwest Foundations 31st Annual Nonprofit Organizations, January 15-17, 2014.
- Author, Gifts From Cousin Eddie: Foundation Acceptance, Ownership & Management of Bizarre Assets, Presented to the SALK Institute, 42nd Annual Tax and Management Seminar for Private Foundations, May 14-16, 2014

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................... 1

II.   THE GENESIS OF THE RESTRICTION – HOW DO RESTRICTIONS COME ABOUT? ............................... 1

III.  QUESTIONS ARISING WITH RESTRICTED GIFTS UNDER STATE LAW ..................................... 1
    A.  What is the effect of a restricted gift? ........................................................................ 1
    B.  What if we don't understand the restriction? .............................................................. 2
    C.  What if we can't follow the restriction or prefer not to follow it? ............................... 3
    D.  What if we choose to ignore the restriction? .............................................................. 6
    E.  Can We Return A Donation? ...................................................................................... 8

IV.   QUESTIONS ARISING WITH RESTRICTED GIFTS UNDER FEDERAL LAW ............................ 8
    A.  General rule on deductibility ..................................................................................... 8
    B.  Is a partial interest deductible? .................................................................................. 8
    C.  What is the result of an incomplete gift? ................................................................... 9
    D.  What is the result of conditions? ............................................................................... 9
    E.  Does a restriction affect valuation? ......................................................................... 10
    F.  What if the donor gets something in return? ............................................................ 10
    G.  What should we know about earmarked gifts? ........................................................ 10
        1.  Individual selected by donor ........................................................................... 10
        2.  Individual selected by charity .......................................................................... 11
        3.  Deputized fundraising ..................................................................................... 11
        4.  Crowdfunding issues ....................................................................................... 12
        5.  Scholarships .................................................................................................... 12
        6.  Gifts earmarked for non-exempt entities ......................................................... 12
        7.  Friends of Organizations ................................................................................. 13
        8.  Fiscal sponsorship ........................................................................................... 14
    H.  How do the earmarking rules apply to private foundations? .................................... 14
        1.  Grants for Travel, Study, and Other Similar Purposes .................................... 14
        2.  Grants to non-exempt entities ......................................................................... 15

V.    CONCLUDING THOUGHTS ......................................................................................... 15

EXHIBIT 1 ............................................................................................................................... 17

EXHIBIT 2 ............................................................................................................................... 21

# GIVING WITH STRINGS ATTACHED: AN EXAMINATION OF KEY ISSUES FOR CONSIDERATION

## I.  INTRODUCTION

Donors to charitable organizations routinely give gifts intended for certain programs or projects.  Donors have many motivations for doing so, and charities desiring to have their programs and projects supported, routinely work with donors in the area of gift restrictions.  From time to time donors will seek to restrict gifts for the benefit of individuals as scholarship gifts or missions support.  Common types of restrictions include restrictions on purpose, investment, administration, naming rights, and endowment gifts.  Although restricted gifts provide the opportunity of valuable contributions to charitable organizations and the chance for a donor to benefit a targeted area while making a deductible contribution, the area of restricted gifts poses hazards that both the charitable organization as well as the donor must understand.  Gifts with restrictions, that is gifts with strings attached, should be carefully reviewed to ensure the charity can (and should) comply with the restrictions and the donor receives the tax treatment desired.  This paper will examine key considerations with respect to gift restrictions arising under state law and federal law for the charity and the donor.

## II.  THE GENESIS OF THE RESTRICTION – HOW DO RESTRICTIONS COME ABOUT?

There are three general methods by which a gift is restricted.  First, restrictions may arise from the specific purposes identified in the organizational instrument of the donee.  *See Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App.—Houston [1ˢᵗ Dist.] 1986, writ ref'd n.r.e.).  Second, restrictions may be initiated by a donor including restrictions appearing in a deed or gift or grant agreement, restrictions appearing in a letter transmitting a gift, or even restrictions appearing on the memo line of a check.  Finally, there are restrictions initiated by the donee through a program of solicitation.  For example, to the extent funds are raised based on solicitations that the funds will be used for a specific project (as opposed to general support of the organization), the donated funds are restricted to such use.[1]  Ultimately, whether a gift was given based on an implied agreement that it be used for a specific purpose and only that specific purpose is a question of fact.  *See Lokey v. Texas Methodist Foundation*, 479 S.W.2d

260, 266-67 (Tex. 1972).  A final note: while some organization may view funds that the board has set aside for endowment or other specific purposes to be restricted, these types of "quasi-endowments" are precatory only.

## III.  QUESTIONS ARISING WITH RESTRICTED GIFTS UNDER STATE LAW

### A.  What is the effect of a restricted gift?

In general, when a charitable organization accepts a restricted gift the restriction is legally binding on the charity.  To understand the state law basis for enforcement of restricted gifts requires an understanding of the characterization of the gift under Texas law and the fiduciary obligations of directors of charitable organizations.

A Texas nonprofit corporation organized for charitable purposes is considered a "charitable entity".  *See* Tex. Prop. Code § 123.001(1)(2).  Monies donated to a charitable entity are said to be impressed with a charitable trust for the benefit of the public, meaning the funds have to be used for the organization's stated purposes and consistent with any other restrictions.  *See Blocker*, 718 S.W.2d at 415.  Although statutory law makes clear directors are themselves not held to the fiduciary standard of a trustee, this law highlights not only the fiduciary nature played by directors but also the role of the charity as a "trust" holding a restricted gift.  *See, e.g.*, Texas Business Organizations Code ("BOC") § 22.223.

Texas law is clear that corporate directors owe a strict fiduciary obligation to the corporation as a matter of law.  *See International Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *Landon v. S&H Marketing Group, Inc.*, 82 S.W.3d 666, 672 (Tex. App.—Eastland 2002, no pet.); *General Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied).  Two primary fiduciary duties of nonprofit directors are universally recognized: the duty of care and the duty of loyalty.  The duty of care most simplified is a duty to stay informed and exercise ordinary care and prudence in management of the organization.  *See Holloway*, 368 S.W.2d at 576.  The Business Organizations Code specifies that a director must act in good faith and use the care that a person of ordinary prudence would use in the same or similar circumstances making decisions that the director reasonably believes to be in the best interests of the corporation.  BOC § 22.221(a).  The Texas Supreme Court has described the duty of loyalty as requiring "an extreme measure of candor, unselfishness, and good faith."  *See International Bankers Life Ins. Co.*, 368 S.W.2d at 577.  To satisfy the duty of loyalty, the director must act for the benefit of the organization and not for his or her personal benefit, i.e. the duty of loyalty requires undivided

---

[1]  However, to the extent donors are advised that the organization has full authority to apply designated donations/contributions to any purpose of the organization (for example, in the event the project is abandoned), no ongoing restriction would follow the assets.

1

loyalty to the organization. *See Landon*, 82 S.W.3d at 672.

A third duty is often added – the duty of obedience. *See, e.g.*, Johnny Rex Buckles, *How Deep are the Springs of Obedience Norms that Bind the Overseers of Charities?*, 62 Cath. U. L. Rev. 913 (2013). There continues to be scholarly debate regarding the duty of obedience and whether it should be separately identified as a distinct fiduciary duty. The American Law Institute's Principles of Law of Nonprofit Organizations decline to separately identify the duty of obedience. Principles of the Law of Nonprofit Organizations, § 300, cmt. (g)(3) (American Law Institute). However, those Principles recognized the concepts widely understood to be concepts of obedience (e.g., following the law, fidelity to the purposes of the corporation, following gift restrictions) as applicable components of the duties of care and loyalty. Although no Texas case specifically discusses the duty of obedience, charities are well-advised to understand and appreciate the duty of obedience if for no other reason than because the Office of the Attorney General, charged with enforcing nonprofit director compliance with fiduciary norms in Texas, recognizes the duty of obedience. *See, e.g.*, John W. Vinson, *The Charity Oversight Authority of the Texas Attorney General*, 35 St. Mary's L. J. 243, 272-73 (2004).

In practice, the duty of obedience requires a director to follow the governing documents of the organization, laws applicable to the organization (including reporting and regulatory compliance), and restrictions imposed by donors. Following express restrictions in gift agreements is much less challenging from a standpoint of understanding the restriction than following a restriction imposed as a result of solicitations. Even less clear is the situation where the restriction arises as a result of the organization's governing documents, particularly post-amendment of those governing documents.

An important question is whether a future governing board may amend or alter the purposes of the organization to a different charitable purpose. Of course where the corporation has obtained recognition of its tax-exempt status, it has made certain representations to the Internal Revenue Service (the "Service") as to its purposes and operations. Nevertheless, it is possible to inform the Service of a change in purpose and continue operations. The larger question is how such action would implicate the duty of obedience under state law. May the board freely amend where there is no prohibition to same in the governing documents and the corporate form was intentionally chosen to provide latitude to the governing body? Must the approval of the Attorney General be sought? How broadly should the purpose be defined in making the determination of whether a deviation exists? May a board only change the purpose

when such purpose has become impossible, illegal or impracticable (i.e. when the doctrine of cy pres would apply)? If the purposes are amended, must the assets of the corporation on hand at the time of the change be restricted to the former purposes absent court or AG approval? As one court has stated "those who give to a home for abandoned animals do not anticipate a future board amending the charity's purpose to become research vivisection" *See Attorney General v. Hahnemann Hospital*, 494 N.E. 2d 1011, 1021 n.18 (Mass. 1986). These questions will be considered in Section III.c. below. In any event, should a board contemplate deviating from the established purpose in its governing documents, particularly where the organization has been significantly funded with its current purposes, the duty of obedience should be carefully considered.

