## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **FREDRIC N. ESHELMAN.** *Plaintiff,* <br><br> **v.** <br><br> **TRUE THE VOTE,** *Defendant* | **CIVIL ACTION NO. 4:20-CV-04034** |

## RESPONSE OF TRUE THE VOTE AND CATHERINE ENGELBRECHT TO MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTION

THE AKERS FIRM, PLLC
BROCK C. AKERS
TEXAS BAR NO. 00953250
THE CLOCKTOWER BUILDING
3401 ALLEN PARKWAY, SUITE 101
HOUSTON, TX 77019
TELEPHONE: (713) 552-0232
FACSIMILE: (713) 583-8662

**ATTORNEY FOR DEFENDANTS,**
**TRUE THE VOTE AD CATHERINE ENGELBRECHT**

## TABLE OF CONTENTS

INDEX OF AUTHORITIES ................................................................................iii

    I.     NATURE OF THE PROCEEDING ....................................................... 1

    II.    BACKGROUND FACTS ......................................................... 2

    III.   STATEMENT OF ISSUES AND REVIEW ................................. 7

    IV.   ARGUMENTS AND AUTHORITIES ........................................ 7

          A.    The Gifts were Not Conditional ........................................ 7

          B.    True the Vote Fulfilled its Goals...................................... 11

          C.    Plaintiff has No Substantial Likelihood of Success ........................ 12

          D.    Plaintiff Is Not Irreparably Harmed ................................. 13

          E.    Great Harm Comes to Defendant by Injuction ............................... 14

          F.    The Public Interest is Not Served by an Injunction ........................ 15

    V.     CONCLUSION ................................................................ 15

CERTIFICATE OF COMPLIANCE ........................................................ 16

CERTIFICATE OF SERVICE............................................................... 17

ii

# INDEX OF AUTHORITIES

## CASES

*Allen-West Comm'n Co. v. Grumbles*,
129 F. 287 (8th Cir.1904) ............................................................................. 10

*Burges v. Mosley*,
304 S.W.3d 623 (Tex.App.—Tyler 2010, no pet.) ....................................... 8

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
762 F.2d 464 (5th Cir. 1985) ...................................................................... 14

*Grimsley v. Grimsley*,
632 S.W.2d 174 (Tex.App.—Corpus Christi 1982, no writ) .......................... 8

*Harmon v. Schmitz*,
39 S.W.2d 587 (Tex. Comm'n App.1931, judgm't adopted) ....................... 10

*Hilley v. Hilley*,
161 Tex. 569, 342 S.W.2d 565 (Tex.1961) ................................................ 8

*Hunt v. Bankers Tr. Co.*,
646 F. Supp. 59 (N.D. Tex. 1986) .............................................................. 14

*Janvey v. Alguire*,
647 F. 3d 585 (5th Cir. 2011) ..................................................................... 7

*Oadra v. Stegall*,
871 S.W. 2d 882 (Tex. App.—Houston [14th Dist.] 1993) .......................... 9

*Pankhurst v. Weitinger & Tucker*,
850 S.W.2d 726 (Tex. App.—Corpus Christi 1993, writ denied) ................ 8

*Pemelton v. Pemelton*,
809 S.W.2d 642 (Tex.App.—Corpus Christi 1991),
rev'd on other grounds, 836 S.W.2d 145 (Tex.1992) ................................. 8

*Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens, Inc.*,
318 MD 47 (1989) ....................................................................................... 10

*Yates v. Blake*,
491 S.W. 2d 751 (Tex. Civ. App.—Corpus Christi 1973) ............................ 9

**OTHER AUTHORITIES**

15 Am. Jur. 2d Charities § 137 .......................................................................... 10

15 Am. Jur. 2d Charities § 139 .......................................................................... 10

*https://www.irs.gov/charities-non-profits/charitable-organizations/*
    *donor-advised-funds* ................................................................................... 11

IRC 4966(d)(2) ................................................................................................... 10

TO THE HONORABLE UNITED STATES DISTRICT JUDGE CHARLES R. ESKRIDGE III:

Defendants, TRUE THE VOTE and CATHERINE ENGELBRECHT file this response to the Request for Temporary and Preliminary Injunction filed by Plaintiff Eshelman, and with respect thereto would show the court as follows:

