**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **FREDRIC N. ESHELMAN.**<br>*Plaintiff,*<br><br>v.<br><br>**TRUE THE VOTE,**<br>*Defendant* | **CIVIL ACTION NO. 4:20-CV-04034** |

# RESPONSE OF GREGG PHILLIPS AND OPSEC GROUP, LLC TO MOTION FOR TEMPORARY AND PRELIMINARY INJUNCTION

THE AKERS FIRM, PLLC
BROCK C. AKERS
TEXAS BAR NO. 00953250
THE CLOCKTOWER BUILDING
3401 ALLEN PARKWAY, SUITE 101
HOUSTON, TX 77019
TELEPHONE: (713) 552-0232
FACSIMILE: (713) 583-8662

ATTORNEY FOR DEFENDANTS,
GREGG PHILLIP AND OPSEC GROUP, LLC

**TABLE OF CONTENTS**

INDEX OF AUTHORITIES .................................................................................................iii

    I.      NATURE OF THE PROCEEDING ............................................................. 1

    II.     BACKGROUND FACTS .............................................................................. 2

    III.    STATEMENT OF ISSUES AND REVIEW ................................................ 4

    IV.    ARGUMENTS AND AUTHORITIES ......................................................... 5

         A.     The Gifts were Not Conditional ......................................................... 5

         B.     True the Vote Fulfilled its Goals ........................................................ 8

         C.     Plaintiff has No Substantial Likelihood of Success ......................... 10

         D.     Plaintiff Is Not Irreparably Harmed .................................................. 12

         E.     Great Harm Comes to Defendant by Injuction ................................ 13

         F.     The Public Interest is Not Served by an Injunction ......................... 14

    V.     CONCLUSION ............................................................................................ 14

CERTIFICATE OF COMPLIANCE ................................................................................. 15

CERTIFICATE OF SERVICE ........................................................................................... 16

# INDEX OF AUTHORITIES

**CASES**

*Allen-West Comm'n Co. v. Grumbles*,
   129 F. 287 (8th Cir.1904)...................................................................................... 7

*Burges v. Mosley,*
   304 S.W.3d 623 (Tex.App.—Tyler 2010, no pet.) ......................................................... 6

*Edwards v. Mid–Continent Office Distrib., L.P.,*
   252 S.W.3d 833 (Tex.App.—Dallas 2008, pet. denied) ................................................ 12

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*,
   762 F.2d 464 (5th Cir. 1985)...................................................................................... 13

*Everett v. TK-Taito, LLC,*
   178 S.W.3d 844 (Tex. App.—Fort Worth 2005)............................................................ 12

*Grimsley v. Grimsley*,
   632 S.W.2d 174 (Tex.App.—Corpus Christi 1982, no writ)........................................... 6

*Harmon v. Schmitz*,
   39 S.W.2d 587 (Tex. Comm'n App.1931, judgm't adopted........................................... 7

*Hilley v. Hilley*,
   161 Tex. 569, 342 S.W.2d 565 (Tex.1961).................................................................. 5

*Hunt v. Baldwin,*
   68 S.W.3d 117 (Tex.App.—Houston [14th Dist.] 2001, no pet.) ........................... 12, 13

*Janvey v. Alguire,*
   647 F. 3d 585 (5th Cir. 2011)..................................................................................... 4

*Khorshid, Inc. v. Christian,*
   257 S.W.3d 748 (Tex.App.—Dallas 2008, no pet.)...................................................... 11

*Oadra v. Stegall,*
   871 S.W. 2d 882 (Tex. App.—Houston [14th Dist.] 1993)............................................ 7

*Pankhurst v. Weitinger & Tucker*,
   850 S.W.2d 726 (Tex. App.—Corpus Christi 1993, writ denied) ................................ 6

*Pemelton v. Pemelton*,
   809 S.W.2d 642 (Tex.App.—Corpus Christi 1991), rev'd on other grounds, 836
   S.W.2d 145 (Tex.1992)............................................................................................... 6

*Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens, Inc.,*
   318 MD 47 (1989) .................................................................................................. 8

*Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,*
   300 S.W.3d 348 (Tex. App.—Dallas 2009, pet. denied) ................................. 11

*Waisath v. Lack's Stores, Inc.,*
   474 S.W.2d 444 (Tex.1971) ................................................................................ 11

*Yates v. Blake,*
   491 S.W. 2d 751 (Tex. Civ. App.—Corpus Christi 1973) .................................. 7