**B.    What if we don't understand the restriction?**

The Uniform Declaratory Judgments Act provides statutory authority for a court to construe the terms of a grant agreement constituting a contract as well as to construe the terms of a gift constituting a charitable trust. *See* Tex. Civ. Prac. & Remedies Code §§ 37.004, 37.005. Section 37.005 of the Texas Civil Practice and Remedies Code provides that "a person interested as or through an executor or administrator, including an independent executor or administrator, a trustee, guardian, other fiduciary, creditor, devisee, legatee, heir, next of kin, or cestui que trust in the administration of a trust or of the estate of a decedent, an infant, mentally incapacitated person, or insolvent may have a declaration of rights or legal relations in respect to the trust or estate: (1) to ascertain any class of creditors, devisees, legatees, heirs, next of kin, or others; (2) to direct the executors, administrators, or trustees to do or abstain from doing any particular act in their fiduciary capacity; (3) to determine any question arising in the administration of the trust or estate, including questions of construction of wills and other writings; or (4) to determine rights or legal relations of an independent executor or independent administrator regarding fiduciary fees and the settling of accounts." In the case of a purely charitable trust, it will most often be the trustee(s) who bring a construction action (though a named beneficiary could do so). In the case of a nonprofit corporation, the action may be brought by the corporate entity. The declaration sought from the court should be limited to one of the enumerated areas.

In construing an instrument purporting to create a trust, the rules for the interpretation of deeds, wills, and other written instruments are followed. *See Blieden v. Greenspan*, 742 S.W.2d 93 (Tex. App. Beaumont 1987), judgment rev'd on other grounds, 751 S.W.2d 858 (Tex. 1988). The cardinal principle in construing a trust is the ascertainment of the settlor's (donor's)

intention with the view of effectuating that intent. *See Parrish v. Mills*, 101 Tex. 276, 106 S.W. 882 (1908). The intention of the settlor/donor at the time of the trust's creation is determinative. *See Cutrer v. Cutrer*, 345 S.W.2d 513, 519 (Tex. 1961). The intent of the settlor/donor must be ascertained from the four corners of the trust instrument. *See Moody v. Pitts*, 708 S.W.2d 930 (Tex. App.—Corpus Christi 1986, no writ). Thus, a court does not focus on what the grantor/donor intended to write but the meaning of the words actually used. *See San Antonio Area Found. v. Lang*, 35 S.W.3d 636, 639 (Tex. 2000).

When there is no dispute about the meaning of words used in an instrument, extrinsic evidence will not be received to show that the settlor/donor intended something outside the words used. *See Lehman v. Corpus Christi Nat'l Bank*, 668 S.W.2d 687, 688 (Tex. 1984). If, on the other hand, the meaning of words used in an instrument is uncertain or reasonably susceptible to more than one meaning, the instrument is ambiguous. *See Davis v. Shanks*, 898 S.W.2d 285, 286 (Tex. 1995). There are, therefore, two separate analyses depending upon whether the instrument is unambiguous or ambiguous.

If the language of the instrument is unambiguous and expresses the intent of the settlor/donor, it is unnecessary to construe the instrument because it speaks for itself. *See Sorrel v. Sorrel*, 1 S.W.3d 867 (Tex. App—Corpus Christi 1999, no pet.). Where the trustee's (or entity's) powers are unambiguously conferred by the instrument, neither the trustee/entity nor the courts can add to or take away from those powers. *See Moody*, 708 S.W.2d at 935. Extrinsic evidence may not be introduced to show that the settlor/donor intended something outside of the words used. *See San Antonio Area Found.*, 35 S.W.3d at 639.

If, on the other hand, the meaning of the instrument is uncertain or "reasonably susceptible to more than one meaning," the instrument is ambiguous. *See Eckels v. Davis*, 111 S.W.3d 687, 694 (Tex. App.—Fort Worth 2003, pet. denied). An ambiguity can be either patent or latent. A patent ambiguity arises on the reading of the trust from the words themselves. *See id.* at 695. A latent ambiguity exists when the trust appears to convey a sensible meaning on its face but cannot be carried out without further clarification. *See id.* While extrinsic evidence may not be introduced if there is no ambiguity, a court may admit extrinsic evidence to show the settlor's intent where there is a latent or patent ambiguity. *See id.* at 696.

A proceeding to construe the terms of a charitable trust (including one arising as a result of a restricted gift to a nonprofit corporation) is a "proceeding involving a charitable trust" as that term is defined in Section 123.001(3) of the Texas Property Code. As a result, upon initiation of this type of proceeding under Chapter 37 of the Texas Civil Practices and Remedies Code, notice and the opportunity to intervene must be given to the Office of the Attorney General ("OAG").

## C.  What if we can't follow the restriction or prefer not to follow it?

When a restriction cannot be fulfilled, or, in the event a charity desires to seek modification of a restriction, the charity should first understand the genesis of the restriction (see Section II, supra) because restrictions arising as a result of the charity's organizational documents offer different considerations.

With respect to restrictions arising from a written statement of intent from the donor or as a result of a program of solicitation, the question is whether the restriction is on an institutional fund or a program-related fund.[2]  Charities seeking release or modification of institutional funds will look to rules provided by UPMIFA. Charities seeking release or modification of program-related funds will look to the doctrines of cy pres and equitable deviation.[3]

Traditionally, the only way to alter or remove the restrictions was through application of the doctrine of cy pres. The doctrine of cy pres applies where a donor has made the donation with general charitable intent, that is, an intent that the funds be devoted to a more general charitable purpose than the specific purpose serving as the basis of the restriction. Where the donor manifests general charitable intent, a court may direct use of the funds to purposes as near as possible to the initial purposes when the initial purposes are or become impossible, impracticable, or illegal. *See* Restatement (Second) of Trusts § 399 (1959); *see also* Tex. Prop. Code § 112.054; Johnny Rex Buckles, *When Charitable Gifts Soar above Twin Towers: A Federal Income Tax Solution to the Problem of Publicly Solicited Surplus Donations Raised for a Designated Charitable Purpose*. 71 Fordham L. Rev. 1827 (2003). Importantly, a restrictive purpose does not fail merely because it is not "efficient" to continue it.

---

[2]  This discussion assumes the charity is a nonprofit corporation and thereby subject to UPMIFA.

[3]  There is some debate about whether such an action would be brought under the common law or under Section 112.054 of the Property Code (on the basis that restrictions results in assets being impressed with a charitable trust). Under either circumstance the standards are the same; however, under Section 112.054, the petitioner may seek reasonable and necessary fees in brining the action under Section 114.064. At the same time Section 163.011 of UPMIFA specifies that the Texas Trust Code does not apply to any institutional fund governed by UPMIFA.

Case 4:20-cv-04034   Document 45-2   Filed on 01/21/21 in TXSD   Page 13 of 31

The doctrine of cy pres applies to use of the donated funds. A similar doctrine, equitable deviation, applies to modification of administrative terms of a gift when the terms as imposed are or become impossible or illegal, or where compliance would substantially impede the accomplishment of the purposes of the gift due to circumstances not anticipated by the donor. *See* Restatement (Second) of Trusts § 381; *see also* Tex. Prop. Code § 112.054.

Application of the doctrines of cy pres and equitable deviation are restrictive as both necessitate a finding of related to the difficulty of following the restriction (cy pres: carrying out the designated purposes of the gift is, or has become impossible, impracticable, or illegal).

In 2007, Texas adopted the Uniform Prudent Management of Institutional Funds Act ("UPMIFA"). It can be found in Chapter 163 of the Texas Property Code. UPMIFA provides modern articulations of the prudence standards for the management and investment of charitable funds and for endowment spending. Additionally, UPMIFA has specific provisions that speak to the release or modification of restrictions in certain cases with respect to institutional funds.

UPMIFA in Texas applies to Texas "institutions" managing "institutional funds" or "endowment funds". "Institution" is defined to include: (1) a person, other than an individual, organized and operated exclusively for charitable purposes; (2) a government or governmental subdivision, agency or instrumentality, to the extent that it holds funds exclusively for a charitable purpose; and (3) a trust that had both charitable and noncharitable interests, after all noncharitable interests have terminated. *See* Tex. Prop. Code § 163.003(4). "Institutional fund" means a fund held by an institution exclusively for charitable purposes. The term does not include: (A) program related assets; (B) a fund held for an institution by a trustee that is not an institution; or (C) a fund in which a beneficiary that is not an institution has an interest, other than an interest that could arise upon violation or failure of the purposes of the fund. *See* Tex. Prop. Code § 163.003(5). An endowment fund is defined as "an institutional fund or part thereof that, under the terms of a gift instrument, is not wholly expendable by the institution on a current basis. The term does not include assets that an institution designates as an endowment for its own use." Tex. Prop. Code § 163.003(2). A "gift instrument" is defined by UPMIFA as a record or records, including an institutional solicitation, under which property is granted to, transferred to, or held by an institution as an institutional fund." Tex. Prop. Code § 163.003(3).