<strong>I.</strong>     <strong><u>NATURE OF THE PROCEEDING</u></strong>

1. Plaintiff Eshelman seeks a return of a substantial donation to Defendant True the Vote.  He claims the gift was conditional, those conditions were not met, and the money is subject to reverter.  However, the donation was not "conditional" in any way, no matter how many times  Plaintiff chooses to characterize it in that manner.  There is not one document, not an email or a text which would indicate that the donation was conditional and subject to revocation.  Internal Revenue Code Rules and Regulations relating to charitable contributions do not permit donors to maintain control of donated funds, except under special circumstances not present here.  Regardless, everything that Plaintiff claims were the requirements of the so called conditional donation were met.  The activities of True the Vote were and have been completely consistent with the stated objectives of the organization at the time of the donation.  It is true that the results of the presidential election were not changed by these activities, but neither was there an imposed condition on positive results.  Plaintiff Eshelman is therefore not likely to prevail in this matter, and the imposition of an injunction would be improper and burdensome on True the Vote and Catherine Engelbrecht.

## II.   <u>**BACKGROUND FACTS**</u>

2.     True the Vote is a 501c(3) corporation that was founded by Catherine Engelbrecht in 2009.  The organization grew out of efforts by Ms. Engelbrecht and a small group of friends to monitor election procedures and provide support, training and education to others to work toward integrity at the ballot box.  These local efforts grew such that True the Vote is regularly called upon to provide their services in many places around the country.  The organization is non-partisan public service group, and therefore qualifies as a charitable institution to whom donations may enjoy tax benefits.  To our knowledge, True the Vote is the only organization in the country dedicated to these efforts in this manner.

3.     The activities of True the Vote occur throughout the year, but in presidential election years there is additional need for their services.  Even prior to the November election, True the Vote was giving advice, direction and training relative to questionable voter registration issues and then issues surrounding absentee and mail in balloting.  Once the Presidential election occurred, there were revealed a series of irregularities in various states, as widely reported in the media, and equally scoffed at as unreliable in the media. Though there are some skeptical of that which may be fairly called "voter fraud," since the Wednesday after Election Day there were sufficient identified events to warrant investigation in the days and weeks following the election.   True the Vote is one organization that has been researching and gathering information for the use of others in the evaluation and in some instances challenges of the voting procedures which led to unexpected election results.

4.      On November 5, 2020, two days after the election, Ms. Engelbrecht was contacted by a political consultant who indicated that he had a significant donor who might be interested in contributing to True the Vote and helping finance its efforts.  Over the next half hour, Ms. Engelbrecht was introduced to another consultant and then to Fred Eshelman, all on the same conference call.  In that call, Ms. Engelbrecht explained then current and ongoing activities of True the Vote which included an Election Integrity Hotline.  Mr. Eshelman expressed a desire to expand the Hotline to include a whistleblower program fund, which all agreed fit nicely with the ongoing efforts.  In the course of the conversation, which lasted minutes only, Mr. Eshelman pledged his support to the efforts and offered to contribute $2 million for the effort.  He wired the funds within hours on the same day.  Several days later, Mr. Eshelman contributed an additional $500,000.

5.      Significantly and importantly, there were no particular "strings" on the money that had been donated.  At the time of the contribution, True the Vote's then ongoing activities and what it would be able to do with a greater influx of funds was understood. Yet,  there was never a discussion that suggested the donated funds were conditional, were contingent upon certain actions or conduct, or were subject to being revoked if True the Vote somehow failed to perform a task or was not as successful in their efforts. Significantly, there is no contract, no letter, no email, no text or other writing of any sort to suggest that the donation was conditional in any way, or would be somehow subject to the continued control of the donor, Mr. Eshelman.  True the Vote disputes any parol claim that such a condition was placed on the donation.  It simply did not occur.

3

6.      It is important to note that in the immediate hours and days after the election, things were moving quickly.  Despite the allegation to the contrary, at the time of the initial introduction and subsequent donation from Mr. Eshelman on November 5 there were not yet any plans for the filing of lawsuits.  That strategy developed after the contribution, but literally on the same day after a conversation between Catherine Engelbrecht and her general counsel, co-defendant James Bopp.  Plaintiffs have also said that Mr. Eshelman was enticed with the "Validate the Vote" initiative, which included a list of planned activities.  In fact, the name "Validate the Vote" was given to Catherine Engelbrecht by the political consultant for Mr. Eshelman, who also said that he had the rights to the website with that name.  That all developed <u>after</u> the contribution was made.