**OTHER AUTHORITIES**

15 Am. Jur. 2d Charities § 137 ................................................................................ 7

15 Am. Jur. 2d Charities § 139 ................................................................................ 7

*https://www.irs.gov/charities-non-profits/*
   *charitable-organizations/donor-advised-funds* ................................................ 8

IRC 4966(d)(2) ......................................................................................................... 8

TO THE HONORABLE UNITED STATES DISTRICT JUDGE CHARLES R. ESKRIDGE III:

Defendants, GREGG PHILLIPS and OPSEC GROUP, LLC (hereinafter called OPSEC) and file this response to the Request for Temporary and Preliminary Injunction filed by Plaintiff Eshelman, and with respect thereto would show the court as follows:

### I.  NATURE OF THE PROCEEDING

1. Defendants Phillips and OPSEC contracted with co-Defendant True the Vote to perform services relating to election integrity investigations. Neither Defendant has any relationship with Plaintiff, contractual or otherwise. True the Vote paid Phillips and OPSEC for their services, which included significant expenses. All of the money True the Vote has paid to these Defendants has been spent on salaries or expenses. Plaintiff Eshelman seeks a return of a substantial donation to True the Vote, claiming the gift was conditional, that the conditions were not met and the money is subject to reverter. The claims made against these Defendants are that the money that True the Vote paid to OPSEC was from Eshelman's donation, and therefore these Defendants are wrongfully holding Plaintiff's money. Plaintiff's claims that the money is subject to reverter are dependent upon the claim that the gift to True the Vote was conditional, and that those conditions were not met. These claims are without merit. Plaintiff is unlikely to prevail on the predicate question of whether the money given to True the Vote is subject to being returned, and therefore on the question of whether or not True the Vote's payment to OPSEC is likewise subject to return.

## II.  BACKGROUND FACTS

2. Gregg Phillips started OPSEC in 2019 in anticipation of the 2020 election, and incorporated OPSEC in 2020.  He is its sole owner.  With a background in politics, elections, and voter integrity issues and services, often surrounding the use of computers and sophisticated analysis of information.  He has purchased and possesses troves of data that are potentially useful in voter analysis.  Phillips has been acquainted with co-Defendant Catherine Engelbrecht for several years.  They have worked together in various voter integrity projects, and worked together on projects relating to the 2020 election.  He served on the board of True the Vote for a few years, but his term ended in 2017.

3. Seeing the need for significant efforts relating to the 2020 election, Phillips assembled a team for OPSEC which consisted of 14 research, data and analytics experts.  These people were all fully engaged in this work through the Georgia Senate run offs which occurred on January 5, 2021.  Phillips and OPSEC provided significant services to True the Vote, including research, the maintenance of a whistleblower/witness hotline, investigation of witnesses, employment of software to analyze data, communication, advisory, litigation support and other activities.  As a result of the extensive efforts, data collection and analysis of OPSEC, True the Vote was able to initiate over 364,000 citizen led challenges in Georgia.  Phillips and the OPSEC team worked with whistleblowers and various law enforcement to help secure indictments of people in Arizona accused of illegal voter harvesting, and has supplied information and data to various authorities in Georgia, Nevada, Pennsylvania and Michigan which may ultimately lead to more indictments.

4. In various states that engaged in litigation, he was in charge of the attempt to gather data and make connections and conclusions relating to voter activity and patterns in multiple states, working with a legal team in an effort to assemble data with the goal of being able to evaluate the veracity of the reported vote totals in the 2020 election. The acquisition of data is extremely expensive, often requiring expenditures of over $100,000 for a data set. Such expense is even before the data is then analyzed. For its various activities, OPSEC charged True the Vote $750,000. All of those funds were used to pay for the activities of OPSEC, to buy the expensive data, to pay for the salaries of the data team, travel to investigate and interview witnesses and security protection for whistleblowers whose lives were endangered because of their willingness to come forward with stories of illegality and outright fraud.

5. Phillips and OPSEC became aware of the contributions made by Mr. Eshelman to True the Vote. However, neither Phillips nor anyone from OPSEC had any contact with Mr. Eshelman at the time of the contributions, and did not participate in any discussions relating to the contributions with Mr. Eshelman. When the contributions were made, however, OPSEC was able to make much more significant purchases of data and expand operations to include more states in need of review and attention.