UPMIFA permits release or modification of restrictions on institutional fund management, investment and/or purpose in limited circumstances.[4] If the donor consents in a record, an institution may release or modify, in whole or in part, a restriction contained in a gift instrument on the management, investment or purpose of an institutional fund. A release or modification may not allow a fund to be used for a purpose other than a charitable purpose of the institution. Tex. Prop. Code § 163.007(a). Absent donor written consent, such as in the case of a deceased or unidentified donor, an institution may apply to a court for modification of a restriction on management or investment of an institutional fund, on the grounds of impracticability or wastefulness, if it impairs the management or investment of the fund, or if, because of circumstances no anticipated by the donor, a modification of a restriction will further the purposes of the fund, and the court may modify. To the extent practicable, any modification must be made in accordance with the donor's probable intention. Tex. Prop. Code § 163.007(b). An institution may apply to a court for modification of a particular charitable purpose or a restriction contained in a gift instrument on the use of an institutional fund, if such purpose or restriction becomes unlawful, impracticable, impossible to achieve, or wasteful, and the court may modify in a manner consistent with the charitable purposes expressed in the gift instrument. Tex. Prop. Code § 163.007(c). If an institution applies to a court for modification, Chapter 123 of the Texas Property Code applies (and therefore the AG must be notified in accordance with that chapter). *See* Tex. Prop. Code § 163.007(b) and (c).

For certain smaller and older funds, if an institution determines that a restriction contained in a gift instrument on the management, investment, or purpose of an institutional fund is unlawful, impracticable, impossible to achieve, or wasteful, the institution, 60 days after receipt of notice by the AG, may release or modify the restriction, in whole or in part, if:

- The institutional fund subject to the restriction has a total value of less than $25,000;
- More than 20 years have elapsed since the fund was established; and
- The institution uses the property in a manner consistent with the charitable purposes expressed in the gift instrument.

---

[4] When considering release of restrictions under UPMIFA, keep in mind the definition of "institutional fund" expressly excludes program-related assets.

The notification to the AG must be accompanied by a copy of the gift instrument and a statement of facts sufficient to evidence compliance with the requirements set out above. *See* Tex. Prop. Code § 163.006(d).

Note that UPMIFA does not apply to trusts managed by corporate or individual trustees, but the Act does apply to trusts managed by charities. A charity whose governing instrument is a trust document (and whose trustee is not a charity) is instead governed by the Texas Uniform Prudent Investor Act (located in Chapter 117 of the Texas Property Code) for investment and management issues.

Modification and/or termination of a charitable trust is governed by the Texas Trust Code. When drafting a petition to modify or terminate a trust, the practitioner must comply with Section 112.054 (or if the trust is uneconomical, Section 112.059) of the Property Code.

Section 112.054 provides as follows:

(a) On the petition of a trustee or a beneficiary, a court may order that the trustee be changed, that the terms of the trust be modified, that the trustee be directed or permitted to do acts that are not authorized or that are forbidden by the terms of the trust, that the trustee be prohibited from performing acts required by the terms of the trust, or that the trust be terminated in whole or in part, if:

(1) the purposes of the trust have been fulfilled or have become illegal or impossible to fulfill;

(2) because of circumstances not known to or anticipated by the settlor, the order will further the purposes of the trust;

(3) modification of administrative, nondispositive terms of the trust is necessary or appropriate to prevent waste or avoid impairment of the trust's administration;

(4) the order is necessary or appropriate to achieve the settlor's tax objectives and is not contrary to the settlor's intentions; or

(5) subject to Subsection (d):

(A) continuance of the trust is not necessary to achieve any material purpose of the trust; or

(B) the order is not inconsistent with a material purpose of the trust.

(b) The court shall exercise its discretion to order a modification or termination under Subsection (a) in the manner that conforms as nearly as possible to the intention of the settlor. The court shall consider spendthrift provisions as a factor in making its decision whether to modify or terminate solely because the trust is a spendthrift trust.

(c) The court may direct that an order described by Subsection (a)(4) has retroactive effect.

(d) The court may not take the action permitted by Subsection (a)(5) unless all beneficiaries of the trust have consented to the order or are deemed to have consented to the order. A minor, incapacitated, unborn, or unascertained beneficiary is deemed to have consented if a person representing the beneficiary's interest un-der Section 115.013(c) has consented or if a guardian ad litem appointed to represent the beneficiary's interest under Section 115.014 consents on the beneficiary's behalf.

A petition under the Texas Property Code to modify or terminate a trust may only be brought by a trustee or a beneficiary. It is necessary to include one of the enumerated reasons in Section 112.054 within the petition, as the court is under no obligation to modify or terminate a trust simply because it is requested. It should be noted that the Texas Property Code provides that a court may order such relief. Therefore, the practitioner should undertake to plead and prove facts to show the merit/benefit/purpose of the requested relief.

Texas law also permits the termination of a trust that has become uneconomical to maintain due to its paucity of assets. Section 112.059 of the Texas Property Code provides that after providing notice to beneficiaries who are distributees or permissible distributees of the trust or who would be distributees or permissible distributees if the interest of the distributees or the trust were to terminate and no powers of appointment were exercised, the trustee of a trust with a total value of less than $50,000 may terminate the trust if the trustee concludes after considering the purpose of the trust and the nature of the trust assets that the value of the trust property is insufficient to justify the continued cost of administration.

Restrictions arising as a result of the organizational documents present a different analysis. Because tax exemption rests in the first part on being organized for an appropriate tax-exempt purpose (be it charitable or social), these organizations more specifically identify their purposes in their governing documents compared to a for profit business which may be organized to conduct all lawful operations of whatever kind or nature. One court has noted the distinction stating that "[u]nlike business corporations,

whose ultimate objective is to make money, nonprofit corporations are defined by their specific objectives: perpetuation of particular activities are central to the raison d'etre of the organization." *Manhattan Eye, Ear & Throat Hosp. v. Spitzer*, 715 N.Y.S.2d 575, 595 (Sup. Ct. 1999). With the additional level of specificity as to purpose, the decision maker faces a more defined realm of permissible actions. That realm can be even more narrowly defined when funds are raised for specific purposes.

Because the duty of obedience requires pursuit of the mission of the organization and protection of charitable assets, it is clearly important to understand the purposes of the organization. In the context of a nonprofit corporation, the purpose is stated in the organization's governing documents (Articles of Incorporation/Certificate of Formation/Bylaws) and may be amplified by other documents such as testamentary documents directing the creation of the organization, the application for exempt status filed with the Internal Revenue Service or solicitations for contributions. Each of these sources should be consulted though the basic statement of purpose in the Articles of Incorporation/Certificate of Formation should be given primacy.

An initial question that arises then is what purposes must be followed – the purposes at the time the gift was given, or the purposes as they may be changed by amendment to the governing documents of the corporation from time to time? Professor Johnny Rex Buckles, a leading commentator in this area, refers to the difference between these two positions as static charter fidelity (adhere to the purposes as they existed at the time of the gift) and dynamic charter fidelity (adhere to the purposes as they may be changed from time to time). *See* Johnny Rex Buckles, *How Deep are the Springs of Obedience Norms that Bind the Overseers of Charities?*, 62 Cath. U. L. Rev. 913, 921-22 (2013). The debate is more intense in the context of charitable corporations as compared to trusts because unlike the majority of charitable trusts, charitable corporations organized under Texas statutory law (historically the Texas Nonprofit Corporation Act and now the Business Organizations Code) are generally empowered to amend their governing documents. This power to amend (which does not generally require judicial action, notice to the OAG or other government oversight) arguably presupposes the power to change the purposes of the corporation. At least one Texas case has held in accord. *See The City of Hughes Springs v. Hughes Springs Volunteer Ambulance Service, Inc.*, 223 S.W.3d 707 (Tex. App.—Texarkana 2007, no pet.). In Hughes Springs, the Texarkana Court of Appeals considered the ability of a nonprofit corporation to change its purposes (without judicial or Attorney General oversight) to purposes more readily carried out. The City of Hughes Springs (who was to

receive the assets of the nonprofit upon dissolution) argued the directors should not be able to change the purposes. The court recognized the power of the directors under statutory law to amend the purposes and the corporation thus survived with amended purposes.

While Hughes Springs is only one appellate court, its rationale is sound and no other Texas case that would prohibit a nonprofit corporation from amending its purposes so long as the purposes remain charitable in nature.[5] However, this power to amend purposes only raises a second question – can assets donated to a charitable corporation with specific purposes be redeployed in furtherance of purposes amended after receipt of the donation. Stated differently, does the donation of assets to a charitable corporation with specific purposes set out in its governing documents operate to restrict those donated assets for use only for the purposes existing at the time of the donation? Again, while there is academic debate on the subject, Texas law is sparse. The primary Texas case cited with respect to this question is *Blocker v. State*, 718 S.W.2d 409 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). It was the Blocker court that held that "the acceptance of such assets from donors established a charitable trust for the declared purposes [i.e. the purposes existing at the time of the donation as set forth in the recipient corporation's governing documents] as effectively as though the assets had been accepted subject to an express limitation providing the gift was held in trust solely for such charitable purposes." *Id.* at 415. In the event a charity has always been formed and operated for a specific purpose and the charity has raised funds for its operations, careful consideration should be undertaken of the ability to redeploy those assets post conversion and a review of then-current case law should be performed.