7.      Mr. Eshelman expressed a desire to get more contributors for the project which all knew would be an expensive undertaking.  He asked for a document to outline the plan for him to use with others.  After the contribution, and then after both the legal strategy outlined by her attorney Bopp and the naming of the new project as "Validate the Vote," a new strategy was proposed.  Catherine Engelbrecht then put together a project sheet for "Validate the Vote" which included its goals:  gathering whistleblower testimonies, providing publicity relating to discoveries of wrongdoing, efforts to encourage legislative support in key states, sophisticated data analysis to identify patterns of election subversion, and the filing of lawsuits in key states.  The overall budget for this project was over $7 million.  All of this data was shared with Mr. Eshelman.

8.      During the course of the hectic days which followed the first meeting and contribution, True the Vote commenced its efforts on all of these initiatives.  The people

4

involved were working day and night, often with little to no sleep at all. During that time, Ms. Engelbrecht was in regular contact with the consultants Mr. Eshelman had retained, and who told Ms. Engelbrecht that all information best flowed directly through them. There were also various conversations with Mr. Eshelman.

9.    A key ingredient in all of the efforts, and that which is part of the expertise of True the Vote, is the gathering of data and comparing the registered voters, the legitimate voters, and the actual voters in a state's election. This data is needed to challenge the legitimacy of voting processes and to challenge the counting of illegal votes. The lawsuit strategy required, in order to be successful, the acquisition of the data in order to establish a likely right of recovery in those states where injunctions were sought. Getting the data in order to make this case was a challenge that the lawyers were hoping to overcome with considered attention from the courts.

10.    On November 13, 2020, Ms. Engelbrecht received a bill from the consultants for $1 million. The bill did not identify any detail of the work, efforts, or purpose of the invoice. It was unclear why Mr. Eshelman's hired political consultants would need to be paid by True the Vote rather than Mr. Eshelman himself. It was also completely unclear as to what the consultants had done to earn $1 million for their efforts in the week preceding. Ms. Engelbrecht spoke directly to Mr. Eshelman about the bill, who in turn contacted the consultants. Thereafter, the consultants expressed anger at Ms. Engelbrecht for going around them and straight to Mr. Eshelman.

11.    Within days, Mr. Eshelman was expressing frustration at not being previously kept in the loop on all activities, as well as frustration at what he perceived was

a lack of progress.  Coincidentally, it became apparent that the data necessary to make a prima facie case in the various courts where lawsuits were filed was not going to be available in time to avoid a likely dismissal.  Counsel made the decision to dismiss the lawsuits rather than expose the plaintiffs to ruinous claims of attorney fees by intervenors. Mr. Eshelman was angered by this decision of counsel.  He made a demand for an accounting of where his money was spent and asked for his money back.  Before there was a chance for all parties to ensure that the facts and circumstances surrounding all of these activities could be had, this lawsuit was filed.  This demand came eleven days after the initial contribution.

12.     Since the time of the demands, True the Vote has continued its efforts to support election integrity issues, which has been the goal from the start.  Through its activities, True the Vote has acquired whistleblower testimony and information which has led to four indictments so far in Arizona, federal investigations in Nevada and Georgia, and investigations by Michigan officials.  In addition, True the Vote was able to use the Georgia election code procedures to provisionally challenge the votes of over 364,000 people in Georgia prior to the Senate run off there.  These efforts led to True the Vote being sued by a progressive group called "Fair Fight," the Stacy Abrams group, in which litigation True the Vote is still involved.  Now, True the Vote is in the process of consulting and counseling several state legislatures on voting procedures and security, among other things, while it continues to work with various authorities to identify voting fraud, and build out local citizen-led election integrity teams nationwide to improve transparency, promote engagement, and increase confidence in our electoral process.  The foregoing facts

6

are supported by the declarations of Catherine Engelbrecht and Gregg Phillips, attached to this response, and the exhibits to those declarations.

### III.     STATEMENT OF ISSUES AND REVIEW

13.     In this request for Preliminary Injunction, this court must determine Plaintiff has:  1) A substantial likelihood of success on the merits; 2) A substantial threat of irreparable injury without an injunction; 3) that the threatened injury without injunction outweights the harm if injunction is granted; and 4) That the granting of injunction will not disserve the public interest.  *Janvey v. Alguire,* 647 F. 3d 585, 595 (5th Cir. 2011).  The most compelling issue for the court's determination will be whether Plaintiff is substantially likely, to prevail on his claim that the gift to True the Vote was indeed conditional by way of oral testimony only, and if so, then prove the conditions were not met.