6. Phillips recalls only a single call with Mr. Eshelman, which occurred on November 16, 2020. It was in that call that Phillips discussed the progress made relative to gathering whistleblower witness evidence and the assembling of data. It was also the call that True the Vote General Counsel James Bopp explained that various lawsuits were dismissed. Mr. Eshelman expressed great anger, cursed at Catherine Engelbrecht, and

hung up the phone. Thereafter, neither Mr. Phillips nor anyone from OPSEC had direct contact with Mr. Eshelman.

7. The work of OPSEC continued thereafter, and continues to this very day. Though all of the money that was previously billed to True the Vote has been spent on these endeavors, the need continues and the work does as well. The work of OPSEC is currently more focused on assisting with the gathering of information for law enforcement officials, as well as working with various whistleblowers, to identify the perpetrators of voter fraud in several states. Likewise, OPSEC is working with True the Vote to consult with various authorities on means and methods to avoid voter harvesting and other instances of illegal conduct surrounding elections. These facts are supported by the Declarations of Gregg Phillips and Catherine Engelbrecht.

### III. STATEMENT OF ISSUES AND REVIEW

8. In this request for Preliminary Injunction, this court must determine Plaintiff has: 1) A substantial likelihood of success on the merits; 2) A substantial threat of irreparable injury without an injunction; 3) That the threatened injury without injunction outweighs the harm if injunction is granted; and 4) That the granting of injunction will not disserve the public interest. *Janvey v. Alguire,* 647 F. 3d 585, 595 (5th Cir. 2011). The most compelling issue for the court's determination will be whether Plaintiff is substantially likely, to prevail on his claim that the gift to True the Vote was indeed conditional by way of oral testimony only, and if so, then prove the conditions were not met. Assuming for argument's sake the court rules the gift was conditional and the conditions were not met, the court will need to determine if the money paid to OPSEC, and

already spent on the election integrity efforts, was somehow a conversion or subject to the cause of action for money had and received.

## IV. ARGUMENTS AND AUTHORITIES

### A. The Gifts were Not Conditional

9. The fundamental flaw in Plaintiff's cause of action against all Defendants is the supposition that the donations made to True the Vote were conditional. The attached affidavit of Catherine Engelbrecht (Exhibit A) makes clear that there was nothing in any conversation much less any other communication to suggest that the money Mr. Eshelman donated was conditional in any way, or in any way subject to having the gift returned. There is a big difference in making a donation to an organization in order to support its stated goals and desires, and a donation which is made only contingent on certain activities being accomplished, and to the satisfaction of the donor. Plaintiff's version of the donation would suggest that he essentially "hired" True the Vote to accomplish certain tasks. Such is simply not the case.

10. There was no contract of any sort that related to the contributions of Mr. Eshelman which might have spelled out any terms and conditions of the gift. Likewise, there is not a single letter, email, text or any other writing which would support the claim that these funds were given only conditionally. An examination of the caselaw relating to gifts and transfers reveals that these contributions could not be conditional. A gift is a transfer of property made voluntarily and gratuitously. *Hilley v. Hilley*, 161 Tex. 569, 342 S.W.2d 565, 568 (Tex.1961). A gift requires: 1) an intent to make a gift; 2) delivery of the property; and 3) acceptance of the property. *See Grimsley v. Grimsley*, 632 S.W.2d 174,

5

177 (Tex.App.—Corpus Christi 1982, no writ); *Pankhurst v. Weitinger & Tucker*, 850 S.W.2d 726, 730 (Tex. App.—Corpus Christi 1993, writ denied). Lack of consideration is an essential characteristic of a gift such that an exchange of consideration precludes a gift. *Pemelton v. Pemelton*, 809 S.W.2d 642, 647 (Tex.App.—Corpus Christi 1991), rev'd on other grounds, 836 S.W.2d 145 (Tex.1992). The reason is because if there was consideration for a gift, it is the "antitheses" of a gift. *Id.* A lack of consideration occurs when a contract, at its inception, does not impose obligations on both parties. Without a mutuality of obligation, a contract is unenforceable. *Burges v. Mosley,* 304 S.W.3d 623, 628 (Tex.App.—Tyler 2010, no pet.).