**D.   What if we choose to ignore the restriction?**

Choosing to ignore a restriction is a recipe for a breach of fiduciary duty claim; however, standing to complain of wrongful conduct by the fiduciary is narrow. With respect to nonprofit corporations, the organization (and/or its members to the extent the organization has members) may bring an action against a director based on an alleged breach of the decision maker's duties. Such derivative suits may be brought by a director, member, or the Office of the Attorney General ("OAG").The OAG's standing arises from that office's role as the representative of the public interest in charity. *See* Tex. Prop. Code § 123.001, *et. seq.* The OAG is charged to ensure charitable assets are

---

[5] *Cf. Blocker v. State*, 718 S.W.2d at 415 (prohibiting amendment that would have allowed distribution to individuals).

used for appropriate charitable purposes and has broad authority to carry out that duty emanating from the Texas Constitution, common law, and various statutes. Where the OAG brings suit alleging breach of one of the fiduciary duties outlined above, venue is in Travis County. *See* Tex. Prop. Code § 123.005(a). In the event the OAG is successful in its claims of breach of fiduciary duty, the OAG is entitled to recover from the fiduciary actual costs incurred in bringing the suit and may recover reasonable attorney's fees. *See* Tex. Prop. Code § 123.005(b). Other remedies available to the OAG include removal from the fiduciary position, actual damages, disgorgement of benefits, imposition of a constructive trust, and in certain circumstances, exemplary damages.

Aside from the OAG, certain other parties may be able to establish standing. *See, e.g., Cornyn v. Fifty-Two Members of the Schoppa Family*, 70 S.W.3d 895 (Tex. App.—Amarillo 2001, no petition). Such standing requires that the donor have a special interest in the donated gift. See id. (holding donors had a special interest where donation was brain tissue for Alzheimer's research); *see also* George G. Bogert et al., The Law of Trusts and Trustees § 411 (Rev. 2d ed. 1991). Generally, however, absent contractual standing created by way of a gift instrument a donor lacks standing to enforce the terms of a restricted gift because the very concept of a gift is that the donor has irrevocably parted with all rights in the gifted property. However, a donor who has made a conditional gift with a right of reverter or gift over, has standing to enforce the terms of the gift. Likewise, a donor who has a special interest in seeing the terms followed, an interest separate and distinct from the interest of the general public, also has standing. *See Cornyn v. Fifty-Two Members of the Schoppa Family*, 70 S.W.3d 895 (Tex.App.—Amarillo 2001, no pet.). Finally, a donor who is a member of the charity or serves on the board of the charity has standing to bring an action in his capacity as a director. Accordingly, absent clear standing, a charity's first line of defense in a donor intent lawsuit (other than one brought by the attorney general) will be to challenge standing on the part of the claimant. While standing could be challenged through a motion for summary judgment, standing is most often raised by way of a plea to the jurisdiction.

A plaintiff's standing is a jurisdictional prerequisite. *See Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993). Lack of standing raises a jurisdictional defect and is properly raised through a plea to the jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000).

A claimant who cannot clearly establish standing based on one of the theories above, may nevertheless seek to establish standing through alternate arguments advanced in other jurisdictions:

1. The charity is a trust (or is deemed to hold its assets in trust) and therefore has a duty to use the assets for the purpose of the trust which obligation is enforceable by beneficiaries of the trust;
2. UPMIFA grants standing to a donor to enforce the terms of a restricted gift;
3. Public policy supports allowing the claimant to bring the suit to enforce the terms of the gift.

In *Dodge v. The Trustees of Randolph-Macon Women's College*, the claimants (alumni and donors of the college) sought to establish standing arguing the restricted gift resulted in the creation of a charitable trust and they were the beneficiaries. *Dodge v. The Trustees of Randolph-Macon Women's College*, 661 S.E.2d 805 (Va. 2008). The claimants were ultimately unsuccessful. Texas law does provide that a gift to a charity is deemed to be held in trust. See *Blocker v. State*, 718 S.W.2d 409, 415 (Tex. App. – Houston [1st Dist.] 1986, writ ref'd n.r.e.). However, as in Dodge, this language does not mean that an express trust subject to the provisions of the Texas Trust Code springs into existence whenever a gift is given to a charity. In fact, § 22.223 of the Business Organizations Code expressly negates such a reading of Blocker. Rather, the fact that the monies donated are "impressed with a charitable trust" highlights the role of the attorney general. The attorney general's standing arises from that office's role as the representative of the public interest in charity. *See* Tex. Prop. Code § 123.001, et. seq. The attorney general is charged to ensure charitable assets are used for appropriate charitable purposes including in accordance with any gift restrictions. Furthermore, even if an express trust were created, the Texas Trust Code (unlike the Uniform Trust Code) does not expressly provide for donor standing to enforce the terms of a restricted gift.

Likewise, while UPMIFA applies to charitable corporations, it does not confer standing. *See generally* Tex. Prop. Code § 163.001 et. seq. In *Hardt v. Vitae Foundation* the claimants sought to establish standing arguing, among other things, that UPMIFA conferred standing on donors. 302 S.W.3d 133 (Mo. App. W.D. 2009). As noted by the Missouri Court of Appeals in Hardt, the prefatory note to UPMIFA expressly provides that "the [a]ttorney [g]eneral continues to be the protector of both the donor's intent and of the public's interest in charitable funds." *Id.* at 138. The Hardt Court further noted that while "the drafters of UPMIFA reportedly considered an amendment granting standing to donors . . . the amendment is absent from the final version adopted by the drafting committee." *Id.* at 139. Rather, the ability to provide for changes in restrictions with the consent

of a living donor is intended to allow charities an easier method of dealing with changed circumstances. Such provisions therefore should not be read to grant standing to others to control a charities' use of its assets, that role belonging to the attorney general.

Finally, Texas has never recognized a public policy exception to the standing requirement. The leading public policy case is *Smithers v. St. Luke's – Roosevelt Hospital Center* where the claimant successfully established standing on the public policy basis that she was in a better position than the attorney general to watch over and enforce the gift's terms. 281 A.D.2d 127 (N.Y. App. On. 2001). A charity facing such a claim will want to demonstrate that Smithers is not the rule in Texas and, in fact, not the rule in the majority of jurisdictions. The charity should highlight the Hardt case from Missouri as the majority rule.

**E.     Can We Return A Donation?**

An obligation to return real or personal property donated to a charitable organization only exists in the event an enforceable reversionary right exists by virtue of a deed (real property) or agreement (personal property). This is true because a charitable contribution is, by its nature, an irrevocable gift whereby the donor is releasing control of the property to the charity. *See, e.g., Harmon v. Schmitz*, 39 S.W.2d 587, 589 (Tex. Comm'n App.1931, judgm't adopted) (quoting *Allen– West Comm'n Co. v. Grumbles*, 129 F. 287, 290 (8th Cir.1904)). To be entitled to return, the gift must be subject to an agreement that it will be returned if some event occurs or fails to occur. In such event the gift is a conditional gift.[6] If it is unclear whether a reversion exists based on ambiguity in the gift documentation, judicial guidance should be sought under Chapter 37 of the Texas Civil Practice and Remedies Code.

Although a charity is only required to return donations when the gift is conditional and the condition fails, there may be other instances in which the question of return arises. Most often this occurs when a project is abandoned or overfunded. In such instances the question is posed as to whether the restrictions should be modified to allow another use by the charity or a transfer to another charity under principles of cy pres. If there was no general charitable intent, it could be appropriate to return the funds. However, this is a decision to be made by the court with notice to (and likely involvement of) the OAG. Additionally, return of donated funds in such an instance creates a tax issue for a donor who previously claimed a deduction.[7]

## IV.   QUESTIONS ARISING WITH RESTRICTED GIFTS UNDER FEDERAL LAW

**A.     General rule on deductibility**

Generally, a taxpayer may deduct the fair market value of his or her gift of property at the time of the contribution to a charitable organization under Internal Revenue Code ("Code") section 170, limited to certain percentages of a taxpayer's contribution base, depending upon the status of the donee and nature of the contributed property. *See* 26 U.S.C.A. ("I.R.C.") § 170(a), (c). Fair market value is defined as the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Treas. Reg. § 1.170A-1(c)(2). Restrictions – strings attached to the donation – may alter this general rule. Some of the most common problem scenarios are set forth below.

**B.     Is a partial interest deductible?**

No deduction is allowed under section 170 for a charitable contribution, not made in a transfer in trust, of an interest in property that is less than the donor's entire interest in such property. *See* I.R.C. § 170(f); Treas. Reg. § 1.170A-7. A deduction of a partial interest in property will be allowed under the exceptions of section 170(f)(3)(B). Exceptions include: (1) a remainder interest in a charitable remainder unitrust, charitable remainder annuity trust or pooled income fund; (2) a partial interest representing the donor's entire interest in the property, and which was not created for the purpose of making the gift; (3) a partial interest which is an undivided portion of the donor's entire interest in the property (a fraction or percentage of each substantial interest or right owned by the donor in such property and must last for the entire term of the donor's interest in such property and in other property into which it is converted); (4) a remainder interest in a personal residence or farm; and (5) a qualified conservation interest. *See* I.R.C. § 170(f); Treas. Reg. § 1.170A-7; Martin Hall, *Charitable Giving Without Trusts – Deduction Rules and Techniques*, SJ087 ALI-ABA 215, 223-24.