### IV.     ARGUMENTS AND AUTHORITIES

**A.     The Gifts were Not Conditional**

14.     The fundamental flaw in Plaintiff's cause of action against all Defendants is the supposition that the donations made to True the Vote were conditional.  The attached affidavit of Catherine Engelbrecht (Exhibit A) makes clear that there was nothing in any conversation much less any other communication to suggest that the money Mr. Eshelman donated was conditional in any way, or in any way subject to having the gift returned. There is a big difference in making a donation to an organization in order to support its stated goals and desires, and a donation which is made only contingent on certain activities

7

being accomplished, and to the satisfaction of the donor.  Plaintiff's version of the donation would suggest that he essentially "hired" True the Vote to accomplish certain tasks.  Such is simply not the case.

15.     There was no contract of any sort that related to the contributions of Mr. Eshelman which might have spelled out any terms and conditions of the gift.  Likewise, there is not a single letter, email, text or any other writing which would support the claim that these funds were given only conditionally.  An examination of the caselaw relating to gifts and transfers reveals that these contributions could not be conditional.  A gift is a transfer of property made voluntarily and gratuitously.  *Hilley v. Hilley*, 161 Tex. 569, 342 S.W.2d 565, 568 (Tex.1961).  A gift requires:  1) an intent to make a gift; 2) delivery of the property; and 3) acceptance of the property.  *See Grimsley v. Grimsley*, 632 S.W.2d 174, 177 (Tex.App.—Corpus Christi 1982, no writ); *Pankhurst v. Weitinger & Tucker*, 850 S.W.2d 726, 730 (Tex. App.—Corpus Christi 1993, writ denied).  Lack of consideration is an essential characteristic of a gift such that an exchange of consideration precludes a gift. *Pemelton v. Pemelton*, 809 S.W.2d 642, 647 (Tex.App.—Corpus Christi 1991), rev'd on other grounds, 836 S.W.2d 145 (Tex.1992).  The reason is because if there was consideration for a gift, it is the "antitheses" of a gift.  *Id.*  A lack of consideration occurs when a contract, at its inception, does not impose obligations on both parties.  Without a mutuality of obligation, a contract is unenforceable.  *Burges v. Mosley,* 304 S.W.3d 623, 628 (Tex.App.—Tyler 2010, no pet.).

16.     There is no mutuality in obligations inherent in the donation by Mr. Eshelman.  The work that True the Vote was to accomplish, even by his own claims, was

not to benefit him.  Mr. Eshelman was not a candidate, and had no standing personally relating to any election.   He was not a party to any of the lawsuits, and did not personally benefit from the whistleblowers, the public relations activities, the organization of interested political forces or any other of the goals of True the Vote which he says were the conditions of his gift.  Mr. Eshelman clearly made the gift voluntarily, caused it to be delivered, and relinquished all title and control of the funds which he gave.  There is no reference to a requirement to approve the spending of money that he gave, to control how the money was spent, or to even provide input much less direction as to how the money was to be spent.  Instead, the money was given for the purposes of others—the goals of True the Vote, which goals Mr. Eshelman shared.

17.     Plaintiffs cite to two cases in their motion, neither of which support their theory in this case.  *Oadra v. Stegall,* 871 S.W. 2d 882 (Tex. App.—Houston [14th Dist.] 1993) and *Yates v. Blake,* 491 S.W. 2d 751 (Tex. Civ. App.—Corpus Christi 1973) are cited for the proposition that a. manifested intent to revoke a conditional gift causes title to a gift to remain with the donor.  This statement does not appear in either case.  Both the *Oadra*  and *Yates* cases relate to the effective delivery of property—one a trust account and the other a certificate of deposit.  These were probate matters.  In *Oadra*, the trust account at issue never left the control of the grantor.  871 S.W. 2d at 893.  In *Yates,*  the certificate of deposit ownership was retained by the grantor, even though the recipient had physical possession of the item.  491 S.W. 2d at 753.  There is nothing in these cases, or any other, that provides a right of reverter to a gift that has been actually transferred.