11.  There is no mutuality in obligations inherent in the donation by Mr. Eshelman. The work that True the Vote was to accomplish, even by his own claims, was not to benefit him. Mr. Eshelman was not a candidate, and had no standing personally relating to any election. He was not a party to any of the lawsuits, and did not personally benefit from the whistleblowers, the public relations activities, the organization of interested political forces or any other of the goals of True the Vote which he says were the conditions of his gift. Mr. Eshelman clearly made the gift voluntarily, caused it to be delivered, and relinquished all title and control of the funds which he gave. There is no reference to a requirement to approve the spending of money that he gave, to control how the money was spent, or to even provide input much less direction as to how the money was to be spent. Instead, the money was given for the purposes of others—the goals of True the Vote, which goals Mr. Eshelman shared.

12. Plaintiffs cite to two cases in their motion, neither of which support their theory in this case. *Oadra v. Stegall,* 871 S.W. 2d 882 (Tex. App.—Houston [14th Dist.] 1993) and *Yates v. Blake,* 491 S.W. 2d 751 (Tex. Civ. App.—Corpus Christi 1973) are cited for the proposition that a. manifested intent to revoke a conditional gift causes title to a gift to remain with the donor. This statement does not appear in either case. Both the *Oadra* and *Yates* cases relate to the effective delivery of property—one a trust account and the other a certificate of deposit. These were probate matters. In *Oadra*, the trust account at issue never left the control of the grantor. 871 S.W. 2d at 893. In *Yates,* the certificate of deposit ownership was retained by the grantor, even though the recipient had physical possession of the item. 491 S.W. 2d at 753. There is nothing in these cases, or any other, that provides a right of reverter to a gift that has been actually transferred.

13. An obligation to return money donated to a charitable organization only exists in the event an enforceable reversionary right exists by virtue of an agreement. A charitable contribution is, by its nature, an irrevocable gift whereby the donor is releasing control of the property to the charity. *See e.g.*, *Harmon v. Schmitz*, 39 S.W.2d 587,589 (Tex. Comm'n App.1931, judgm't adopted) (*quoting Allen-West Comm'n Co. v. Grumbles*, 129 F. 287, 290 (8th Cir.1904)). A charitable gift which is conditional is subject to return only when the donor is able to show the clear intent of both the conditions themselves and the specific intent that the gift would be returned if the conditions were not met. 15 Am. Jur. 2d Charities § 139. The conditions must typically be found in the document or documents surrounding the transfer of the property. 15 Am. Jur. 2d Charities § 137. However, neither the conditions nor the right to reverter are enforceable unless the intent

is clear. *Ringgold v. Queen Anne's Cty. Ass'n for Handicapped Citizens, Inc.*, 318 MD 47, 52 (1989). No case can be found permitting a reverter of a charitable donation solely on the basis of oral testimony, and where there is neither an admission of the condition, nor circumstantial evidence of its existence. Mr. Eshelman will have only oral testimony to support his claim, and this is not enough, particularly in light of all of the facts which otherwise surround this gift.

14. The IRS provides guidelines for what it calls donor advised funds. IRC 4966(d)(2). Such a requirement must be specifically set up in a manner and means that is not present here. This is the only contemplated manner in which a donor may direct the use of donated funds after the donation, but even then it is only on an advisory basis, because as the IRS has stated, once the donor makes the contribution, the organization has legal control over it. *See* [https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds](https://www.irs.gov/charities-non-profits/charitable-organizations/donor-advised-funds).

**B.  True the Vote Fulfilled its Goals**

15. Plaintiff's pleadings and discovery responses claim that the so-called conditions allegedly placed on the donated funds were: "True the Vote's efforts to investigate, litigate and publicize illegal balloting and other election fraud in connection with the 2020 general election." Plaintiff claims that these conditions were laid out in solicitation materials prepared by True the Vote and circulated by Ms. Engelbrecht. Significantly, the promotional material that Plaintiff claims formed the basis of the conditions and representations (Exhibit 1 to Amended Complaint) was created after Mr.

Eshelman's original $2 million donation. Regardless, Defendants accomplished every one of the stated goals identified by Plaintiff as the condition for the donation.

16. The attached affidavit of Catherine Engelbrecht (Exhibit A) and of Gregg Phillips (Exhibit B) makes clear that until the moment that the demand for return of the funds was made, and thereafter, the focus of all of True the Vote's efforts, and those of Ms. Engelbrecht herself, involved a tireless commitment to investigating, litigating and publicizing illegal balloting and other election fraud. When the initial discussion with Mr. Eshelman occurred, the primary activity of True the Vote was the gathering of information from individuals, whistleblowers, who might testify and identify improprieties in the election process. The litigation was commenced, but just like the many other filed lawsuits relating to the 2020 election which turned out to be functional dead ends, the lawsuits which were commenced through these efforts were dismissed because of a lack of then present evidence. Even after that, however, True the Vote continued to seek other means of acquiring evidence, as it does today, of election fraud so that such may be quelled in the future. These efforts are already resulting in criminal investigations and indictments.