A contribution by a taxpayer of the right to use property is considered a contribution of less than the taxpayer's entire interest in such property, thus excluding the contribution from charitable deduction. *See* I.R.C. § 170(f); Treas. Reg. § 1.170A-7. However, a deduction is allowed if such partial interest is the taxpayer's entire interest in the property, such as an income or remainder interest. *See* Treas. Reg. § 1.170A-7. The deduction will be disallowed if the property was divided in order to create such interest and avoid the consequences of section 170(f)(3). Id.

---

[6]  *See* IV.d. below for a discussion on the deductibility of conditional gifts.

[7]  *See, e.g.*, Rev. Rul. 76-150, 1976-1 C. B. 38; *see also* Letter from the IRS to Rep. Kay Granger on August 10,

2009, released on September 25, 2009 (copy attached at Exhibit 1).

Giving With Strings Attached: An Examination of Key Issues for Consideration
Case 4:20-cv-04034 Document 45-2 Filed on 01/21/21 in TXSD Page 18 of 31
Chapter 9

For example, the donor may not retain the mineral rights while making a gift of the surface (or vice-versa). Thus, if the donor owns both the surface and mineral estate, he must make a gift of a portion of each. However, the donor may not sever these rights in anticipation of giving one interest to the charity and retaining the other interest (such as through the use of a partnership).

A final consideration as to fractional gifts of tangible personal property must be made. No deduction is allowed for a contribution of an undivided portion of a donor's entire interest in tangible personal property, such as a work of art or collectible, unless all interests in such property are held by the taxpayer or by the taxpayer and the donee immediately prior to the contribution. *See* I.R.C. § 170(o)(1). Any additional contribution of this interest in tangible personal property at a later time will be valued at the lesser of the property's fair market value on the date of initial contribution, or on the date of the additional contribution. *See* I.R.C. § 170(o)(2). Further, the amount of the income tax deduction that has been taken for a fractional interest in such property will be recaptured, unless the donor contributes all of his or her remaining interests in that property to the charity by the earlier of: 10 years after the initial contribution date, or by the date of the donor's death. *See* I.R.C. § 170(o)(3). This recapture rule will also apply if the donee charity has not had substantial physical possession of the contributed property, or has not used it in a manner related to its tax-exempt purpose during this same period. *Id*. In such cases of recapture, the donor's income tax for that year is increased by ten percent (10%) of the recaptured amount. *Id*. Therefore, the donor should be sure to contribute his or her remaining interest in the tangible personal property to the donee charity within the above time period in order to keep the charitable deduction and avoid the recapture penalty.

## C. What is the result of an incomplete gift?

To be deductible, a gift must be complete and irrevocable. *See Threlfall v. U.S.*, 302 F.Supp. 1114 (D. Wis. 1969). A gift is complete "if the donor has so parted with dominion and control as to leave in him no power to change its disposition" but is incomplete if any dominion or control is retained. *See* Treas. Reg. § 25.2511-2(b),(c). While the issue of the completeness of a gift is generally an issue in the context of gift taxes, it can also be an issue for income tax deductibility. Where the donor fails to give up complete dominion and control over the property, the gift is incomplete and there is no income tax deduction. For example, if a donor retains the right (superior to the charity) to direct the use of the gift, change the purpose of the gift, or redirect the gift, the gift is incomplete. *See Pauley v. U.S.*, 459 F.2d 624 (1972).

To continue to have a right to advise on use of the funds after the gift is given, a donor should utilize a donor advised fund which allows for non-binding (though typically followed) recommendations. In the event the donor desires a greater level of control, he may want to consider establishing a private foundation. If the issue to be addressed is the ability to cause the gift to transfer in the event the charity fails to follow the restriction or commits some other specific act or omission, the donor should utilize a gift over provision specifying another charity to which the gift will transfer in such event. In this way the gift is complete and remains in the hands of a qualified organization thereby protecting the donor's deduction.

## D. What is the result of conditions?

The income tax regulations restrict the use of a charitable deduction to gifts to qualifying charitable donees that are certain to receive that charitable contribution. The Treasury Regulations provide that if the charitable gift is conditional or dependent upon the performance of some event in order to become effective, or may be defeated by some future event, no deduction is allowable unless the possibility that the charitable transfer will not be effective is "so remote as to be negligible." This phrase has been defined by the U.S. Tax Court as a "chance which persons generally would disregard as so highly improbable that it might be ignored with reasonable safety in undertaking a serious business transaction." *Briggs v. Comm'r*, 72 TC 646 (1979). This phrase has also been held to mean "a chance which every dictate of reason and common sense would justify an intelligent person in disregarding as so highly improbable and remote as to be lacking in reason and substance." *See id.*; *see also* § Teas. Reg. 20.2055-2(b).

Placing a reversion on gifts to a charitable entity causes the gift to be contingent on a future event. For example, in Revenue Ruling 79-249, a gift to a public school system to build a school contained a reverter clause if the remaining funds were not raised to complete the project. As of the date of the gift, the transfer for charitable purposes was dependent upon the happening of other events (i.e. other donors giving sufficient funds) in order to become effective. The IRS ruled that until it was certain there were adequate funds to construct the building, the possibility the donation would be returned to the donor was not so remote as to be negligible. Therefore, the deduction was required to be deferred by the donor until it was clear that the building would be constructed.

In another case, a corporation held an option to re-acquire a tract of real estate which it had donated to a charitable organization. The corporation's shareholders were not allowed to take the charitable deduction until the option to reacquire the tract had expired, since the contribution was dependent upon

such expiration and the possibility of the corporation exercising the option was not "so remote as to be negligible."

An oft-cited example of a conditional gift being failing the "so remote as to be negligible test" is found in Revenue Ruling 2003-28. There a donor made a donation of a patent to a university conditioned on a specific member of the faculty remaining on the faculty for the anticipated fifteen-year duration of the patent's remaining life. The Service determined the possibility that the faculty member not remain in a faculty position for this time period was not so remote as to be negligible.

### E.    Does a restriction affect valuation?

In instances in which a donor would generally be entitled to deduct the fair market value of his or her gift, restrictions on the use of the gifted property will affect the valuation where the restriction limits the amount a willing buyer would pay a willing seller for the property subject to the encumbrance (i.e. the restriction). *See Cooley v. Comm'r*, 283 F.2d 945 (2d Cir. 1960); Rev. Rul. 85-99, 1985-2 CB 83. In Revenue Ruling 85-99 the Service considered a situation in which an individual donor donated 50 acres out of a 100 acre tract to a local agricultural college under a deed restricting the land to be used only for agricultural purposes, a use not the highest and best use of the land. As a result, the donor's deduction was limited to the fair market value of the property at the time of the contribution considering the restriction in place. *See* Rev. Rul. 85-99. In furtherance of this position, the appraisal rules require the appraiser to note and consider all restrictions imposed on gifted property. *See* Treas. Reg. § 1.170A-13(c)(3)(ii)(D).

### F.    What if the donor gets something in return?

Occasionally a donor's restriction on the use of property results in the donor receiving a substantial return benefit, effectively a bargained for exchange as opposed to a gift. In these situations, the donor is not entitled to a deduction. *See, e.g., Ottowa Silica v. U.S.*, 699 F.2d 1124, 1131 (Fed. Cir. 1983); *Singer Co. v. U.S.*, 196 Ct. Cl. 90, 499 F.2d 413, 420, 422 (1971). For example, where a couple donated their lake house to a local volunteer fire department to be used and later demolished as part of a training exercise, their claimed $76,000 deduction was denied. The Tax Court determined that the couple received a substantial return benefit because the value of the demolition services exceeded the value of the house.[8] The Seventh Circuit, in affirming the Tax Court's ruling, pointed back to the rule on valuing gifted property subject to a restriction

in light of the restriction. *See Theodore R. Rolfs and Julia A. Gallagher, (CA 7 2/8/2012) 109 AFTR 2d ¶ 2012-427.*

The issue of return benefit is also present with dual character gifts (part gift/part sale). The IRS looks to whether the donor parted with more than he or she received in return and whether the excess value with which the donor parted was transferred with the intention of making a gift. *See* Treas. Reg. § 1.170A-1(h). Thus, a portion of a payment is deductible as a charitable contribution under section 170 if the following two conditions are met: "First, the payment is deductible only if and to the extent it exceeds the market value of the benefit received. Second, the excess payment must be 'made with the intention of making a gift.'" *United States v. American Bar Endowment*, 477 U.S. 105, 117-18 (1986) (quoting Rev. Rul. 67-246, 1967-2 C.B. 104, 105). For example, should a donor transfer cash to a charity with the binding restriction that the funds be used to pay the donor's bill for services rendered to the charity, no deduction is allowed.

### G.    What should we know about earmarked gifts?

Donors often earmark gifts to charity. Typically this has a negative connotation when used with respect to restricted gifts and deductibility. However, Webster's dictionary defines "to earmark" to mean "to say that something will be used or treated in a specified way." *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 13 July 2014. <http://www.merriam-webster.com/dictionary/earmark>. Accordingly, where the earmark is not only consistent with but in furtherance of a charity's purpose, the earmark is not problematic. See Treas. Reg. § 1.507-2(a)(i); see also Alan F. Rothschild, Jr., The Dos and Don't's of Donor Control, 30 ACTEC 261, 262 (2005). Rather, in this type of situation, the "earmark" simply acts as a designation of which of the charity's programs the donation is to be used.