9

18.     An obligation to return money donated to a charitable organization only exists in the event an enforceable reversionary right exists by virtue of an agreement.  A charitable contribution is, by its nature, an irrevocable gift whereby the donor is releasing control of the property to the charity.  *See e.g.*, *Harmon v. Schmitz*, 39 S.W.2d 587, 589 (Tex. Comm'n App.1931, judgm't adopted)(*quoting Allen-West Comm'n Co. v. Grumbles*, 129 F. 287, 290 (8th Cir.1904)).  A charitable gift which is conditional is subject to return only when the donor is able to show the clear intent of both the conditions themselves and the specific intent that the gift would be returned if the conditions were not met.  15 Am. Jur. 2d Charities § 139.  The conditions must typically be found in the document or documents surrounding the transfer of the property.   15 Am. Jur. 2d Charities § 137.  However, neither the conditions nor the right to reverter are enforceable unless the intent is clear.  *Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens, Inc.,* 318 MD 47, 52 (1989).  No case can be found permitting a reverter of a charitable donation solely on the basis of oral testimony, and where there is neither an admission of the condition, nor circumstantial evidence of its existence.  Mr. Eshelman will have only oral testimony to support his claim, and this is not enough, particularly in light of all of the facts which otherwise surround this gift.

19.     The IRS provides guidelines for what it calls donor advised funds.  IRC 4966(d)(2). Such a requirement must be specifically set up in a manner and means that is not present here.  This is the only contemplated manner in which a donor may direct the use of donated funds after the donation, but even then it is only on an advisory basis, because as the IRS has stated, once the donor makes the contribution, the organization has

legal control over it. *See*: https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds.

**B.      True the Vote Fulfilled its Goals**

20.      Plaintiff's pleadings and discovery responses claim that the so called conditions allegedly placed on the donated funds were:  "True the Vote's efforts to investigate, litigate and publicize illegal balloting and other election fraud in connection with the 2020 general election."  Plaintiff claims that these conditions were laid out in solicitation materials prepared by True the Vote and circulated by Ms. Engelbrecht. Significantly, the promotional material that Plaintiff claims formed the basis of the conditions and representations (Exhibit 1 to Amended Complaint) was created after Mr. Eshelman's original $2 million donation.  Regardless, Defendants accomplished every one of the stated goals identified by Plaintiff as the condition for the donation.

21.      The attached affidavit of Catherine Engelbrecht (Exhibit A) and of Gregg Phillips (Exhibit B) makes clear that until the moment that the demand for return of the funds was made, and thereafter, the focus of all of True the Vote's efforts, and those of Ms. Engelbrecht herself, involved a tireless commitment to investigating, litigating and publicizing illegal balloting and other election fraud.  When the initial discussion with Mr. Eshelman occurred, the primary activity of True the Vote was the gathering of information from individuals, whistleblowers, who might testify and identify improprieties in the election process.  The litigation was commenced, but just like the many other filed lawsuits relating to the 2020 election which turned out to be functional dead ends, the lawsuits which were commenced through these efforts were dismissed because of a lack of then present

11

evidence.  Even after that, however, True the Vote continued to seek other means of acquiring evidence, as it does today, of election fraud so that such may be quelled in the future.  These efforts are already resulting in criminal investigations and indictments.

22.     Plaintiffs cannot credibly claim that True the Vote and Catherine Engelbrecht did not work and work hard to fulfill all of their stated goals.  As anyone paying attention to the news knows well, there were many and various people and groups from the highest and most powerful perches in America working to bring to light election fraud so as to make a difference in the reported election results.  True the Vote was one of those, and though there were tremendous successes that can be counted, and which are discussed in the affidavits of Catherine Engelbrecht and Gregg Phillips, the election results were not reversed.  Plaintiff does not claim he was promised a guaranteed result, only the effort. The effort was made, and then some.

## C.     Plaintiff has No Substantial Likelihood of Success

23.     Plaintiff must show that he has a substantial likelihood of success in his causes of action, all of which depend entirely on his claim the gift was conditional and the conditions were not met.  Yet, he presents a claim that he was enticed by representations from Catherine Engelbrecht in a telephone call and the written materials she provided then. Ms. Engelbrecht categorically denies that the contribution came with "strings" or conditions of any sort, and can conclusively show that the written materials that Plaintiff references were not created until after the money was already wired to the True the Vote account.  There are no writings or other circumstantial evidence to support Plaintiff's claims.  The suggestion the contribution was conditional came up for the first time only

after Mr. Eshelman was angered, and then demanded his money back.  As discussed above, to be conditional the gift must be clearly made in that way, and the notion that the gift was subject to reverter likewise needs to be clearly stated.  There will be no documentary evidence evidence before the court, leaving only oral testimony which will be controverted.