17. Plaintiffs cannot credibly claim that True the Vote and Catherine Engelbrecht did not work and work hard to fulfill all of their stated goals. As anyone paying attention to the news knows well, there were many and various people and groups from the highest and most powerful perches in America working to bring to light election fraud so as to make a difference in the reported election results. True the Vote was one of those, and though there were tremendous successes that can be counted, and which are discussed in the affidavits of Catherine Engelbrecht and Gregg Phillips, the election results were not

reversed. Plaintiff does not claim he was promised a guaranteed result, only the effort. The effort was made, and then some.

### C. Plaintiff has No Substantial Likelihood of Success

18. Plaintiff must show that he has a substantial likelihood of success in his causes of action, all of which depend entirely on his claim the gift was conditional and the conditions were not met. Yet, he presents a claim that he was enticed by representations from Catherine Engelbrecht in a telephone call and the written materials she provided then. Ms. Engelbrecht categorically denies that the contribution came with "strings" or conditions of any sort, and can conclusively show that the written materials that Plaintiff references were not created until after the money was already wired to the True the Vote account. There are no writings or other circumstantial evidence to support Plaintiff's claims. The suggestion the contribution was conditional came up for the first time only after Mr. Eshelman was angered, and then demanded his money back. As discussed above, to be conditional the gift must be clearly made in that way, and the notion that the gift was subject to reverter likewise needs to be clearly stated. There will be no documentary evidence before the court, leaving only oral testimony which will be controverted.

19. Even more importantly is the fact that Plaintiff will not be able to credibly claim that the matters which he claims were the conditions to his gift were not satisfied. True the Vote and Catherine Engelbrecht worked tirelessly to fulfill the goals outlined in the Validate the Vote brochure, and initiated every one of them. The biggest complaint Plaintiff seems to have relates to the dismissal of the various lawsuits filed. The lawsuits themselves were each filed in the names of individual voters as party plaintiffs, with

10

attorney James Bopp and other local counsel representing these individuals. The dismissals were the result of informed decisions by the lawyers, on behalf of the individual voters, and over which neither True the Vote nor Catherine Engelbrecht even had standing to affect. Nevertheless, all other aspects of the project continued without relent, and many continue to this day.

20. In the unlikely event that Plaintiff is able to establish these fundamental facts, he must then prove a case against Phillips and OPSEC for conversion and money had and received. Conversion is the unauthorized and wrongful assumption and exercise of dominion and control over the personal property of another to the exclusion of, or inconsistent with, the owner's rights. *Waisath v. Lack's Stores, Inc.,* 474 S.W.2d 444, 447 (Tex.1971); *Khorshid, Inc. v. Christian,* 257 S.W.3d 748, 758–59 (Tex.App.—Dallas 2008, no pet.). To establish a claim for conversion, a plaintiff must prove that: 1) the plaintiff owned or had possession of the property or entitlement to possession; 2) the defendant unlawfully and without authorization assumed and exercised control over the property to the exclusion of, or inconsistent with, the plaintiff's rights as an owner; 3) the plaintiff demanded return of the property; and 4) the defendant refused to return the property. *Khorshid, Inc.,* 257 S.W.3d at 759; *Tex. Integrated Conveyor Sys., Inc. v. Innovative Conveyor Concepts, Inc.,* 300 S.W.3d 348, 365–66 (Tex. App.—Dallas 2009, pet. denied). Phillips and OPSEC sent an invoice to True the Vote for its services, which invoice was meant among other things to pay for the extensive expenses incurred for the election integrity operation. By the time that these Defendants were added to this lawsuit, the money had been spent. The money received by Phillips and OPSEC was hardly

acquired unlawfully or without authorization. The money came from the account of True the Vote, which money in turn came from that by many donors including Mr. Eshelman. There is no way to identify what portion of the money was from the Eshelman contribution as opposed to the thousands of other contributors who are not making a complaint and are thrilled with the work of True the Vote and those with whom they contract. Plaintiff could never demonstrate a substantial likelihood of success on this cause of action.