#### 1.    Individual selected by donor

Where a donor earmarks a gift in such a way that he is seeking to use the charity as a conduit to effectuate a gift to an individual or a non-exempt organization (as opposed to primarily benefiting the charitable organization), the gift is not deductible. The key issue, then, is determining the purpose of the donation.

A gift to an individual is non-deductible regardless of the charitable nature of the gift. Likewise, gifts that are earmarked for the benefit of individuals are non-deductible because the gift is intended to benefit the individual as opposed to being "to or for the use of" a charitable organization. To determine whether the purpose of the gift is to benefit

---

[8] The court determined there was no value to the house because of the condition that it be destroyed.

an individual or is "to or for the use of" the charitable organization, the Service looks to two tests:

(a)  Does the donor intend to benefit the charity or the individual?  To answer this question the Service looks to any written gift agreement between the parties, any solicitation materials, and any other written correspondence regarding the gift.

(b)  Does the charitable organization have full discretion and control over the use of the gift?  The organization has discretion and control where it has the option to apply the funds to another use if it chooses.  This is often demonstrated through use of the following statement (or a modification):

"Contributions are solicited with the understand that the donee has complete discretion and control over the use of all donated funds."

Clearly, then, where a donor restricts the use of the donated funds to benefit an individual designated by the donor on the donor's initiative, no deduction is available.  *See, e.g., Tripp v. Comm'r*, 337 F.2d 432 (7th Cir. 1964).

2.  Individual selected by charity
How do a donor and a charity make this work?  The clearest route is for the charity to create the designation (through the exercise of the fiduciary duties of the board ensuring that the designation is consistent with the charity's purposes) and allow donors to contribute to the charity for this fund/designation.  An example would be an organization established to provide for the needs of terminally ill children.  Consider a situation in which a family's child is terminally ill and the family needs additional funds to allow the family to care for the child.  If a donor gives funds directly to the family for necessities, the gift is non-deductible.  Likewise, if the donor approaches the charity and requests to be able to "pass through" a gift to the family, the gift is non-deductible.  However, if the charitable organization, consistent with its tax-exempt purposes selects the family as a proper recipient of funding and announces to the public that a fund has been established to provide for the family, where the donor contributes to this fund (with the understanding that the charitable organization has complete discretion and control), the gift is deductible.

3.  Deputized fundraising
A form of this general rule often used in the religious organization context is known as deputized fundraising.  As described by the Evangelical Council

for Financial Accountability, "[u]nder the deputized fundraising concept, the charity generally determines an amount each staff member is responsible to raise. Funds raised are often recorded in a support account for each worker.  Charges are made against the support account to fund the staff member's particular sphere of the organization's ministry.  These support charges may include amounts for the charity's overhead expenses."  *See* Dan Busby, *Deputized Fundraising – The Basics*, www.ecfa.org/Documents/DeputizedFund-Raising.pdf (last visited July 17, 2014).

Recognizing that "[t]his practice has occasionally been controversial because of the tendency on the part of some fundraisers to represent that contributions will only be used to support the work of the individual doing the fundraising," the Service employs the two tests set forth above (intended benefit test and control test) to ensure the donation is made to or for the use of the charity.  In the context of deputized fundraising, the Service has identified the following factors as relevant to demonstrate discretion and control:

•  Control by the governing body of donated funds through a budgetary process;

•  Consistent exercise by the organization's governing body of responsibility for establishing, reviewing, and monitoring the programs and policies of the organization;

•  Staff salaries set by the organization according to a salary schedule approved by the governing body.  Salaries must be set by reference to considerations other than an amount of money a deputized fundraiser collects.  There can be no commitments that contributions will be paid as salary or expenses to a particular person;

•  Amounts paid as salary, to the extent required by the Internal Revenue Code, reported as compensation on Form W-2 or Form 1099-MISC;

•  Reimbursements of legitimate ministry expenses approved by the organization pursuant to guidelines approved by the governing body.  Reimbursement must be set by considerations other than the amount of money a deputized fundraiser collects;

•  Thorough screening, of potential staff members pursuant to qualifications established by the organization, and that are related to its exempt purposes and not principally related to the amount of funds that may be raised by staff members;

•  Meaningful training, development, and supervision of staff members;

- Staff members assigned to programs and project locations by the organization based upon its assessment of each staff member's skills and training, and the specific need of the organization;
- Regular communication to donors of the organization's full control and discretion over all its programs and funds through such means as newsletters, solicitation literature, and donor receipts; and
- The financial policies and practices of the organization annually reviewed by an audit committee, a majority of whose members are not employees of the organization.

*See* Letter from David W. Jones, Chief, Review Branch, Exempt Organizations, IRS to Milton Cerny, Caplin & Drysdale, copy attached as Exhibit 2.

In addition to these factors, the ECFA suggests its members also consider ensuring consistent communication with donors (by all parties and in all forms), appropriate terminology when communicating with donors ("refrain from any inference that the contributions will be paid as salary or expenses to the worker), and avoid paying 100% of all funds raised directly to the worker. These final considerations are intended to further cement the donations as t or for the use of the charity.

4. Crowdfunding issues

In recent years crowdfunding for charitable purposes has become more prevalent. Crowdfunding is defined as the practice of soliciting financial contributions from a large number of people especially from the online community . See "Crowdfunding." *Merriam-Webster.com*. Merriam-Webster, n.d. Web. 13 July 2014. <http://www.merriam-webster.com/dictionary/crowdfunding>. An example is Pure Charity, a Section 501(c)(3) public charity, that allows individuals raising funds within its sphere of purposes (such as adoption funding and missionary expenses) to engage in online crowdfunding. While Pure Charity includes language on its website regarding its discretion and control, and while Pure Charity only processes gifts by providing donated funds to another public charity (the adoption agency or missions agency) with which it has a pre-existing relationship, the education of fundraisers (those doing the crowdfunding) is critical to ensure those individuals are making proper representations to the donors. The fine distinctions of the two part intent/control tests can easily be lost in translation.

5. Scholarships

Finally, a note regarding scholarships. Scholarships follow the same rules set forth above. If a donor sends funds to a college to be used to fund a scholarship for a specific individual, it is non-deductible. If, on the other hand, a donor contributes to a scholarship fund with respect to which the college will choose recipients based on non-discriminatory policies, the gift is to or for the use of the college and will thus be deductible. The Service has noted the following factors that create a presumption that the payment is not a charitable contribution:

- The existence of a contract under which a taxpayer agrees to make a contribution and which contains provisions insuring the admission of the taxpayer's child;
- A plan allowing taxpayers either to pay tuition or to make contributions in exchange for schooling;
- Earmarking a contribution for the direct benefit of a particular individual.

For additional reading on the subject of earmarked gifts, consider the following sources:

- PLR 200530016 (March 29, 2005)
- Johnny Rex Buckles, *The Case for the Taxpaying Good Samaritan: Deducting Earmarked Transfers to Charity Under Federal Income Tax Law, Theory and Policy*, 70 Fordham L. Rev. 1243 (2002).

6. Gifts earmarked for non-exempt entities

The problem of inappropriate earmarking can also arise outside the context of individuals. Most often this arises where donors seek to earmark (or pass through) gifts to non-charitable organizations (such as a chamber of commerce, organization that has yet to be recognized as exempt, or foreign organization). If a donor were to give to such an entity directly, the gift would be non-deductible. That general rule does not change by inserting a charity as an intermediary to "process" the gift where the donor, on his own initiative, restricts use of the gift to such purposes.

As with gifts to individuals, there is a process by which donors may receive a deduction for gifts designated for a non-exempt secondary beneficiary. Again, the test is the intent of the donor and the discretion and control of the charity receiving the donation. The use of the language suggested by the Service in solicitation materials is important: "Contributions are solicited with the understand that the donee has complete discretion and control over the use of all donated funds." Likewise, ensuring that the charity exercises control in fact is critical. This is best accomplished by the charity only accepting gifts designated to a non-exempt secondary beneficiary where the charity has a pre-existing relationship with

the beneficiary and has made a determination that support of the non-exempt beneficiary furthers the charity's tax-exempt purposes. For example, a local charity routinely supports the educational offerings of a local chamber of commerce. While a gift to the chamber of commerce would be non-deductible, a gift to the local charity designated to for use as part of the charity's ongoing efforts to support the educational programs offered by the chamber of commerce would be deductible.

For example, a humanitarian relief organization may have an existing relationship with a local group working in South Sudan. The domestic charity regularly supports the South Sudanese charity. A donor provides a donation to the domestic humanitarian relief organization and notes his preference that it be used as part of the charity's support of the South Sudanese charity. This gift is deductible. However, if the domestic charity is simply a fundraising arm of the South Sudanese charity and pays over 100% of all donations raised without exercising discretion and control over the funds, the gift is non-deductible. Intermediary public charities fundraising for international programs are sometimes referred to as "friends of" organizations.

7.   Friends of Organizations

Some public charities may carry out international grantmaking in an intermediary capacity. In such situations, it is critical to understand the requirements to ensure deductibility for the original donor as well as the charity's compliance with its own obligations to ensure that its charitable assets are used for exclusively charitable purposes.