24.     Even more importantly is the fact that Plaintiff will not be able to credibly claim that the matters which he claims were the conditions to his gift were not satisfied. True the Vote and Catherine Engelbrecht worked tirelessly to fulfill the goals outlined in the Validate the Vote brochure, and initiated every one of them.  The biggest complaint Plaintiff seems to have relates to the dismissal of the various lawsuits filed.  The lawsuits themselves were each filed in the names of individual voters as party plaintiffs, with attorney James Bopp and other local counsel representing these indivuals.  The dismissals were the result of informed decisions by the lawyers, on behalf of the individual voters, and over which neither True the Vote nor Catherine Engelbrecht even had standing to affect.  Nevertheless, all other aspects of the project continued without relent, and many continue to this day.

**D.     Plaintiff Is Not Irreparably Harmed**

25.     Plaintiff seeks only the return of money, and money that he intended at the outset to never have returned to him.  If money damages are available as a remedy at law, then the harm is not "irreparable."  "[A]n injury is 'irreparable' only if it cannot be undone through monetary remedies.  Thus, the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs

heavily against a claim of irreparable harm." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985).

26.     Among other things, the trier of fact in this case will be required to determine what portion of the gift were not spent in accord with the conditions.  Such will be a fact intensive analysis.  It cannot be clear what amount of money Plaintiff would ever be entitled to recover at this time, if anything.  True the Vote is an active organization with over 7500 individual donations in the past year.  It is mere speculation on the part of Plaintiff that True the Vote would not be able to pay a judgement for money damages.  "[S]peculation is not sufficient to support a finding of an irreparable injury. Nor is the mere risk of harm irreparable injury.  There must be a present threat of substantial, noncompensable harm." *Hunt v. Bankers Tr. Co.*, 646 F. Supp. 59, 65 (N.D. Tex. 1986).  This extraordinary relief sought is unmerited.

**E.      Great Harm Comes to Defendant by Injuction**

27.     The relief sought by Mr. Eshelman is the freezing of all bank accounts of these Defendants.  This would mean, functionally, that all activities of True the Vote would need to stop, that it would not be able to afford to pay for its defense in this lawsuit.  Further, as a result of TTV's Validate the Vote project in Georgia, TTV has now been sued in federal court, *Fair Fight, Inc., et al. v. True the Vote, et al.*, Case No. 2:20-cv-00302 (N.D. Ga).  It requires funds to defend itself there as well.  The relief seeks to freeze Ms. Engelbrecht's personal bank account as well. Plaintiff, who made the donation to this 501c(3) never expecting to get the money back, and with suggestions there would be more,

is frankly not harmed at all.  The injction as to True the Vote and Catherine Engelbrecht would be crippling.

**F.    The Public Interest is Not Served by an Injunction**

28.    The public is not served by imposing on a charity the risk that a donor to a charitable organization may impose some later contrived "condition" on a donation, and succeed in shutting down that very organization.  It would mean that charities would be more likely to need to succumb to the directions of their donors, or risk ruinous litigation such as this, thereby causing the charity itself to have to subvert its own fiduciary duties to manage and control its assets.  Finally, and importantly, the valuable work of True the Vote, seeking the protection of the sanctity of the voting process so crucial to a functional democracy.  All other people who have donated to True the Vote—more than 7500 of them—will have their desires thwarted by this injunction.

## V.    <u>CONCLUSION</u>

28.    Plaintiff's claim for the extraordinary relief of a Preliminary Injunction is not justified.  The theory on which the entire case is based is severely flawed, and not consistent with the evidence.  The likelihood of success is not present because the gift of Plaintiff was not conditional, but even if the court finds otherwise, Plaintiff will never be able to prove that True the Vote and Catherine Engelbrecht failed to move forward on the initiatives the parties had discussed.  Further, weighing those matters unique to this remedy, Plaintiff cannot show irreparable harm.  The damage to Defendants and then to the public, as a result of this injunction would by contrast be devastating.  Plaintiff's Motion should be denied in all things.

Respectfully submitted,

THE AKERS FIRM, PLLC

By:  _____

Brock C. Akers
State Bar No. 00953250
The Clocktower Building
3401 Allen Parkway, Ste. 101
Houston, Texas 77019
(713) 877-2500
1-713-583-8662 (Fax)

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document complies with the Court's requirements, and that it contains 4,378 words, and is in 13 point type.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that, on this 21st day of January 2021, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  We also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner to those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Brock C. Akers

17