21. The doctrine of "money had and received" carries with it additional problems for Plaintiff. To prove a claim for money had and received, a plaintiff must show that a defendant holds money which in equity and good conscience belongs to him. *Edwards v. Mid–Continent Office Distrib., L.P.,* 252 S.W.3d 833, 837 (Tex.App.—Dallas 2008, pet. denied). It is an equitable doctrine applied to prevent unjust enrichment. *Everett v. TK-Taito, LLC,* 178 S.W.3d 844, 860 (Tex. App.—Fort Worth 2005); *Hunt v. Baldwin,* 68 S.W.3d 117, 132 (Tex.App.—Houston [14th Dist.] 2001, no pet.). Plaintiff cannot prove unjust enrichment. The money that OPSEC received from True the Vote was for services rendered, and to fund the massive expenses the voter integrity investigation required. All of these expenses were consistent with what even Plaintiff claims he expected the money would be spent for when the contribution was originally made. Most certainly, Plaintiff will not show a substantial likelihood of showing that Phillips or OPSEC were unjustly enriched when their invoice was paid.

D. **Plaintiff Is Not Irreparably Harmed**

22. Plaintiff seeks only the return of money, and money that he intended at the outset to never have returned to him. If money damages are available as a remedy at law,

then the harm is not "irreparable." "[A]n injury is 'irreparable' only if it cannot be undone through monetary remedies. Thus, the possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985).

23. Among other things, the trier of fact in this case will be required to determine what portion of the gift were not spent in accord with the conditions. Such will be a fact intensive analysis. It cannot be clear what amount of money Plaintiff would ever be entitled to recover at this time, if anything. Plaintiff has no information relating to the financial status of Phillips or OPSEC. It is mere speculation on the part of Plaintiff that either Phillips or OPSEC would not be able to pay a judgement for money damages, much less a determination of what those damages might be.. "[S]peculation is not sufficient to support a finding of an irreparable injury. Nor is the mere risk of harm irreparable injury. There must be a present threat of substantial, noncompensable harm." *Hunt v. Bankers Tr. Co.*, 646 F. Supp. 59 (N.D. Tex. 1986). This extraordinary relief sought is unmerited.

E. **Great Harm Comes to Defendant by Injuction**

24. The relief sought by Mr. Eshelman is the freezing of all bank accounts of these Defendants. This would mean, functionally, that all activities of OPSEC would need to stop, that it would not be able to afford to pay for its defense in this lawsuit. Plaintiff, who made the donation to this 501c(3) never expecting to get the money back, and with suggestions there would be more, is frankly not harmed at all. The injunction as to OPSEC would put it out of business.

## F. The Public Interest is Not Served by an Injunction

25. The public is not served by imposing on a charity the risk that a donor to a charitable organization may impose some later contrived "condition" on a donation, and succeed in shutting down that very organization. It would mean that charities would be more likely to need to succumb to the directions of their donors, or risk ruinous litigation such as this, thereby causing the charity itself to have to subvert its own fiduciary duties to manage and control its assets. Finally, and importantly, the valuable work of OPSEC on behalf of True the Vote, seeking the protection of the sanctity of the voting process so crucial to a functional democracy would come to a halt.

## V. CONCLUSION

26. Plaintiff's claim for the extraordinary relief of a Preliminary Injunction is not justified. The theory on which the entire case is based is severely flawed, and not consistent with the evidence. The likelihood of success is not present because the gift of Plaintiff was not conditional, but even if the court finds otherwise, Plaintiff will never be able to prove that True the Vote and Catherine Engelbrecht failed to move forward on the initiatives the parties had discussed. It is not likely that there would ever be a finding that OPSEC received money, in payment of its bill, in an improper manner, or that it was in any way unjustly enriched by performing the services for which it was hired. Further, weighing those matters unique to this remedy, Plaintiff cannot show irreparable harm. The damage to Defendants and then to the public, as a result of this injunction would by contrast be devastating. Plaintiff's Motion should be denied in all things.

Respectfully submitted,

THE AKERS FIRM, PLLC

By: _____
Brock C. Akers
State Bar No. 00953250
The Clocktower Building
3401 Allen Parkway, Ste. 101
Houston, Texas 77019
(713) 877-2500
1-713-583-8662 (Fax)

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document complies with the Court's requirements, and that it contains 4,097 words, and is in 13 point type.

**CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that, on this 21st day of January 2021, we electronically filed the foregoing document with the Clerk of the Court using CM/ECF. We also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner to those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Brock C. Akers*
———————————————
Brock C. Akers