The IRS issued a key Revenue Ruling in 1963 dealing with the deductibility of contributions by individuals to a charity in the United States which subsequently grants some or all of such funds to a foreign grant recipient. Rev. Rul. 63-252 (Revenue Ruling 63-252 is reproduced at Appendix "4"). Revenue Ruling 63-252 provides five hypothetical situations involving funding transmitted to a foreign organization by or through an intermediary public charity:

(1)  In pursuance of a plan to solicit funds in this country, a foreign organization caused a domestic organization to be formed. At the time of formation, it was proposed that the domestic organization would conduct a fund-raising campaign, pay the administrative expenses from the collected fund and remit any balance to the foreign organization.

(2)  Certain persons in this country, desirous of furthering a foreign organization's work, formed a charitable organization within the United States. The charter of the domestic organization provides that it will receive contributions and send them, at convenient intervals, to the foreign organization.

(3)  A foreign organization entered into an agreement with a domestic organization that provides that the domestic organization will conduct a fund-raising campaign on behalf of the foreign organization. The domestic organization has previously received a ruling that contributions to it are deductible under section 170 of the Code. In conducting the campaign, the domestic organization represents to prospective contributors that the raised funds will go to the foreign organization.

(4)  A domestic organization conducts a variety of charitable activities in a foreign country. Where its purposes can be furthered by granting funds to charitable groups organized in the foreign country, the domestic organization makes such grants for purposes which it has reviewed and approved. The grants are paid from its general funds and although the organization solicits funds from the public, no special fund is raised by a solicitation on behalf of particular foreign organizations.

(5)  A domestic organization, which does charitable work in a foreign country, formed a subsidiary in that country to facilitate its operations there. The foreign organization was formed for purposes of administrative convenience and the domestic organization controls every facet of its operations. In the past the domestic organization solicited contributions for the specific purpose of carrying out its charitable activities in the foreign country and it will continue to do so in the future. However, following the formation of the foreign subsidiary, the domestic organization will transmit funds it receives for its foreign charitable activities directly to that organization.

With respect to the first two hypothetical situations and the earmarked contributions in the third, the IRS held that the contributions would not be deductible. The contributions contemplated in the fourth and fifth hypothetical situations, however, would be deductible. The key distinction is the level of discretion and control the organization has over the funds. For charities finding themselves serving in an intermediary capacity, this Revenue Ruling provides important guidance on what it means to exercise discretion and control as opposed to simple being a conduit organization. An organization that operates as a conduit organization will not be able to demonstrate

13

the type of discretion and control necessary to ensure charitable assets are used exclusively for charitable purposes.

As opposed to a conduit entity that merely passes funds through to a foreign organization, a "friends of" organization, when properly structured, can satisfy the requirements for deductibility to the original donor and compliance with the public charity's obligations to ensure that its charitable assets are used exclusively for charitable purposes.

Revenue Ruling 66-79 amplifies the IRS position set out in Revenue Ruling 63-252 providing guidance specifically with respect to a "friends of" organization. There it was held that because the domestic organization could "only solicit for specific grants when it has reviewed and approved them as being in furtherance of its purposes" and could "make such solicitations only on the condition that it shall have control and discretion as to the use of the contributions received by it," the organization was structured and operated in such a way that contributions to it would be deductible under § 170 of the Code. Accordingly, a properly structured "friends of" organization will provide for a board that operates independent of control by the foreign organization. The organization will communicate to donors and potential donors that all funds donated are subject to the independent control of the domestic organization, and the organization will thereafter exercise such independent control over the funds in determining whether and to what extent to make grants to the foreign organization.

8. Fiscal sponsorship

Another example of this type of "pre-existing relationship" that allows for deductibility of gifts designated for a non-exempt entity is fiscal sponsorship. A fiscal sponsorship arrangement is an agreement between a Section 501(c)(3) public charity and a project (which may be an unincorporated association or nonprofit corporation) pursuing charitable or otherwise exempt activities but lacking its own Section 501(c)(3) recognition. One model of fiscal sponsorship involves the public charity agreeing to act as fiscal sponsor for the project, entering into a grant agreement with the project, accepting contributions on behalf of the project subject to the fiscal sponsor's discretion and control, and re-granting those funds to the project for exclusively tax-exempt purposes. The sponsored organization reports back to the fiscal sponsor while such grants are outstanding. This process continues until such time as the project receives recognition of its Section 501(c)(3) status. Suggested language for a donor making a gift to a fiscal sponsor is as follows:

We understand you serve as the fiscal sponsor for _____. Enclosed herewith is check number

_____ payable to you in the amount of _____ to benefit _____ pursuant to the agreement between you and _____.

**H. How do the earmarking rules apply to private foundations?**

Private foundations, while not concerned with income tax deductibility, are concerned with ensuring their grants constitute qualifying distributions and do not constitute taxable expenditures. The problem of earmarked gifts can be problematic in this regard particularly when the foundation assets are being used to provide funds for individuals for travel, study, or related purposes.

Private foundations may make grants to individuals as well as to organizations. Grants to individuals can be broken down into grants made for travel, study and related purposes, grants made to assist needy persons who lack the basic necessities of life as a result of poverty or temporary distress, and grants that constitute awards for past achievement. Grants to individuals for any of the aforementioned purposes will constitute qualifying distributions; however, certain rules must be followed to ensure that grants for travel, study, and similar purposes do not constitute taxable expenditures.

1. Grants for Travel, Study, and Other Similar Purposes

Grants to individuals for travel, study, or other similar purposes must be made pursuant to a procedure approved by the IRS in advance of any grant to an individual for such purpose or will otherwise constitute taxable expenditures. *See* I.R.C. §§ 4945(d)(3), (g). This does not require the organization to seek pre-approval on every occasion it desires to make a grant for such purposes; rather, the IRS evaluates on a one-time basis (usually when the organization applies for tax-exempt status, if such grantmaking procedures are provided at that time) the foundation's entire system of standards, procedures, and follow-up for the making of such grants. The IRS focuses on whether the grantmaking procedure utilizes an objective and nondiscriminatory selection process, whether the procedure is reasonably calculated to result in performance by grantees of the activities that the grants are intended to finance, and whether the foundation will obtain reports to ensure the grantees have performed the activities that the grants were intended to finance. *See* Treas. Reg. § 53.4945-4(c).

The IRS has suggested the following criteria for making a grant on an objective and nondiscriminatory basis: prior academic performance; performance on tests designed to measure ability and aptitude for college work; recommendations from instructors; financial need; and the conclusions which the selection

committee might draw from a personal interview as to the individual's motivation, character, ability and potential. In selecting any recipient of a scholarship grant, the Foundation should adhere to such criteria and document in its records that such criteria was used in selecting all recipients. Such documentation will help support the position that it is sufficiently clear that the selection of the particular individual is calculated to accomplish a charitable purpose rather than benefit a particular person or class of persons. The IRS has stated that a scholarship program must be consistent with the disinterested purpose of enabling individuals to obtain an education solely for their personal benefit. *See* Rev. Proc. 76-47 at § 4.07.

If a foundation makes a distribution to an individual for travel, study or similar purposes, it must monitor the grant in order to avoid a penalty. The Treasury Regulations provide that foundations must arrange to receive a "verified" report from the appropriate educational institution at least once for each year in which the grantee of a scholarship takes courses and receives grades. The foundation must receive a final report upon completion of the grantee's studies. *See* Treas. Reg. § 53.4945-4(c)(2). The foundation must be able to ensure that the grantees have not diverted funds away from the original purpose of the grant. If the foundation fails to investigate or correct grant misuse the grant may become a taxable expenditure. *See* Treas. Reg. § 53.4945-4(c)(4).

The foundation must retain records pertaining to all grants to individuals for travel, study or other similar purposes. The records must include:

(a) all information the foundation secures to evaluate the qualifications of potential grantees
(b) the identification of grantees. This should include any relationship of any grantee to:

    i. members, officers or trustees/directors of the organizations
    ii. a grantor or substantial contributor to the organization or a member of the family of either, and

(c). a corporation controlled by a grantor or substantial contributor (Rev. Rul. 56-304).

    i Specification of the amount and purposes of each grant
    ii. Any follow-up information which the foundation obtains regarding possible misuse of funds.

*See* Treas. Reg. § 53.4945-4(d).

Grants made pursuant to pre-approved procedures will count as qualifying distributions for the foundation and will not count as taxable expenditures. However, if a foundation makes a grant to an individual for study, travel or related purposes without having had its procedures approved by the IRS in advance, such grant will be considered a taxable expenditure. *See* I.R.C. 4945(d), (g). Accordingly, it is imperative that the organization seek pre-approval and understand the difference between granting scholarships directly (i.e. choosing the recipient of the award) and making grants to academic institutions in order to provide for scholarships with the recipients chosen by the academic institution (simply a gift to an public charity that does not require pre-approval).

### 2.   Grants to non-exempt entities

Private foundation grants to non-exempt entities require the exercise of expenditure responsibility to avoid being treated as taxable expenditures. A private foundation might seek to avoid the administrative burden of expenditure responsibility by making a grant to a public charity but earmarking the grant to a non-exempt secondary beneficiary. In such a situation, the grant is treated as a grant from the foundation to the secondary beneficiary and expenditure responsibility is required. In order to avoid this treatment, the foundation must relinquish control over use of the funds to the initial charitable donee. Although the foundation may indicate a preference, the charity must have full discretion and control. Foundations may utilize the same giving techniques identified above, however: giving to programs of the charity based on a pre-existing relationship with the secondary beneficiary and giving to the charity who has agreed to act as the fiscal sponsor of the secondary beneficiary. In each instance, discretion and control is exercised by the initial donee and the foundation is not required to exercise expenditure responsibility.

## V.   CONCLUDING THOUGHTS

Restricted gifts are an important part of charitable giving frequently utilized to allow donors confidence that their donations will support specific causes that they seek to support or to provide tax benefits in complex transactions. However, a host of considerations arise when a gift is given with strings attached. Careful attention to these issues will go far in ensuring deductibility to the donor and providing a framework for dealing with any concerns that may arise in the future.

FROM CAPLIN



(TUE) 02. 29' 00  14:5⁰ST. 14:30/NO. 3560840157 P  3/6

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

EXHIBIT 1

Milton Cerny
Caplin & Drysdale
One Thomas Circle, NW
Suite 1100
Washington, DC  20005

Many religious, charitable, and other organizations that qualify for tax deductible contributions use a practice known as "deputized fundraising" to support their activities. Deputized fundraising consists of paid staff, and/or volunteers conducting grass roots fundraising to support the organization. This practice has occasionally been controversial because of the tendency on the part of some fundraisers to represent that contributions will only be used to support the work of the individual doing the fundraising. In such cases, the nature of the transaction may become blurred and donors may be led to believe that the organization is a mere conduit and that contributions will automatically be allocated to the fundraiser. Although private giving through an organization to earmarked individual recipients is not deductible, and conduit organizations operated to facilitate such private giving are not tax-exempt, unearmarked contributions to a religious, charitable or other qualified organization for use in its charitable program are deductible.

Rev. Rul. 62-113, 1962-2 C.B. 10, provides guidance regarding potential conduit giving, stating that the test of whether a gift is intended by a donor for the use of the organization and not as a gift to an individual is whether "the organization has full control of the donated funds, and discretion as to their use, so as to insure that they will be used to carry out its functions and purposes." The purpose of the following questions and answers is to clarify the application of the control test in the context of organizations that utilize deputized fundraising.

1.    Question:  If an organization otherwise described in IRC 501(c)(3) and IRC 170(c)(2) receives substantially all of its revenues through deputized fundraising, i.e., through individual missionaries, staff members, or volunteers conducting grass-roots fundraising to support the organization, can the organization be described in IRC 501(c)(3) and IRC 170(c)(2)?

1.    Answer:  Yes, the organization can be an organization described in IRC 501(c)(3) and 170(c)(2) if it has full control of the donated funds and has

17

FROM-CAPLIN                    (TUE) 02. 29' 00  14:5^-ST. 14:30/NO. 3560640157 P  4/6

Milton Cerny

discretion as to use of the funds. Control and discretion can be shown by the following factors:

- Control by the governing body of donated funds through a budgetary process;

- Consistent exercise by the organization's governing body of responsibility for establishing, reviewing, and monitoring the programs and policies of the organization;

- Staff salaries set by the organization according to a salary schedule approved by the governing body. Salaries must be set by reference to considerations other than an amount of money a deputized fundraiser collects. There can be no commitments that contributions will be paid as salary or expenses to a particular person;

- Amounts paid as salary, to the extent required by the Internal Revenue Code, reported as compensation on Form W-2 or Form 1099-MISC;

- Reimbursements of legitimate ministry expenses approved by the organization pursuant to guidelines approved by the governing body. Reimbursement must be set by considerations other than the amount of money a deputized fundraiser collects;

- Thorough screening, of potential staff members pursuant to qualifications established by the organization, and that are related to its exempt purposes and not principally related to the amount of funds that may be raised by the staff members;

- Meaningful training, development, and supervision of staff members;

- Staff members assigned to programs and project locations by the organization based upon its assessment of each staff member's skills and training. and the specific needs or the organization;

- Regular communication to donors of the organization's full control and discretion over all its programs and funds through such means as newsletters, solicitation literature, and donor receipts; and

- The financial policies and practices of the organization annually reviewed by an audit committee, a majority of whose members are not employees of the organization.

FROM: CAPLIN                        (TUE) 02. 29' 00  14:5^ST. 14:30/NO. 3560640157 P  5/6

3

Milton Cerny

2.    Question: If the facts are the same as in question 1, except that, in the
organization's discretion, substantially all the contributions received by the
organization are tracked for internal accounting purposes as having been raised
through the efforts of a missionary, staff member, or volunteer and are generally
used to pay for the reasonable salary or other reasonable and necessary
organization-related expenses of the designated individual, can the organization be
described in IRC 501(c)(3) and IRC 170(c)(2)?

2.    Answer: Although such tracking by an organization may show that
contributions are earmarked for a particular individual and that the organization is
not retaining discretion as to the use of funds, the organization may by the totality
of the facts and circumstances demonstrate that it has full control of, and
discretion over the use of, the donated funds so as to ensure that they will be used
to carry out the organization's functions and purposes, and thus be an organization
described in IRC 501(c)(3)) and IRC 170(c)(2).

3.    Question: What language would the Internal Revenue Service suggest should
be included in a solicitation by an organization described in IRC 501(c)(3) and IRC
170(c)(2) for a contribution raised through deputized fundraising in order to make it
clear to the donor that all contributions are under the complete control of the
recipient organization and are subject to the organization's discretion for use
consistent with its exempt purpose?

3.    Answer: For a contribution to be deductible under IRC 170, the donor must
intend that the contribution be to or for the use of a qualified donee
organization, such as one described in 170(c)(2). The following language in
solicitations for contributions, with no conflicting language in the solicitations
and no conflicting understandings between the parties, would help show that
the qualified donee has the necessary control over contributions, that the
donor has reason to know that the qualified donee has the necessary control

19

Case 4:20-cv-04034 Document 45-2 Filed on 01/21/21 in TXSD   Page 29 of 31

FROM CAPLIN                                    (TUE) 02. 29' 00  14: 5  ST. 14:30/NO. 3560640157 P  6/6

                                                                4

Milton Cerny

and discretion over contributions. and that the donor intends that the
qualified donee is the actual recipient of the contributions;

Contributions are solicited with the understanding that the donee
organization has complete discretion and control over the use of all
donated funds.

Sincerely,

David W. Jones

David W. Jones
Chief, Review Branch
Exempt Organizations

20

EXHIBIT 2



OFFICE OF
CHIEF COUNSEL

**DEPARTMENT OF THE TREASURY**
INTERNAL REVENUE SERVICE
WASHINGTON, D.C. 20224

August 10, 2009

Number: **INFO 2009-0165**                         CC:ITA:B01
Release Date: 9/25/2009

UIL: 61.44-00                                       CONEX-135026-09

The Honorable Kay Granger
Member, U.S. House of Representatives
1701 River Run Road, Suite 407
Fort Worth, TX 76107

Attention:

Dear Congresswoman Granger:

Thank you for your letter dated July 10, 2009, on behalf of your constituent,

You ask about the tax consequences to a donor who receives a repayment of a
charitable gift that he or she made in an earlier taxable year.  In a letter enclosed with
yours,            writes that he made a designated gift to a charitable organization
more than two decades ago.            indicates that the organization recently
informed him that it will not be using the gift for his designated purpose.
states that he has requested that the organization repay the designated gift and
accumulated interest to him.  He states that he would like to use any future repayment
to make a charitable contribution to a different charitable organization.

I am pleased to provide you with the following general information about the federal
income tax consequences to a donor who receives a repayment of a charitable gift plus
interest on the repayment.  This letter does not constitute a ruling, and it does not
address whether federal, state, or other laws (or a charitable organization's policies) in
fact require or permit the organization to repay an earlier gift or to pay interest on the
repayment.  We express no opinion as to the legal or tax consequences to the charity of
a potential repayment.

If a taxpayer receives the full tax benefit of a charitable contribution deduction when
making a contribution to a qualified charity, and the charity repays the contribution to the
taxpayer in a subsequent year, the "tax benefit rule" requires the taxpayer to include in
gross income in that subsequent year the amount of the previously deducted

21

CONEX-135026-09 2

contribution. I have enclosed Revenue Ruling 76-150, 1976-1 C.B. 38, which addresses this issue.

A taxpayer who receives interest on a repaid contribution must also include that amount in income. An individual taxpayer generally includes interest in income when it is available to the taxpayer free of substantial limitations and restrictions. Thus, if a taxpayer has no access to interest income before the year he or she actually receives it, the interest generally is not included in the taxpayer's income until that year.

If the taxpayer uses a repaid contribution to make a new charitable contribution to a different charitable organization, he or she may claim a charitable contribution deduction for the new contribution, subject to the usual restrictions and limitations on charitable contribution deductions. I have enclosed Publication 526, *Charitable Contributions*, which contains the rules for charitable contribution deductions.

I hope this information is helpful. Please contact me at        or at        if we can be of further assistance.

Sincerely,


Andrew J. Keyso, Jr.
Deputy Associate Chief Counsel
(Income Tax and Accounting)

Enclosures (2)